LAW OFFICES
**CHARLES A. GRUEN**
Attorneys for Plaintiff, Greg E. Lindberg
381 Broadway, Suite 300
Westwood, New Jersey 07675
(201) 342-1212
(CG5456)


IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREG E. LINDBERG, | ) |
| *Plaintiff,* | ) Case No. 1:20-cv-08231 |
| - against - | ) **COMPLAINT** |
| DOW JONES & COMPANY, INC., | ) |
| *Defendant.* | ) |

Plaintiff Greg E. Lindberg ("Lindberg") brings this complaint against Dow Jones & Company, Inc. ("Defendant") and alleges the following:

<u>OVERVIEW</u>

1.      This lawsuit concerns the Wall Street Journal's publication of materially false and defamatory statements about Lindberg in February, March and October 2019.  The Wall Street Journal made these statements in articles published under the headlines "Financier Who Amassed Insurance Firms Diverted $2 Billion into His Private Empire" (February 28th digital edition),"Insurance Tycoon Diverts $2 Billion" (Front Page, March 1st print edition), and "'Active Interest': Insurance Tycoon Spied on Women Who Caught His Eye" (October 3rd digital edition, October 4th print edition).  These articles purported to delve into Lindberg's personal and professional lives, and Lindberg's holdings and activities in the domestic insurance industry in particular, portraying him, his businesses, his business dealings, and his personal relationships and interactions in a false light.  Indeed, and upon information and belief,

the journalists involved not only misstated the facts, but purposefully omitted facts that rebutted their desired narrative for the sole purpose of portraying Lindberg in a negative light.

2.      The Wall Street Journal is an international daily newspaper that is published six days a week by Defendant. The Wall Street Journal is one of the largest newspapers in the United States by circulation. As of August 2019, its circulation exceeded 2.8 million copies, which included over 1.8 million digital subscriptions. Given this circulation, any article that creates a negative impression of its subject can have significant repercussions.  When that article relies on deliberately provocative falsehoods, the repercussions can be disastrous.

3.      The repercussions have been disastrous. Lindberg is now in the unenviable position of being forced to bring this lawsuit to (1) correct the record on Defendant's false and defamatory statements, and (2) rehabilitate his reputation after the avalanche of events which have occurred since publication.

## THE PARTIES

4.      <u>Greg E. Lindberg</u>: Lindberg is a resident of Las Vegas, Clark County, Nevada.

5.      <u>Dow Jones & Company, Inc.</u>: Defendant is a Delaware corporation duly authorized to do business in New York. Defendant's principal office and place of business is in the City of New York, New York County, New York.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over Lindberg's claims pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity between the parties and the amount in controversy exceeds $75,000.

7.      This Court has personal jurisdiction over Defendant because it is a resident of New York.

8.      Venue in this district is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendant is a resident of this district, and a substantial part of the events or omissions giving rise to the claim occurred within this district.

## FACTUAL ALLEGATIONS

9.      The Wall Street Journal's reporting regarded Lindberg as an individual and businessperson.  This reporting focused primarily on Lindberg's insurance company holdings and his personal life.  Accordingly, the following allegations provide background facts that are necessary to both contextualize the defamatory reporting and highlight the reporting's falsity.

## I.      Lindberg – An Entrepreneur Whose Companies Service Vital Industries.

10.     Lindberg is the founder and sole owner of Global Growth, an investment firm, and the Global Growth family of companies.  Lindberg and Global Growth are engaged in business activities in industries as diverse as publishing, healthcare and insurance.  Global Growth's current portfolio consists of over 100 companies worldwide that employ over 8,000 individuals.  This portfolio generates over $1.4 billion in annual revenue.

11.     Global Growth grew from a company that Lindberg founded in 1991 as a college student. Lindberg launched Home Care Week, an insurance and compliance newsletter targeted to home health agencies, from his dorm room with only $5,000.  By 2000, Lindberg's company grew to approximately $5 million in annual revenue with no outside equity capital.  The company enjoyed approximately $1 million in annual profit by 2001.

12.     Lindberg and Global Growth reinvested that cash flow to fund over 100 acquisitions during the ensuing two decades.  These investments produced Global Growth's current portfolio and a compound annual growth rate of over 35% on equity capital.  In fact, Lindberg and Global Growth still publish Home Care Week to this day.

3

II. **Global Growth's Insurance Operations and Loans Met North Carolina Legal Requirements.**

13.     Lindberg's claims against Defendant regard reporting over several North Carolina-domiciled insurance companies the North Carolina Department of Insurance (the "Department") regulates.  These companies include Colorado Bankers Life Insurance Company ("Colorado Bankers"), Southland National Insurance Company ("Southland National"), and Bankers Life Insurance Company ("Bankers Life").

A.     **Global Growth Moves into the Insurance Industry.**

14.     Global Growth acquired Colorado Bankers in 2015 and Southland National in 2014. Global Growth redomesticated Colorado Bankers and Southland National to North Carolina, at the Department's request, shortly after the acquisitions closed.

15.     Lindberg and Global Growth sought the counsel of the Department before purchasing Colorado Bankers and Southland National.  Lindberg and Global Growth also kept the Department looped in during the acquisitions.  Lindberg and Global Growth's actions here included broaching discussions with the Department as early as 2012.  That was when Lindberg and Global Growth began evaluating whether the time was ripe to enter the insurance industry.

16.     Lindberg and Global Growth were interested in growing a world class life and annuity insurance platform.  This platform would offer highly competitive products and robust protections for policyholders.  This platform would also strive to replicate Berkshire Hathaway Inc.'s successful model

of investing insurance reserves in affiliated high-barrier-to-entry,[1] non-cyclical,[2] low capex,[3] and inflation-protected businesses[4] with long-term growth potential.[5] Lindberg and Global Growth had deep experience purchasing and managing those types of investments, which are often superior to the fixed income corporate bonds in which many insurers usually invest.

17.    The pre-2015 discussions between Lindberg, Global Growth, and the Department concerned the regulatory compliance issues that any acquisition would have to address to succeed. It was through these discussions that the Department became acquainted with the operations and investment philosophy of Lindberg and Global Growth.

18.    As an outgrowth of these discussions, Lindberg, Global Growth, and the Department explored the possibility of Global Growth investing a portion of insurance acquisition reserves in non-insurance affiliates. Lindberg and Global Growth proposed to invest 40% of insurance company assets in sub-investment grade middle market loans with the following characteristics:

(1)    A positive yield substantially over the risk-free rate in all interest rate environments;

---

[1] A high barrier to entry is the existence of high startup costs or other obstacles that prevent new competitors from easily entering an industry or area of business. Barriers to entry benefit existing firms because they protect their revenues and profits. Common barriers to entry include regulatory barriers, patents, network effect, strong brand identity or customer loyalty, and high customer switching costs.

[2] Cyclicality regards how highly correlated a company's performance is to economic fluctuations. Non-cyclical businesses experience profit regardless of economic gyrations because they produce or distribute goods and services always in need (e.g., food, water, healthcare) or are difficult to stop producing (e.g., nuclear power).

[3] Capital expenditures ("capex") is the money used by a company to either acquire, upgrade, or maintain assets such as property, industrial buildings, and equipment. Capex is often used to undertake new projects or investments like opening a new manufacturing facility to expand production capacity. A low-capex business is one that does not need large cash outlays to maintain or grow its business, which is attractive because it increases the overall return on money invested.

[4] Inflation-protected businesses are those that either are not affected by the overall increase in input prices or are more likely to have the ability to pass on those increases to their customers.

[5] Long-term growth potential simply means that a company either has a small share of a large market that it can continue to capture or is participating in an area of the economy that is likely to substantially grow over time.

On their own, each of the characteristics set forth in footnotes 2 through 6 is considered an attractive attribute. A combination of several typically creates a highly valuable and defensible asset. Berkshire Hathaway Inc. is one example. It is the most successful insurance company on the planet in large part because it invests most of its assets in affiliates that possess these characteristics.

(2)    Underlying assets pre-selected to be stronger, based on the criteria from Berkshire Hathaway Inc.'s model, which would allow for better crediting rates and lower default rates to protect policyholders;

(3)    Primarily variable rate in nature to protect policyholders from interest rate risk;

(4)    Strong performance covenants to avoid loss of principal and protect policyholders (unlike most corporate bonds in which typical insurance companies invest);

(5)    Monthly monitoring to detect problems early (unlike traditional corporate bond investments where investors receive information months after the fact);

(6)    Support from Lindberg through injection of additional capital, on an as-needed basis, into any underlying borrower where he maintained an economic interest;

(7)    Valuation of an insurer's books using ratings from a nationally recognized statistical rating organization;

(8)    Structuring on an arm's length basis to protect the insurer; and

(9)    Borrowers being separate and discrete bankruptcy-remote entities with no risk of contagion among themselves.

19.    These characteristics would make the loans substantially less risky than typical life insurance investments.  Even so, Lindberg and Global Growth offered to install additional buffers to protect policyholders:

(1)    A spread over the risk-free rate between 4% and 12%, which would be adjusted from time to time to maintain arm's length pricing;

(2)    Most of the loans as senior secured investments where the insurer/lender has a first claim on all assets and cash flows of the borrower, as well as a pledge of the borrower's stock;

(3)    Administration by a third-party agent; and

(4)    A third-party arm's length pricing opinion.

20.    Lindberg and Global Growth also did not want any domestic insurance companies they acquired to take on unnecessary or imprudent risk.  Accordingly, these insurers would seek to avoid long-term care risks, market volatility risks, inflation risks, and other reserve risks while maintaining a focus on easy-to-understand and reserve liabilities.  And if that was not enough, Lindberg offered his

6

entire net worth as a backstop guarantee of all affiliate loans and investments.[6]  This backstop would have the practical effect of increasing the capital and surplus available to the insurance companies, making them extraordinarily safe compared to other comparably-sized insurers.

21.     The proposal provided numerous safeguards to policyholders.  *It was also permissible under North Carolina law.*  For instance, N.C. Gen. Stat. § 58-7-170's limits on an insurer's investments in lower- and medium-grade obligations did not apply to obligations of affiliates.[7]  Section 58-19-10, which limited investments in a subsidiary to the lesser of 10% of the insurer's assets or 50% of its surplus, did not apply to investments in non-subsidiary affiliates.  Section 58-19-30 also permitted affiliate investments without limitation provided the terms of the investments were fair and reasonable.[8]

B.     **Global Growth Acquires Colorado Bankers and Southland National.**

22.     Following the above discussions, Lindberg and Global Growth approached senior-level Department staff in early 2014 to discuss the planned acquisition of Southland National.  Southland National was domesticated in Alabama at the time.  Lindberg, Global Growth, and the Department also discussed the possibility of investing a portion of Southland National's assets in non-insurance affiliates.

23.     The Department approved the acquisition in December 2014 and asked for Southland National to be redomesticated to North Carolina.  The Department also assented to a North Carolina-domiciled Southland National investing up to 40% of its assets in non-insurance affiliates.  These investments could be in the form of sub-investment grade affiliate loans.  A percentage of Southland National's assets, although less than the 40% of assets the Department approved, was eventually invested

---

[6] The offer to backstop exposed Lindberg to appreciable risk if an affiliate loan or investment went bad.  Having this "skin in the game" incentivized Lindberg to see to it that any affiliate loans and investments were stable and reliable.

[7] An affiliate investment that exceeded 3% of the insurer's admitted assets required approval or non-disapproval from the Department.

[8] North Carolina enacted legislation last year that revised these laws.  *See* S.L. 2019-179 (H 220), available at https://tinyurl.com/y4k7tvyp.

in sub-investment grade loans to Southland National's non-insurance affiliates as approved following the redomestication.

24.    Also in 2015, Lindberg and Global Growth approached senior-level Department staff regarding the planned acquisition of Colorado Bankers.   Colorado Bankers was domesticated in Colorado at the time.  As they did prior to the Southland National acquisition, Lindberg, Global Growth, and the Department discussed the possibility of investing a portion of Colorado Bankers' assets in non-insurance affiliates.

25.    The Department approved the acquisition of Colorado Bankers in December 2015.  It also asked Lindberg and Global Growth to redomesticate Colorado Bankers to North Carolina.  And as it had with Southland National, the Department assented to a North Carolina-domiciled Colorado Bankers investing up to 40% of its assets in non-insurance affiliates.  A percentage of Colorado Bankers' assets, although less than the 40% of assets the Department had approved, was invested in 2016 in non-insurance companies where Lindberg maintained a significant economic interest.

26.    Also around this time, the Department asked Global Growth to relocate its insurance team to North Carolina.  Global Growth did so.  It opened a new headquarters for its insurance operations in the City of Durham.  This relocation created over 100 high-paying insurance jobs in North Carolina.

C.    **Restructuring the Affiliate Loans to Further Protect Policyholders.**

27.    Lindberg, Global Growth, and the Department continued their discussions into 2016. These discussions focused on ways to ensure that the insurers' financial performance continued to benefit policyholders.  Lindberg, Global Growth, and the Department weighed a potential restructure of the affiliate loans into nonaffiliate loan backed and structured securities and an increase of the credit quality to investment grade.  The Department assented to the plan.  It coordinated with Global Growth to develop a strategy and structure for the undertaking.  The new structure included improving the investments'

credit ratings to investment grade and disaffiliating the investments through third party-controlled special purpose vehicles.

28.     The special purpose vehicle structure added tens of millions of dollars of additional collateral to protect policyholders and remove Lindberg, Global Growth, and affiliates as controlling parties (of the special purpose vehicles).   Having this structure meant that neither Lindberg nor any affiliate would have voting control, or right to acquire voting control, of the special purpose vehicles. Instead, full control of the special purpose vehicles would go to a third-party asset manager to ensure the special purpose vehicles were disaffiliated under North Carolina law.[9]

29.     Lindberg and Global Growth invested tens of millions of dollars in equity funding into the special purpose vehicles.   The funding allowed Global Bankers to make discounted purchases of loans.   Lindberg funded the amount of the discount personally in many instances.   This allowed the insurers to purchase the loans at an attractive discount and effectively rely on Lindberg's personal funds to increase the collateral coverage of the loans.   Lindberg's investment of his own money outside of the insurers also improved the credit quality of these loans.

30.     Further, several of the non-insurance affiliates filed Disclaimers of Affiliation with the Department on January 28, 2016.   These filings disclaimed control of the special purpose vehicles by Lindberg and others. The Department did not disapprove of the disclaimers and did not raise concerns about the special purpose vehicles.   This was unsurprising since the Department oversaw implementation of the restructure.

**D.     The Department Had Visibility into the Investment Strategy.**

31.     What should be clear from the preceding paragraphs is that Plaintiffs were transparent about their affiliate investment strategy from the outset.   There are several sections in Chapter 58 of the

---

[9] The Department had full visibility into this arrangement.  It did not raise concerns about the independence of the third-party asset manager.

North Carolina General Statutes that require insurers to give the Department notice of planned investments. Noticed investments and actions are deemed approved or disapproved within 30 days without further action by the Department.[10] Plaintiffs routinely provided notice of their investments and strategy following the first affiliate investment. The Department never rejected the noticed investment limits prior to 2017.

## III.  The Department's Change After the 2016 General Election.

32.     Mike Causey ("Causey") is the current North Carolina Commissioner of Insurance. He was elected to office in November 2016. Upon information and belief, this is the first elected office he has ever held.

33.     The 2016 general election also appears to have been the first general election that Causey has ever won. Causey ran for North Carolina Commissioner of Insurance in 1992, 1996, 2000, and 2012. He lost each election. Causey then came in a distant seventh in the 2014 Republican Party primary election for the United States House of Representatives, North Carolina District 6.

34.     Lindberg and others within Global Growth supported the incumbent insurance commissioner's campaign. Lindberg's support of the incumbent and opposition to Causey was a publicly known fact. Causey took note.

35.     Causey took office on January 1, 2017. Almost immediately after that, processing and approval of the companies slowed.[11] Causey also directed Department staff to "investigate" Plaintiffs'

---

[10] *See generally* N.C.G.S. § 58-19-30 ("Standards and management of an insurer within an insurance holding company system").

[11] Turnaround on customary transactional holding company act filings took months instead of days. Approval of a routine tax sharing agreement and an intercompany reinsurance transaction took nearly six months. Approval of a routine cost-sharing agreement took more than five months. Approval of a Form A waiver took around six months—an unheard-of delay—even though the waiver regarded merging two wholly owned Southland National subsidiaries into Southland National.

business activities.  Per John Woodard, a Department employee, Causey ordered an investigation of Lindberg because Causey "was concerned about [] Lindberg's business activities."[12]

36.     The Department represented that its interest in the insurance operations and investment strategy was simply routine.  Over the next several months—indeed, over the period between Causey taking office and publication by the Wall Street Journal, Lindberg and Global Growth endeavored to resolve every question and satisfy every inquiry the Department made.

## IV.     The Wall Street Journal Attacks Lindberg.

37.     Despite the foregoing, in late 2018 editors for the Wall Street Journal reached out to Lindberg about a story the newspaper was developing.  Mark Maremont, Senior Editor ("Maremont"), and Leslie Scism, News Editor ("Scism"), advised Lindberg that they were preparing an article regarding him.  They asked Lindberg whether he was willing to answer several questions they had about himself, Global Growth, insurance company acquisitions, affiliate investments, etc.  Maremont and Scism gave no indication as to how long the Wall Street Journal had been developing this story.  They also did not disclose the identities of any of the persons who had been contacted to, or did, provide information, records, comment or background.  As a matter of fact, they did not explain *why* editors at the Wall Street Journal considered such a story to be newsworthy at that time.

38.     Lindberg, a private person, initially declined comment.  He changed his mind, however, when he came to understand that the Wall Street Journal had what he believed was false information and as a result would be casting him and his companies' business dealings in a false and negative light.

39.     Lindberg's new advisors engaged with the Wall Street Journal soon after that.  The advisors responded to Maremont and Scism's voluminous questions and provided additional details and information over the course of several months.  The tenor and tone of these questions only confirmed

---

[12] John Woodard, *Omitted Details Color Reporting on Donor Scandal*, The Daily Advance (Apr. 7, 2019), https://tinyurl.com/y4twxw22.

Lindberg's earlier understanding—the Wall Street Journal intended to publish a negative article about him and his companies' dealings based on misunderstandings and false information. The questions also confirmed that Maremont and Scism had sourced a good deal of the story's content from persons who were emotionally, politically, or financially vested in seeing Lindberg and his success become the subject of damaging publicity.

40.     The Wall Street Journal published its first article about Lindberg and Global Growth's business dealings in the February 28, 2019 digital edition of the newspaper. The headline for the article was "Financier Who Amassed Insurance Firms Diverted $2 Billion into His Private Empire."[13] The efforts to educate Maremont and Scism prior to publication by providing them with information that contradicted that headline and much of the story seemed to have fallen on deaf ears. As a result, the February 28th article was inflammatory and rife with defamatory falsehoods. It wrongly sought to impress upon the reader that Lindberg was personally enriching himself at the expense of the insurance companies' policyholders, or that Lindberg and his businesses had been operating in an unethical, unsavory or legally dubious manner. The more egregious falsehoods in the article included the following:

(1)     Lindberg "diverted" "huge sums" "from the group of life insurance firms he began assembling in 2014." This was false, reckless and defamatory because all assets had been prudently invested, with full transparency with the Department, as originally agreed upon with the Department in 2014;

(2)     Money was invested in affiliated entities that were "insolvent" or "appeared insolvent." A well-known third-party valuation firm found, that loans to companies where Lindberg maintained a significant economic interest were made at a conservative 39% loan to value and with a 280% collateral coverage. Further, there had never been a "going concern" or "insolvency" opinion on any borrower where Lindberg maintained a significant economic interest;

(3)     Lindberg diverted or "lent at least $2 billion from those insurers to scores of entities he controlled, using much of it to expand his private holdings." It was false, defamatory and reckless to suggest that Lindberg diverted insurance company funds "to expand his private holdings." And to imply or state that he used insurance funds to buy an estate in the Florida Keys, an Idaho lakeside retreat, a Gulfstream jet, the most expensive mansion

---

[13] https://tinyurl.com/y3sp6q4l.

ever sold in Raleigh, North Carolina, or a 214-foot yacht. For example, Lindberg leased an airplane in 2014, before he acquired his first insurance company, and the plane had been used primarily for business. The second airplane, also used primarily for business, was purchased in 2018 and was financed by a third-party lender; no insurance company funds were used in the purchase. Similarly, no insurance company funds were used to invest in real property in Idaho or Key West, Florida, or in a yacht;

(4)   "The sheer scale of [] Lindberg's use of insurance assets . . . exposes hundreds of thousands of policyholders across the U.S. and in Europe to an unusual and potentially risky strategy." To the contrary, the insurers' middle market lending program to companies where Lindberg maintained a significant economic interest was an extraordinary success for policyholders: high yields, inflation protection, senior-secured with stock pledges of borrowers, diversified, and zero payment defaults. Combined with the sizable liquid corporate bond and money market portfolios of the companies, the middle market loan investments provided superior risk-adjusted returns for policyholders. Prior to the article, the domestic insurers held over $2 billion of cash, cash equivalents, and liquid bonds—a higher percentage of liquid assets than most life insurers. With this large and highly liquid portfolio, combined with the insurers' middle market lending program, policyholders had the best of both worlds: strong liquidity from a large, liquid portfolio and high inflation-protected yields from middle market loans with a zero payment-default rate. In other words, the insurers had not sacrificed overall portfolio liquidity to achieve superior returns. And given the fact that Lindberg had committed to personally backstopping or guaranteeing all transactions with affiliated companies with his entire net worth, which had been independently valued by a third party at $1.7 billion, he was taking nearly all, if not all, of the risk. This gave policyholders an unusually low risk situation.

(5)   "The sheer scale of [] Lindberg's use of insurance assets . . . has little precedent." Berkshire Hathaway Inc., one of the most successful insurers in the world, had routinely invested a large percentage of its insurance reserves in affiliates, and continues to do so to this day. The affiliate investment strategy by Berkshire Hathaway Inc. is largely the reason for its success. The Global Growth insurers deployed a similar strategy, but unlike Berkshire Hathaway Inc., they primary invested in senior secured debt where the full stock of the borrower was pledged as collateral to the insurance company lender, giving policyholders the full benefit of the equity of the borrower as additional collateral without taking direct risk for fluctuations in equity values. Furthermore, the insurers enjoyed Lindberg's personal backstop of all investments in companies where he had a significant economic interest, and as a result, the domestic insurers never lost money on such investments;

(6)   "The insurers disguised the flow of money." Lindberg and the Global Growth team were fully transparent with regulators on SPV structure, and the SPVs were implemented at the suggestion and with the assent of the Department. Furthermore, the insurers have monthly reports to the Department detailing all investment transactions, including all investment transactions in companies where Lindberg maintained a significant economic interest. The Department routinely reviewed these monthly submissions and requested

follow-up data as needed, which the insurers always provided.  Lindberg also personally invested tens of millions of dollars in capital to enhance the credit quality of these loans;

(7)     (Regarding the use of SPVs) "<u>Lindberg found a strategy that would allow him to contend on regulatory filings that his affiliated investments were, in fact, unaffiliated.</u>"  The Department suggested the SPV structure and was involved in and assented to the structure's development; and

(8)     (Regarding alleged dividends from the insurers to Lindberg) <u>Lindberg was taking dividends or "insurance money was flowing into his pockets.</u>"  Before the first insurance company acquisition, the Global Growth team established a no-dividend policy to protect policyholders and ensure that the capital that invested was permanent capital.  The Department was aware of that policy from the outset.  That no-dividend policy has remained in place.  What's more, contrary to taking dividends or having insurance money "flow into his pockets," the Global Growth team under Lindberg's leadership invested over $500 million in the domestic insurers, including for the hiring of experienced leadership and the development of a state-of-the-art digital policy administration platform for the companies' new insurance products.

41.     Lindberg's team reached out to Defendant soon after receiving notice of publication.  The team memorialized the falsehoods in the article and asked Defendant to address them before the article appeared in the print edition.  For instance, counsel for Lindberg asked Defendant to replace the word "diverted" as it suggested that Lindberg had engaged in illegality or otherwise implied wrongdoing.  Counsel further noted that Lindberg's team

> spent months working with your reporters and answered scores of questions they posed.  Notwithstanding the information we provided, they nonetheless failed to include some relevant materials in the article or otherwise mischaracterized certain aspects of Mr. Lindberg's business dealings that we made very clear.  A detailed summary of our concerns follows.  We request that you promptly review and make the necessary corrections, to prevent further irreparable harm and damage.[14]

42.     Defendant agreed to make minor revisions in response to the Lindberg team's request for corrections.  However, Defendant reiterated an earlier refusal to revise the egregious and defamatory falsehoods set forth in paragraph 40 above.  With regard to its use of "diverted," for example, the Wall

---

[14] *See* Exh. 1, attached.

Street Journal's representative responded that, "[t]he use of the word 'diverted' in both the headline and in the body of the Article is accurate and therefore no correction is warranted."[15]

43.     Defendant doubled down on its decision when to the Wall Street Journal republished the article on March 1, 2019 with only minor modifications.  The republished article appeared on the front page of the March 1, 2019 print edition of the Wall Street Journal.  The headline for this version was "Insurance Tycoon Diverts $2 Billion."  It was accompanied by an equally defamatory by implication illustration. The article contained each of the previously identified materially false and defamatory statements.

44.     The market's reaction to the print version was immediate.  For one, an NRSRO threatened negative changes to some of its ratings on Lindberg's companies based on the article.  For another, a financial institution threatened to suspend certain business with Lindberg's companies, again because of the article.  The reaction was so immediate and negative, in fact, that Lindberg's team was forced to issue a press release that clarified and corrected the many material falsehoods and harmful statements in the article.  This press release had limited effect, however, as a distributor to one of Lindberg's insurers stopped placing business with it on March 4, 2019.  The distributor cited the article as the basis for its decision.

45.     Further, the articles provided a rationale for the Department to push the Global Growth insurance companies into rehabilitation in June 2019, impacting policyholders and leading to millions of dollars of losses in Lindberg's holdings.

## V.     The Wall Street Journal Renews Attacks on Lindberg.

46.     Not one to rest on its laurels, the Wall Street Journal renewed its attacks on Lindberg in October 2019.  Having successfully tarnished his reputation as a businessperson, the Wall Street Journal

---

[15] *See* Exh. 2, attached.

decided to go after Lindberg's private life.  In its October 3, 2019 digital edition, the Wall Street Journal

published a new article about Lindberg and his personal affairs.  The headline for the article was "'Active

Interest': Insurance Tycoon Spied on Women Who Caught His Eye."[16]  Maremont and Scism were again

the editors of the story and, as before, had sourced a good deal of the story's content from persons who

were emotionally, politically, or financially vested in seeing Lindberg become the subject of damaging

publicity.

47.     This article certainly sought to draw attention to itself.  Accompanied by slick graphics

influenced by the most memorable Hollywood spy thrillers, Maremont and Scism deftly channeled their

inner Tom Clancy to generate reader interest.  Indeed, it was apparent from the lede that this article

would depart from the February and March reporting about Lindberg:

> Federal investigators were closing in on Greg Lindberg . FBI agents confronted the North
> Carolina insurance tycoon last year as they probed whether he tried to bribe a state
> regulator. In March, officials obtained a sealed warrant for his arrest. His attorneys were
> negotiating his surrender.

> Mr. Lindberg also had something else on his mind—the comings and goings of a number of
> women he was dating, interested in dating or, in at least one case, cultivating as an egg
> donor for his future offspring.

48.     After hooking readers with the possibility of learning sordid, salacious details of

"surreptitious photos," "GPS trackers," and romantic encounters with models and pageant contestants,

the article shifted gears to alert readers to the Wall Street Journal's February and March reporting.  The

article provided the following statement about this reporting, with a hyperlink so readers who may have

been unfamiliar with it could access it:

---

[16] https://tinyurl.com/y3byj3wx.

Mr. Lindberg's unorthodox pursuit of romantic interests is a previously unreported sign of the entrepreneur's lavish lifestyle since he started acquiring life insurers in 2014. He bought a private jet and luxury properties, and just a few weeks after the Federal Bureau of Investigation confronted him about its bribery probe, he paid about $40 million for a 214-foot yacht.

The spending took off after Mr. Lindberg began lending at least $2 billion of the insurers' funds to his private conglomerate, the focus of a Journal investigation in February.

49.     What followed this trip down memory lane was reporting that would not have seemed out of place had it appeared in a tabloid. The Wall Street Journal was apparently aware of this, so it sought to give off the appearance of legitimacy. It did so by making numerous and repeated references to interviews or conversations with "former security staffers," "former operatives," and "former staffers," as well as confidential information and records provided by them.

50.     Some former staffers and operatives have since been revealed as sources for the article and the confidential information that appeared in it. For instance, one of them was a former contractor based in the Los Angeles area. Another was a former employee of the Lindberg-owned company which was responsible for his personal security. In late Spring and Summer 2019, these individuals communicated with Maremont and Scism several times, both in person and electronically, to share information as part of the lead up to publication, with one even going so far as to meet with Maremont over stogies at a beachfront cigar bar.

51.     Developing and cultivating sources is a tool of the investigative journalist's trade. After their reporting in February and March 2019, Maremont and Scism—and by extension Defendant—likely expected that others with an emotional, political, or financial interest in harming Lindberg may have more information about him. And being investigative journalists with a major international daily newspaper published by Defendant, Maremont and Scism would not have been strangers to interacting

with potential sources who were constrained by what records or information they could provide because of an existing confidentiality or non-disclosure agreement.

52.     That was the case here.  The former staffers and operatives that have been revealed as sources did, in fact, have confidentiality and non-disclosure agreements that prohibited them from divulging confidential and proprietary information and trade secrets to the Wall Street Journal.  These same persons, due to the sensitive nature of some of the services they were providing for Lindberg, or on his behalf, as well as the confidential information they possessed, stood as fiduciaries of Lindberg. Upon information and belief, Maremont and Scism—and by extension Defendant—were aware of the existence of these agreements and fiduciary relationships.  Still, they actively encouraged and persuaded these individuals to breach their contractual and fiduciary obligations and part with Lindberg's confidential information and records, some of the details of which appeared in the October 3, 2019 article.

53.     In addition, the October 3rd article was inflammatory and contained defamatory falsehoods.  It sought to reinforce the impression that Lindberg and his businesses had been operating in an unethical, unsavory or legally dubious manner.  It also sought to create the impression that Lindberg harassed, stalked and victimized women in his personal life.  Some of the falsehoods in this article included the following:

(1)     There was a "financial hole at his insurers [which] could exceed $1 billion."  To the contrary, reports previously provided to the Wall Street Journal in fact showed Lindberg's net worth reached $1.7 billion.  Further, a report from a well-recognized national valuation firm found recently that, as of December 31, 2019, Global Growth's assets were between $860 million and $1.46 billion on a fair market value basis.  These numbers were net of all liabilities, meaning affiliate investments and loans made by Lindberg's insurance companies were very well secured, and the Wall Street Journal's reporting was off by $1.8 billion to $2.7 billion.

(2)     "Lindberg also scoured Instagram for prospective partners, often aspiring models." Lindberg did not maintain an Instagram account through which he would search for "prospective partners."

(3)    MM, one of the "interests," was subject to "surveillance . . . without her knowledge." Contrary to the Wall Street Journal's reporting, close protection services were provided to MM at her request and with her consent. Indeed, this security would have been prudent given that MM was Lindberg's fiancée.

54.    Because of Defendant's wrongful conduct and the publication of the above articles, Lindberg has been severely harmed. In addition to experiencing reputational loss, Lindberg has been harmed economically. For instance, shortly after publication of the October 3rd article, one of Lindberg's companies lost an $800 million financing. The party on the other side of the deal cited the article as the basis for its decision to back out.

## CLAIMS FOR RELIEF

### Count I
### Defamation

55.    Lindberg incorporates the allegations he sets forth in numbered paragraphs 1 through54 of this complaint.

56.    Defamation is "the making of a false statement which tends to expose the target to public contempt, ridicule, aversion or disgrace, or induce an evil opinion of him in the minds of right-thinking persons, and to deprive him of their friendly intercourse in society." *Foster v Churchill*, 87 NY2d 744, 751, 665 NE2d 153, 642 NYS2d 583 (1996). Defendant, via the Wall Street Journal, published and made materially false and defamatory statements regarding Lindberg to the public on February 28, March 1, 2019, and then republished them on October 3, 2019 (along with new materially false and defamatory statements). Defendant made these materially false and defamatory statements without privilege or authorization. These materially false and defamatory statements included that:

(1)    Lindberg "diverted" "huge sums" "from the group of life insurance firms he began assembling in 2014[;]"

(2)    Money was invested in affiliated entities that were "insolvent" or "appeared insolvent[;]"

(3)    Lindberg "lent at least $2 billion from those insurers to scores of entities he controlled, using much of it to expand his private holdings[;]"

19

(4) "The sheer scale of [] Lindberg's use of insurance assets . . . exposes hundreds of thousands of policyholders across the U.S. and in Europe to an unusual and potentially risky strategy[;]"

(5) "The sheer scale of [] Lindberg's use of insurance assets . . . has little precedent[;]"

(6) "The insurers disguised the flow of money[;]"

(7) (Regarding the use of SPVs) "Lindberg found a strategy that would allow him to contend on regulatory filings that his affiliated investments were, in fact, unaffiliated[;]"

(8) (Regarding alleged dividends from the insurers to Lindberg) Lindberg was taking dividends or "insurance money was flowing into his pockets[;]"

(9) There was a "financial hole at his insurers [which] could exceed $1 billion[;]"

(10) "Lindberg also scoured Instagram for prospective partners, often aspiring models[;]" and

(11) MM, one of the "interests," was subject to "surveillance . . . without her knowledge."

57. Lindberg has been harmed because of the publication of these materially false and defamatory statements, as already set forth in the factual allegations above. Further, these various statements implied that he committed serious crimes or ethical lapses. They also injured his standing in his trade, business and profession, particularly in the domestic insurance industry. Individually and taken together, these statements are defamatory *per se*.

58. Defendant published these statements in bad faith and with actual malice to injure Lindberg's reputation and business. It is apparent that, at the time it made these statements, Defendant knew the statements were materially false and defamatory, or Defendant made them with a reckless disregard for the truth. Lindberg seeks a recovery of compensatory and punitive damages for Defendant's conduct.

59. To the extent that Defendant seeks to assert limitations as a defense to portions of this claim which relate to the February and March 2019 reporting, republication occurred on October 3, 2019. Therefore, limitations does not act as a bar to any portion of Lindberg's claim for defamation.

## Count II
## Aiding and Abetting Breach of Fiduciary Duty

60.     Lindberg incorporates the allegations he sets forth in numbered paragraphs 1 through 59 of this complaint.

61.     As established above, individuals who served as sources for the October 3, 2019 article regarding Lindberg were obligated and bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to Lindberg; were obligated to exercise due care and diligence to preserve, maintain, and protect Lindberg's confidential and proprietary information and trade secrets from public disclosure; owed Lindberg fiduciary duties of loyalty and good faith; and were duty bound to act in a responsible and lawful manner, in good faith, so as not to cause injury to Lindberg.

62.     These individuals breached their fiduciary obligations of due care and loyalty to Lindberg by, among other things, disclosing confidential information and documents to Defendant via the Wall Street Journal.  This confidential information and documents included internal reports regarding close protection services that Lindberg and others close to him had received which, given the intimate and sensitive nature of the information, could subject Lindberg to harm if disclosed.  Lindberg was, in fact, injured and sustained damages as a direct and proximate result of these breaches.

63.     Defendant, via the Wall Street Journal, Maremont and Scism, had actual knowledge that these individuals owed fiduciary duties to Lindberg.  Defendant knew the information and records these individuals could provide was of a confidential and sensitive nature and could harm Lindberg if disclosed.  Nevertheless, Defendant substantially assisted and participated in the breaches of these fiduciary obligations by (1) actively encouraging and persuading these individuals to provide confidential information and records regarding Lindberg, (2) knowingly accepting this information with the intent of publishing details from it, and (3) publishing some of this information as part of the October 3, 2019 article regarding Lindberg.

64.     Lindberg was damaged as a direct and proximate result of Defendant's substantial participation in the underlying breach of fiduciary duties.  Lindberg seeks a recovery of compensatory and punitive damages for Defendant's conduct.

**Count III**
**Tortious Interference with Contract**

65.     Lindberg incorporates the allegations he sets forth in numbered paragraphs 1 through 64 of this complaint.

66.     As established above, individuals who served as sources for the October 3, 2019 article regarding Lindberg were obligated and bound by confidentiality and non-disclosure agreements to preserve, maintain, and protect Lindberg's confidential and proprietary information and trade secrets from public disclosure.

67.     Defendant, via the Wall Street Journal, Maremont and Scism, was aware that these individuals were subject to confidentiality and non-disclosure agreements.  Defendant was aware of the existence of these agreements when Maremont and Scism communicated with these individuals in late Spring and Summer 2019.  Nevertheless, Defendant intentionally sought to have these individuals breach their contracts for the express purpose of securing Lindberg's confidential information and records.  This confidential information and documents included internal reports regarding close protection services that Lindberg and others close to him had received which, given the intimate and sensitive nature of the information, could subject Lindberg to harm if disclosed.  Defendant was successful in securing this information and Lindberg was, in fact, injured and sustained damages as a direct and proximate result of Defendant's interference.  Lindberg seeks a recovery of compensatory and punitive damages for Defendant's conduct.

**CONDITIONS PRECEDENT**

68.     All conditions precedent have been performed, have occurred, or have been waived.

22

## REQUEST FOR RELIEF

WHEREFORE, Lindberg respectfully requests that this Court:

1.      Award Lindberg compensatory damages as permitted or provided by law;

2.      Award Lindberg punitive damages as permitted or provided by law;

3.      Award Lindberg his attorney's fees as permitted or provided by law;

4.      Tax the costs of this action against Defendant; and

5.      Provide such other and further relief that this Court deems just and proper.


LAW OFFICES OF CHARLES A. GRUEN
Attorneys for Plaintiff

By:_____
        Charles A. Gruen (CG5456)

381 Broadway, Suite 300
Westwood, New Jersey 07675
(201) 342-1212

Dated:   October 2, 2020