PATTERSON BELKNAP WEBB & TYLER LLP
Robert P. LoBue (RL-2284)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | | |
|---|---|---|
| GREG E. LINDBERG, | ) | Case No. 1:20-cv-08231 (LAK) |
| Plaintiff, | ) | |
| -against- | ) | |
| DOW JONES & COMPANY, INC., | ) | |
| Defendant. | | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION**
**TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................II

PRELIMINARY STATEMENT ..........................................................................1

STATEMENT OF FACTS ..................................................................................2

A.    The First Article ...................................................................................2

B.    Lindberg is Indicted ............................................................................5

C.    The Second Article .............................................................................6

D.    Lindberg is Convicted ........................................................................6

E.    Lindberg Sues Causey .........................................................................7

F.    Lindberg Sues the *Journal* ...............................................................8

ARGUMENT .....................................................................................................9

I.    Suit on the First Article is Time-Barred ............................................9

II.    The Complaint Fails to Plead Actual Malice as to Either Article......12

    A.    Lindberg is a Public Figure...............................................13

    B.    N.Y. Civil Rights Law § 76-a(2) Applies to Lindberg's Defamation Claim........16

    C.    Lindberg Has Failed Adequately to Plead Actual Malice .....................................19

III.    Neither Article is Actionable ...........................................................21

IV.    The Tort Counts Involving the *Journal*'s Alleged Sourcing Fail to State a Claim ..........29

CONCLUSION.................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aboutaam v. Dow Jones & Co., Inc.*,
   180 A.D.3d 573 (1st Dep't 2020) .................................................................23, 29

*Adelson v Harris*,
   402 P.3d 665 (Nev. 2017) ......................................................................................10

*Adelson v. Harris*,
   973 F. Supp. 2d 467 (S.D.N.Y. 2013)...................................................................11

*Alvord & Swift v. Muller Const. Co.*,
   46 N.Y.2d 276 (1978) ............................................................................................33

*Arrigoni v. Velella*,
   110 A.D.2d 601 (1st Dep't 1985) .........................................................................15

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................................32

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).........................................................................................19, 32

*Berkerey v. Kinney*,
   936 A.2d 1010 (N.J. Super. Ct. App. Div. 2007)..................................................16

*Biro v. Conde Nast*,
   807 F.3d 541 (2d Cir. 2015)............................................................................19, 20

*Biro v. Condé Nast*,
   95 N.Y.S.3d 799 (1st Dep't 2019) ........................................................................11

*Biro v. Conde Nast*,
   963 F. Supp. 2d 255 (S.D.N.Y. 2013)...................................................................22

*Cardillo v. Doubleday & Co., Inc.*,
   518 F.2d 638 (2d Cir. 1975)..................................................................................16

*Cerasani v. Sony Corp.*,
   991 F. Supp. 343 (S.D.N.Y. 1998) .......................................................................16

*Chaiken v. VV Publ'g Corp.*,
   119 F.3d 1018 (2d Cir. 1997)................................................................................19

*Chau v. Lewis*,
771 F.3d 118 (2d Cir. 2014)......................................................................23

*Church of Scientology Int'l v. Eli Lilly & Co.*,
778 F. Supp. 661 (S.D.N.Y. 1991) .............................................................14

*Church of Scientology v. Wollersheim*,
42 Cal. App. 4th 628 (Cal. Ct. App. 1996) ................................................18

*Clark v. Viacom Int'l, Inc.*,
617 F. App'x 495 (6th Cir. 2015) ...............................................................11

*Damon v. Ocean Hills Journalism Club*,
85 Cal. App. 4th 468 (Cal. Ct. App. 2000) ................................................18

*Doctor's Data, Inc. v. Barrett*,
170 F. Supp. 3d 1087 (N.D. Ill. 2016) ........................................................11

*Edwards v. Nat'l Audubon Soc., Inc.*,
556 F.2d 113 (2d Cir. 1977)........................................................................21

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
194 F. Supp. 3d 263 (S.D.N.Y. 2016).........................................................12

*Equilon Enters. LLC v. Consumer Cause, Inc.*,
52 P.3d 685 (Cal. 2002) ..............................................................................18

*Firth v. State*,
98 N.Y.2d 365 (2002) ..................................................................................10

*Freeze-Right Refrig. & Air Conditioning Servs., Inc. v. City of New York*,
101 A.D.2d 175 (1st Dep't 1984) ................................................................24

*Gaeta v. New York News, Inc.*,
62 N.Y.2d 340 (1984) ..................................................................................19

*Gargiulo v. Forster & Garbus Esqs.*,
651 F. Supp. 2d 188 (S.D.N.Y. 2009)...........................................................3

*Gelb v. Royal Globe Ins. Co.*,
798 F.2d 38 (2d Cir. 1986)............................................................................5

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974).....................................................................................13

*Ghartey v. St. John's Queens Hosp.*,
869 F.2d 160 (2d Cir. 1989).........................................................................10

*Gilford v. NYS Office of Mental Health*,
  17-CV-8033 (JPO), 2019 WL 1113306 (S.D.N.Y. Mar. 11, 2019)........................32

*Gleichenhaus v. Carlyle*,
  597 P.2d 611 (Kan. 1979) .........................................................................15

*Global Minerals and Metals Corp. v. Holme*,
  35 A.D.3d 93 (1st Dep't 2006) .................................................................32

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
  17 F. Supp. 2d 275 (S.D.N.Y. 1998)...........................................................35

*Graves v. Chronicle Printing Co.*,
  CV185010056S, 2018 WL 6264070 (Conn. Super. Ct. Nov. 7, 2018) ..................17

*Harris v. Town of Fort Ann*,
  35 A.D.3d 928 (3d Dep't 2006) .................................................................33

*Highland Capital Mgt., L.P. v Dow Jones & Co., Inc.*,
  178 A.D.3d 572 (1st Dep't 2019) ..............................................22, 23, 30, 33

*Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*,
  49 N.Y.2d 63 (1979) ...............................................................................27

*Hotchner v. Castillo-Puche*,
  551 F.2d 910 (2d Cir. 1977)......................................................................23

*Huggins v. Povitch*,
  No. 131164/94, 1996 WL 515498 (N.Y. Sup. Ct., N.Y. Cty. Apr. 19, 1996) ........33

*Huizenga v. NYP Holdings, Inc.*,
  No. 17-cv2113-LTS-GWG, 2019 WL 1620743 (S.D.N.Y. Apr. 16, 2019) ............20

*In re Phila. Newspapers LLC*,
  690 F.3d 161 (3d Cir. 2012)......................................................................11

*In re Sharp Int'l Corp.*,
  403 F.3d 43 (2d Cir. 2005)........................................................................32

*Jankovic v. Int'l Crisis Group*,
  429 F. Supp. 2d 165 (D.D.C. 2006) ...........................................................24

*Jenni Rivera Enter., LLC v. Latin World Entm't Holdings, Inc.*,
  249 Cal. Rptr. 3d 122 (Cal. Ct. App. 2019)..................................................34

*Jewell v. NYP Holdings, Inc.*,
  23 F. Supp. 2d 348 (S.D.N.Y. 1998)...........................................................23

*Kirch v. Liberty Media Corp.*,
    449 F.3d 388 (2d Cir. 2006)..........................................................................24, 33

*Lerman v. Flynt Distrib. Co.*,
    745 F.2d 123 (2d Cir. 1984)................................................................................13

*Martin Ice Cream Co. v. Chipwich, Inc.*,
    554 F. Supp. 933 (S.D.N.Y. 1983) ...............................................................30, 32

*Martin v. Hearst Corp*,
    777 F.3d 546 (2d Cir. 2015)................................................................................28

*McCutcheon v. Fed. Election Comm'n*,
    572 U.S. 185 (2014)............................................................................................14

*McDowell v. Paiewonsky*,
    769 F.2d 942 (3d Cir. 1985)...............................................................................13

*Meeropol v. Nizer*,
    560 F.2d 1061 (2d Cir. 1977).............................................................................13

*Meridian Horizon Fund, LP v. KPMG (Cayman)*,
    487 Fed. App'x 636 (2d Cir. 2012).....................................................................31

*Mirage Entm't Inc. v. FEG Entretenimientos S.A.*,
    326 F. Supp. 3d 26 (S.D.N.Y. 2018)..................................................................11

*Monitor Patriot Co. v. Roy*,
    401 U.S. 265 (1971)............................................................................................15

*Nygard, Inc. v. Uusi-Kerttula*,
    159 Cal. App. 4th 1027 (Cal. Ct. App. 2008) ....................................................17

*Orr v. Argus-Press Co.*,
    586 F.2d 1108 (6th Cir. 1978) ...........................................................................15

*Palin v. New York Times Co.*,
    940 F.3d 804 (2d Cir. 2019)..........................................................................17, 21

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*,
    446 F. Supp. 2d 163 (S.D.N.Y. 2006)................................................................34

*Perlman Rearden LLC v. Vox Media, Inc.*,
    C.A. No. N19C-07-235 PRW ..............................................................................11

*Philadelphia Newspapers, Inc. v. Hepps*,
    475 U.S. 767 (1986)......................................................................................19, 22

*Phoenix Trading, Inc. v. Kayser*,
  No. C10-0920JLR, 2011 WL 3158416 (W.D. Wash. July 25, 2011)...............................17, 18

*Pippen v. NBCUniversal Media, LLC*,
  734 F.3d 610 (7th Cir. 2013) ................................................................................10

*Pons v. People's Republic of China*,
  666 F. Supp. 2d 406 (S.D.N.Y. 2009)................................................................10

*Ray v. Time, Inc.*,
  452 F.Supp. 618 (W.D. Tenn. 1976).....................................................................16

*Rodriguez v. Daily News, L.P.*,
  142 A.D.3d 1062 (2d Dep't 2016) ........................................................................23

*Ruebke v. Globe Commc'ns Corp.*,
  738 P.2d 1246 (Kan. 1987)..................................................................................15

*Salyer v. Southern Poverty Law Ctr., Inc.*,
  701 F Supp. 2d 912 (W.D. Ky. 2009)...................................................................11

*Saul v. Cahan*,
  153 A.D. 3d 947 (2d Dep't 2017).........................................................................31

*Seminole Tribe of Fla. v. Times Pub. Co.*,
  780 So.2d 310 (Fla. Dist. Ct. App. 2001) ............................................................34

*Shawe v. Kramer Levin Naftalis & Frankel LLP*,
  167 A.D.3d 481 (1st Dep't 2018) .........................................................................23

*St. Amant v. Thompson*,
  390 U.S. 727 (1968)..............................................................................................21

*Stepanov v Dow Jones & Co., Inc.*,
  120 A.D.3d 28 (1st Dep't 2014) ...........................................................................29

*Stuart v. Am. Cyanamid Co.*,
  158 F.3d 622 (2d Cir. 1998)...................................................................................9

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
  No. 02 CV 2258 (AJB), 2007 WL 935703 (S.D. Cal. Mar. 7, 2007).....................11

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
  864 F.3d 236 (2d Cir. 2017)..................................................................................22

*United States v. All Right, Title & Interest in Real Prop. & Bldg. Known as 303
  W. 116th St., New York, N.Y.*,
  901 F.2d 288 (2d Cir. 1990)....................................................................................5

*U.S. ex rel. Klein v. Omeros Corp.*,
  897 F. Supp. 2d 1058 (W.D. Wash. 2012) ............................................................11

*United States v. Ferguson*,
  681 F.3d 826 (6th Cir. 2012) ...................................................................................5

*United States v. Huntsberry*,
  956 F.3d 270 (5th Cir. 2020) ...................................................................................5

*Universal City Studios v. Corley*,
  273 F.3d 429 (2d Cir. 2001) ..................................................................................11

*Wells v. Liddy*,
  186 F.3d 505 (4th Cir. 1999) .................................................................................14

*Wheeler v. Twenty-First Century Fox*,
  322 F. Supp. 3d 445 (S.D.N.Y. 2018) ..................................................................23

*White Knight of Flatbush, LLC v. Deacons of Dutch Congregation of Flatbush*,
  159 A.D.3d 939 (2d Dep't 2018) ...........................................................................34

*Wiegel v. Capital Times Co.*,
  426 N.W.2d 43 (Wis. Ct. App. 1988) ...................................................................14

*William Ives Consulting, Inc. v. Guardian It Sys., LLC*,
  19-CV-00336-GCM, 2020 WL 6495542 (W.D.N.C. Nov. 4, 2020) ......................30

**Statutes**

18 U.S.C. § 662 ..........................................................................................................7

18 U.S.C. § 1349 ........................................................................................................6

Cal. Civ. Pro. Code § 425.16 ...................................................................................18

Conn. Gen. Stat. § 52-196a ......................................................................................18

N.Y. Civ. Rights Law § 70-a ....................................................................................19

N.Y. Civ. Rights Law § 74 .......................................................................................23

N.Y. Civ. Rights Law § 76-a ..................................................................16, 17, 18, 19

N.Y. C.P.L.R. § 202 ..................................................................................................9

N.Y. C.P.L.R. § 215 ..................................................................................................9

Wash. Rev. Code § 4.24.525.............................................................................18

**Other Authorities**

Fed. R. Civ. P. 8............................................................................................32

Fed. R. Civ. P. 12(b)(6).............................................................................1, 22

Restatement (Second) of Torts § 559............................................................22

Restatement (Second) of Torts § 577A.........................................................10

Restatement (Third) of Torts § 17 (2020)...........................................30, 31, 34

Restatement (Third) of Torts § 28 (2020).....................................................32

Defendant Dow Jones & Company, Inc. moves under Fed. R. Civ. P. 12(b)(6) to dismiss in its entirety plaintiff Greg E. Lindberg's Complaint for defamation, aiding and abetting breach of fiduciary duty, and tortious interference with contract.

## PRELIMINARY STATEMENT

This lawsuit is a baseless attempt by a prominent financier-turned-felon to damage those he perceives to have contributed to his downfall. He should not be permitted to enlist the Court in that endeavor.

On February 28, 2019, *The Wall Street Journal* published a news article headlined "Financier Who Amassed Insurance Firms Diverted $2 Billion into His Private Empire" (the "First Article"). The article chronicled how Lindberg, a well-known and highly successful businessman and exceedingly generous donor to political campaigns, had acquired numerous insurance companies from around the country, redomiciled several of them in North Carolina, and caused those companies to invest their assets in other companies controlled by Lindberg with the approval of the then-North Carolina Commissioner of Insurance Wayne Goodwin, to whose election campaign Lindberg had contributed. The article reported that Lindberg's personal fortune and the holdings in his non-insurance conglomerate conspicuously expanded in tandem with those events. Soon after the article appeared, Lindberg was indicted in the Western District of North Carolina for attempting to bribe Goodwin's successor, Mike Causey, to remove an official in his department who was investigating Lindberg's insurance businesses—the very activities reported on by the *Journal.*

On October 3, 2019, while Lindberg was awaiting his criminal trial, the *Journal* published a second article about Lindberg, titled "'Active Interest': Insurance Tycoon Spied on Women Who Caught His Eye" (the "Second Article"). The article recounted how Lindberg

directed a private security firm he owned to conduct surveillance on a number of women he was dating. The online version of the story included a hyperlink back to the prior article.

On March 5, 2020, Lindberg was convicted on two felony counts of conspiracy to commit wire fraud and bribery concerning federally-funded programs. He is now serving two concurrent 87-month sentences of imprisonment. Undeterred by his criminal conviction, Lindberg then filed at least three civil cases against his perceived adversaries, including a defamation case against Causey and an action against individuals whom Lindberg alleges to have served as sources for the *Journal*'s reporting. The third is this defamation action against the *Journal*, alleging that his reputation has been sullied by the two articles.

This action should be dismissed on numerous grounds that are apparent from the face of the Complaint and judicially-noticeable documents. As to the First Article, the suit was filed long after the statute of limitations expired, and the presence of a hyperlink back to that article in the later piece does not restart the limitations period. As to both articles, the Complaint fails to allege the knowledge of falsity or reckless disregard for the truth required by both the Constitution and state law. And, even were the Court to address the substance of the articles, the alleged defamatory passages are either not alleged to be false, are on their face not defamatory, or are otherwise protected. Finally, the claims arising from the *Journal*'s reliance on sources fail to assert essential elements of the alleged torts and are at odds with the First Amendment's protections for newsgathering in the public interest.

## STATEMENT OF FACTS

### I.     The First Article

The First Article, written by Mark Maremont and Leslie Scism, is submitted in its online form as Exhibit 1 to the LoBue Declaration, with its paragraphs numbered for convenient

reference.[1]  It appeared in the *Journal*'s website, www.wsj.com, on February 28, 2019 under the headline "Financier Who Amassed Insurance Firms Diverted \$2 Billion into His Private Empire."  A version was also published in the March 1, 2019 print edition of the *Journal* with the shortened headline "Insurance Tycoon Diverts \$2 Billion", with "only minor modifications" to the text not alleged to be material.  (Compl. ¶ 43).  The article depicts in words, graphics and photographs some of the pricey assets acquired over the last few years by companies Lindberg controlled, including nearly 100 companies around the globe and lavish real estate.  It also makes clear how his "private empire" was able to finance those purchases: "The cash came, at least in part, from huge sums Mr. Lindberg diverted from the group of life insurance firms he began assembling in 2014, a Wall Street Journal investigation found." (First Article ¶ 3).  Accurately characterizing the asset flow as a "diversion," the authors explain how Lindberg set out to acquire life insurance companies from around the country with an aim to tap their vast pools of collected premiums and invest those funds in non-insurance entities controlled by Lindberg.  To avoid more stringent regulatory standards in other states, he moved some of those companies to North Carolina, (*id*. ¶¶ 34, 44), whose regulators granted Lindberg a "rare exception" from state laws limiting the amount of insurance assets that could be invested in affiliates, (*id*. ¶ 36).

At the same time, Lindberg contributed hundreds of thousands of dollars to the 2016 reelection campaign of North Carolina Commissioner of Insurance Wayne Goodwin.  (*Id*. ¶

---

[1] Although Lindberg's complaint does not annex the disputed articles, this Court may nonetheless consider them on a motion to dismiss because, in a defamation case, the documents "containing the allegedly actionable statements" are "incorporated by reference" into the complaint.  *See, e.g.*, *Gargiulo v. Forster & Garbus Esqs.,* 651 F. Supp. 2d 188, 190 (S.D.N.Y. 2009).

39-41). All told, Lindberg became North Carolina's single largest political donor, (*id*. ¶ 2), giving millions to favored candidates, (*id*. ¶ 84).

The "diversion" strategy is described beginning in paragraph 48. When a North Carolina regulator raised questions about the potentially excessive investment in affiliated entities even under the state's relaxed rules, Lindberg legally reorganized his holdings. The "affiliates" became Special Purpose Vehicles ("SPVs") whose voting rights were held by an entity controlled by a partner in Lindberg's local law firm, and he secured an opinion from the firm and, he claimed, approval from the North Carolina regulator that those SPVs were not "affiliates" within the meaning of state regulations.

The article then follows the money. One of Lindberg's life insurance companies, Colorado Bankers Life Insurance Co., loaned $8.8 million to an SPV, which used that money to purchase a Massachusetts public relations firm. (*Id*. ¶ 55). "By routing the loan through the SPV, Colorado Bankers could claim the loan wasn't to an affiliated borrower, even though Mr. Lindberg was using the money to expand his empire and one of this companies was the ultimate borrower." (*Id*. ¶ 56). By a similar construct, a 12,000 square foot mansion in Raleigh, N.C., was purchased using money invested by one of Lindberg's North Carolina life insurance companies in an SPV in which Lindberg was listed as president; the SPV then loaned funds to a "shell company" to make the house purchase. (*Id*. ¶¶ 67-68). "Scores of businesses" were acquired for Lindberg's business empire in similar fashion using hundreds of millions of dollars of life insurance company assets funneled through intermediaries. (*Id*. ¶¶ 70-71).

The article quotes a number of explanations and denials of impropriety by Lindberg's spokesperson, (*id*. ¶¶ 14, 37, 54, 72, 76, 90), and by Goodwin, the former insurance regulator who lost his re-election campaign to Causey, (*id*. ¶ 42). It also notes that Lindberg had

(4)

made a total of $5.4 million in political contributions in North Carolina in 2017–18 alone, including a $500,000 contribution to the state Republican party, half of which was passed to Causey's election campaign at Lindberg's suggestion. (*Id*. ¶¶ 84-85). The article explains that a federal investigation was underway of Mr. Lindberg's activities, and that Mr. Causey "cooperat[ed] with the FBI on its secret probe," and turned over the funds he had received from Lindberg to federal officials. (*Id*. ¶ 85).

## II.     Lindberg is Indicted

On March 18, 2019, a federal indictment of Lindberg and others was filed under seal, and unsealed on April 2, 2019. (LoBue Decl. Ex. 2).[2] It charged Lindberg, two of his business colleagues, and an officer of a political party with several counts involving a scheme that unfolded in 2018 to bribe Causey, who by then was North Carolina Commissioner of Insurance. The indictment quoted recordings of conversations between Lindberg and Causey, in which Lindberg proposed and made significant campaign contributions in exchange for an understanding that Causey would reassign an insurance official in his department who was investigating Lindberg's financial machinations and replace that official with a presumably more

---

[2] This motion cites several judicial filings in other court proceedings involving Lindberg. "It is well-settled that courts may judicially notice court records as evidence of judicial actions." *United States v. Huntsberry*, 956 F.3d 270, 285 (5th Cir. 2020); *see also United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012). While judicial notice alone does not establish the truth of the contents of those filings, here Lindberg is collaterally estopped to controvert findings necessarily made against him in the criminal case in which he was convicted. The Second Circuit has held that a "a party other than the Government may assert collateral estoppel based on a criminal conviction," and that as a result, "[t]he criminal defendant is barred from relitigating any issue determined adversely to him in the criminal proceeding, provided that he had a full and fair opportunity to litigate the issue." *Gelb v. Royal Globe Ins. Co*., 798 F.2d 38, 43 (2d Cir. 1986). "Generally, the pendency of an appeal from a conviction does not deprive a judgment of its preclusive effect." *United States v. All Right, Title & Interest in Real Prop. & Bldg. Known as 303 W. 116th St., New York, N.Y.,* 901 F.2d 288, 292 (2d Cir. 1990).

pliable individual. The indictment details that, in carrying out the scheme, Lindberg made contributions of over $1.75 million directly to the party or to a political action committee in 2018, of which $250,000 was earmarked for Causey's campaign. (*Id.* ¶ 84).

## III.    The Second Article

On October 3, 2019, as Lindberg was awaiting his criminal trial, the *Journal* published the Second Article, (LoBue Decl. Ex. 3, with numbered paragraphs), by the same authors as the First Article. The article describes how, as federal authorities were closing in on him with their bribery investigation, "Mr. Lindberg also had something else on his mind—the comings and goings of a number of women he was dating, interested in dating or, in at least one case, cultivating as an egg donor for his future offspring." (*Id.* ¶ 2). The article recounts how Lindberg directed private detectives—employees of one of Lindberg's many companies—to conduct surveillance on his romantic interests, and included photographs and excerpts from "dossiers" reported to have been compiled by those agents documenting their surveillance. The article includes a reference back to the First Article, including, in the online version, a hyperlink back to that earlier report. Referring to Lindberg's lavish purchases, the Second Article states:

> The spending took off after Mr. Lindberg began lending at least $2 billion of the insurers' funds to his private conglomerate, the focus of a Journal investigation in February.

(*Id.* ¶ 8). The Second Article also updates some matters described in the earlier report, noting that "state and federal authorities in separate probes are seeking to follow the money trail. Regulators fear that many of the loans to Mr. Lindberg's businesses may be uncollectible and that the financial hole at his insurers could exceed $1 billion . . . ." (*Id.* ¶ 9).

## IV.    Lindberg is Convicted

On March 5, 2020, Lindberg was found guilty by a jury of the two counts charged against him: violation of 18 U.S.C. § 1349 (conspiracy to commit honest services wire fraud),

and of 18 U.S.C. § 662(a)(2) and § 2 (bribery concerning programs receiving federal funds and aiding and abetting). (LoBue Decl. Ex. 4). On August 19, 2020, he was sentenced to serve 87 months, concurrently, on each of the counts. (*Id.*) His motion for bail pending appeal was denied, and his appeal from the conviction is now pending before the Fourth Circuit Court of Appeals. (LoBue Decl. Ex. 5).

## V.     Lindberg Sues Causey

On March 17, 2020, Lindberg and his principal company sued Causey for constitutional violations, defamation, tortious interference with Lindberg's business, and related torts. *Global Growth v. Causey,* 1:20-cv-00248-CCE-JEP (M.D.N.C.). The thrust of that claim was that Causey, upon succeeding Goodwin as commissioner of insurance, retaliated against Lindberg for the latter's prior financial support of Goodwin's election campaign by, among other acts, defaming Lindberg to federal law enforcement authorities who were prompted to investigate and successfully prosecute Lindberg. (LoBue Decl. Ex. 6 at ¶¶ 8, 11, 79). In his pleading, Lindberg admitted that Causey's office had investigated the financial soundness of Lindberg's insurance companies, (*id.* at ¶ 8), that as a result of Causey's investigations Lindberg's insurance companies lost access to the capital markets in late 2018 and into 2019 with "immediate, widespread and devastating" effects, (*id.* at ¶¶ 107, 110), that in June 2019 Causey placed Lindberg's North Carolina-based insurers into rehabilitation and receivership due to "potential harm to policyholders and the public," (*id.* ¶ 116), and that as a result some policyholders were unable to redeem their policies, (*id.* at ¶ 119). The case was dismissed on September 9, 2020 on the grounds of sovereign immunity and also because "courts are not required to put aside reason and common sense in evaluating whether a complaint states a plausible claim for relief." (LoBue Decl. Ex. 7 at 5-6).

## VI.     Lindberg Sues the *Journal*

Less than a month after Lindberg's suit against Causey was dismissed, he filed the present Complaint on October 2, 2020, a day short of one year after the *Journal* published the Second Article and some 19 months after the First Article appeared.  Lindberg sues Dow Jones as publisher of the *Journal*, first, for defamation based on eleven specified passages from the First and Second Articles enumerated in paragraph 56 of the Complaint.  The first nine relate to Lindberg's financial dealings that were the subject of the First Article and briefly updated in the Second Article.  The last two pertain to details in the Second Article concerning Lindberg's surveillance of romantic interests.  Lindberg also sues the *Journal* for allegedly "aiding and abetting breach of fiduciary duty" and for "tortious interference with contract" on the premise that sources for the Second Article were persons who owed, and breached, duties of confidentiality to Lindberg.  In a separate lawsuit in the Northern District of Texas, recently settled, Lindberg and a company he owns sued two named individuals that Lindberg alleged to be those sources for breach of contract and fiduciary duty and related claims.  *Apex International LLC v. Serber,* 3:19-cv-2242-K (N.D. Tex.) (LoBue Decl. Ex. 8).

Although in the present case Lindberg complains about several passages in the two *Journal* articles that he claims defamed him, (Compl. ¶ 56), what is most striking is the conspicuous absence of *any* allegations of falsity regarding the underlying facts reported in the articles that support those conclusions that he claims to be actionable.  For example, the Complaint claims defamation in the *conclusions* that Lindberg "diverted huge sums" from the life insurance companies in a "potentially risky strategy" in which the insurers "disguised the flow of money."  (Compl. ¶ 56 (1), (4) and (6)).  Yet, the Complaint does not assert that the *factual statements* laid out in the same article that meticulously support those conclusions are in any way false:  that insurance company funds were transferred to SPVs so that they would not

(8)

have to be characterized as "affiliate" investments, and that some $2 billion of insurance funds ultimately were used by Lindberg to buy companies that he owned and controlled. Attached as Appendix A to this brief are the factual statements, taken verbatim from the First Article, that Lindberg does not allege to be false and that explain the thrust of the article that Lindberg had "diverted" insurance funds for his benefit.

## ARGUMENT

### I.    Suit on the First Article is Time-Barred

In this diversity case, the Court will apply the same statute of limitations as the New York courts would apply. *See*, e.g., *Stuart v. Am. Cyanamid Co*., 158 F.3d 622, 626 (2d Cir. 1998). The New York statute of limitations for libel is one year. C.P.L.R. § 215(3). Although Lindberg alleges that he is now a resident of Nevada, (Compl. ¶ 4), and he may have been a resident of North Carolina (or elsewhere) at the time the articles were published, it matters not where his claim is deemed to have arisen: under the New York borrowing statute, an out-of-state resident suing in New York must comply with the shorter of the limitations period in New York and in the jurisdiction where the claim arose. C.P.L.R. § 202. This action therefore is governed by the New York statute's one-year limitation period.

The Complaint admits that the First Article was published online on February 28, 2019, and, with revisions not material here, in print on March 1, 2019. (Compl. ¶¶ 40, 43). On the face of the Complaint, therefore, all defamation claims arising from the First Article expired no later than March 1, 2020 and are time-barred. Nonetheless, in an effort to plead around the statute of limitations, the Complaint alleges that "[t]o the extent Defendant seeks to assert limitations as a defense to portions of this claim which relate to the February and March 2019 reporting, republication occurred on October 3, 2019." (Compl. ¶ 59). Because the Complaint anticipates and addresses this issue, it is appropriate to decide it on this motion to dismiss. *See,*

*e.g.*, *Pons v. People's Republic of China*, 666 F. Supp. 2d 406, 411 (S.D.N.Y. 2009) (citing

*Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989)).

The Complaint contends that the Second Article republished the First Article by

hyperlinking to it. (Compl. ¶ 48). If plaintiff were correct, not only would every hyperlink to an

allegedly defamatory publication renew the statute of limitations, but third parties that did not

author but merely linked to the original article would presumably also become liable as

republishers of everything in the linked piece. Such a rule would have stunningly negative

repercussions for online discourse by deterring the use of hyperlinks, because hyperlinks "are the

signature characteristic of the World Wide Web . . . ." *Adelson v Harris*, 402 P.3d 665, 668-69

(Nev. 2017) (quoting Mark Sableman, *Link Law Revisited: Internet Linking Law at Five*

*Years*, 16 Berkeley Tech. L.J. 1273, 1276 (2001)).

Fortunately, that is *not* the law. Judicial treatment of hyperlinking stems from the

long-established "single publication" doctrine: once a statement has been published, continued

distribution of copies after the publication date does not extend the limitations period. *See, e.g.*,

*Firth v. State*, 98 N.Y.2d 365 (2002); *see generally* Restatement (Second) of Torts § 577A(3).

This principle was developed decades before the internet to shield mass publishers from the

prospect of ruinous, never-ending liability whenever copies of their publications were

distributed. In the modern era, courts routinely apply the rule to online speech because "the

Internet's greater reach comes with an 'even greater potential for endless retriggering of the

statute of limitations, multiplicity of suits and harassment of defendants.'" *Pippen v.*

*NBCUniversal Media, LLC*, 734 F.3d 610, 616 (7th Cir. 2013); *Firth,* 98 N.Y.2d at 370 (failure

to apply the single publication rule to online speech would cause a "a serious inhibitory effect on

the open, pervasive dissemination of information and ideas over the Internet, which is, of course, its greatest beneficial promise").

Implementing the single publication rule, courts recognize that a hyperlink is a reference, not a republication. "A hyperlink is a cross-reference (in a distinctive font or color) appearing on one web page that, when activated by the point-and-click of a mouse, brings onto the computer screen another web page." *Universal City Studios v. Corley*, 273 F.3d 429, 455 (2d Cir. 2001). A hyperlink "does not duplicate the content of a prior publication; rather, it identifies the location of an existing publication." *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1137 (N.D. Ill. 2016). It is "the twenty-first century equivalent of the footnote." *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017). For this reason, courts uniformly agree that hyperlinks to allegedly defamatory content do not restart the limitations period. *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 505-507 (6th Cir. 2015) ("Simply alerting a new audience to the existence of a preexisting statement does not republish it"); *In re Phila. Newspapers LLC*, 690 F.3d 161, 174–75 (3d Cir. 2012); *Biro v. Condé Nast*, 95 N.Y.S.3d 799, 800 (1st Dep't 2019).[3] This rule applies even where the later article describes in words the content it is linking to, because a bare hyperlink would not be at all informative to the reader. *Perlman Rearden LLC v. Vox Media, Inc.*, C.A. No. N19C-07-235 PRW CCLD, 2020 WL 3474143, at *8 (June 24, 2020) ("[A]bsent a change in the content of the destination page, a

---

[3] *See also Mirage Entm't Inc. v. FEG Entretenimientos S.A.*, 326 F. Supp. 3d 26, 39 (S.D.N.Y. 2018); *U.S. ex rel. Klein v. Omeros Corp.*, 897 F. Supp. 2d 1058, 1072-74 (W.D. Wash. 2012); *Salyer v. Southern Poverty Law Ctr., Inc.,* 701 F Supp. 2d 912, 915-18 (W.D. Ky. 2009); *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. 02 CV 2258 (AJB), 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007).

hyperlink accompanied by a description of the content does not substantively alter the destination, and hence does not republish it.").

Of course, if the subsequent publication repeats in words all or some of the prior defamatory statement, the publisher of the later statement may be liable for the defamatory content. A new limitations period will run as to those statements, and including a hyperlink will not immunize the speaker. *See, e.g.*, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC,* 194 F. Supp. 3d 263, 277 (S.D.N.Y. 2016). But that is not what happened here. The allegedly defamatory passages in the First Article—that Lindberg "diverted" assets from the insurance companies, that the "sheer scale" of the diversion "has little precedent[]," that the insurers "disguised" the flow of money, that Lindberg's strategy allowed him to contend that affiliated investments were in fact unaffiliated, and that "insurance money was flowing into [Lindberg's] pockets," (Compl. ¶ 56), **do not appear in the Second Article**. Aside from discussing Lindberg's use of corporate funds to surveil his romantic interests, that article does nothing more than update the earlier one by reporting that Lindberg had been indicted for bribery and that regulators were investigating the financial condition of his businesses and had "taken control of much of his insurance empire" for fear of insolvency—statements that Lindberg does not here allege to be false, and that he admitted were true in his civil complaint against Causey.

In sum, the Second Article does not in words republish allegedly actionable statements from the First Article, nor does its hyperlink constitute a republication of the First Article. All libel claims arising from the First Article should therefore be dismissed as untimely (Compl. ¶ 56, passages numbered 1–8).

## II.     The Complaint Fails to Plead Actual Malice as to Either Article

The Complaint should be dismissed because Lindberg has failed adequately to plead that the *Journal* acted with "actual malice" in publishing the disputed articles. He is

required to do so for two independent reasons: because as a matter of federal constitutional law he is a public figure, and because the New York Civil Rights Law now requires such a showing in any lawsuit pertaining to speech in a "public forum" (such as a newspaper article) or otherwise "in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest."

### A. Lindberg is a Public Figure

The Supreme Court has defined a public figure as "an individual [who] voluntarily injects himself or is drawn into a particular public controversy." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). Public figures, like public officials, must plead and prove that the alleged libel was published with actual malice—defined as knowledge of falsity or reckless disregard for the truth. *Id.* at 343. Evaluating whether a defamation plaintiff is a public figure typically involves consideration of whether the plaintiff "voluntarily injected himself into a public controversy related to the subject of the litigation." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136 (2d Cir. 1984).

This, however, is not the typical case. A libel plaintiff need not always voluntarily seek out a prominent public-facing role in order to be classified as a public figure, because at times events cast a person "into the limelight," rendering him or her an involuntary public figure. *Meeropol v. Nizer*, 560 F.2d 1061, 1066 (2d Cir. 1977). In these instances, voluntariness derives not from intentionally seeking public notice but from intentionally embarking on activity that, if and when revealed, will inevitably attract public attention. "When an individual undertakes a course of conduct that invites attention, even though such attention is neither sought nor desired, he may be deemed a public figure." *McDowell v. Paiewonsky*, 769

F.2d 942, 949 (3d Cir. 1985); *accord Wells v. Liddy*, 186 F.3d 505, 540 (4th Cir. 1999); *Wiegel v. Capital Times Co.*, 426 N.W.2d 43, 50 (Wis. Ct. App. 1988).

Here, while Lindberg claims to be "a private person," (Compl. at ¶ 38), his relevant conduct was nonetheless calculated to gain and exercise influence on matters of significant public interest, and attracted public attention for that reason. His indictment recited hundreds of thousands of dollars of political contributions he made, including to public officials who regulated his insurance businesses. (LoBue Decl. Ex. 2 at ¶¶ 14-16). Those contributions attracted media comment on his role as, reportedly, the largest single political donor in North Carolina, and "what results Lindberg hopes for from his donations." (LoBue Decl. Ex. 9).[4] And, fully a year before the First Article, an op-ed in a local newspaper characterized him as the "poster child for campaign finance reform in North Carolina," opining that "[w]hat he's doing is one of the best examples we've seen of the kind of power that could distort the political process and create a government by highest bid." (LoBue Decl. Ex. 10).

Lindberg's political contributions are of course an exercise of his First Amendment rights. No less than one who becomes a public figure through overt public advocacy, "[w]hen an individual contributes money to a candidate, he exercises [the] right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). And, like the public advocate, by exercising his First Amendment right to influence the political process, Lindberg has exposed himself to reporting and commentary regarding his conduct. As the Supreme Court has held,

---

[4] *See Church of Scientology Int'l v. Eli Lilly & Co.*, 778 F. Supp. 661, 666 n.3 (S.D.N.Y. 1991) (taking judicial notice of the existence of a published press report regarding the plaintiff in order to conduct public figure analysis).

(14)

"the constitutional guarantee [of free speech] has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271-72 (1971).

Individuals who make major campaign contributions with the goal of influencing public policy thus become public figures for the purpose of issues related to those contributions. For instance, in *Gleichenhaus v. Carlyle*, 597 P.2d 611, 613 (Kan. 1979), the court held that a defamation plaintiff who made contributions to a mayoral campaign with the goal of securing city contracts was a public figure with respect to statements related to those contributions and contracts. Similarly, in *Arrigoni v. Velella*, 110 A.D.2d 601, 603-04 (1st Dep't 1985), the court concluded that an executive at a bus company who made campaign contributions to politicians with the power to take action beneficial to the bus company was a public figure.

Lindberg is a public figure not only because he made political contributions with the goal of influencing governmental action, but because he did so corruptly. Lindberg was convicted of attempted bribery related to a scheme to secure favorable regulatory treatment for his insurance businesses via his contributions to North Carolina's insurance commissioner. The investigation into Lindberg's scheme and his prosecution attracted significant media attention beyond the disputed *Journal* articles. (*See, e.g.*, LoBue Decl. Ex. 9, 11). "Those who commit crime or are accused of it may wish to avoid publicity, but are nevertheless persons of public interest, concerning whom the public is entitled to be informed." *Ruebke v. Globe Commc'ns Corp.*, 738 P.2d 1246, 1251 (Kan. 1987). Courts have held that individuals charged in similar high-profile criminal cases become public figures for the purpose of reporting on their criminal activities. *See, e.g.*, *Orr v. Argus-Press Co.*, 586 F.2d 1108, 1116 (6th Cir. 1978) (real estate developer convicted of fraud in connection with development project of interest to the public);

*Berkerey v. Kinney*, 936 A.2d 1010, 1013 (N.J. Super. Ct. App. Div. 2007) ("involvement in publicized criminal activities" is sufficient to "give[] rise to . . . public figure status"); *Ray v. Time, Inc.*, 452 F.Supp. 618, 621-22 (W.D. Tenn. 1976). Indeed, Lindberg's prosecution led to what one newspaper has described as "one of North Carolina's worst government corruption scandals." (LoBue Decl. Ex. 12).[5]

Lindberg is precisely the kind of person on whose activities the press should be reporting.

**B.     N.Y. Civil Rights Law § 76-a(2) Applies to Lindberg's Defamation Claim**

On November 10, 2020, Governor Cuomo signed legislation amending New York's Civil Rights Law with the goal of "protect[ing] citizens' rights to free speech and petition by deterring abusive 'strategic lawsuits against public participation[.]'"[6]  Among other things, this legislation imposed a new substantive element to all actions "involving public petition and participation":  a plaintiff must "establish[] by clear and convincing evidence that any

---

[5] Given Lindberg's well-publicized conviction of serious criminal charges, he is also undoubtedly "libel-proof" in that he has no good reputation to lose. *See, e.g.*, *Cardillo v. Doubleday & Co., Inc.*, 518 F.2d 638, 639 (2d Cir. 1975) (describing as "libel-proof" a plaintiff who is "so unlikely by virtue of his life as a habitual criminal to be able to recover anything other than nominal damages as to warrant dismissal of the case, involving as it does First Amendment considerations"); *Cerasani v. Sony Corp.*, 991 F. Supp. 343, 354-56 (S.D.N.Y. 1998).  Given the numerous other infirmities in the pleading, the Court will not have to reach that issue on this motion.

[6] Press Release, Governor Cuomo Signs Legislation to Stop Frivolous Lawsuits Meant to Intimidate, Bully, or Suppress Free Speech (Nov. 10, 2020), https://www.governor.ny.gov/news/governor-cuomo-signs-legislation-stop-frivolous-lawsuits-meant-intimidate-bully-or-suppress.

The amendments are "effective immediately."  S. 52A, 2019-20 Leg. Sess. § 4 (N.Y. 2020), https://www.nysenate.gov/legislation/bills/2019/s52/amendment/a.

communication which gives rise to the action was made with knowledge of its falsity or with reckless disregard of whether it was false, where the truth or falsity of such communication is material to the cause of action at issue." N.Y. Civ. Rights Law § 76-a(2). This fault standard is identical to the actual malice rule that governs defamation claims by a public figure. *See, e.g., Palin v. New York Times Co.*, 940 F.3d 804, 809-10 (2d Cir. 2019) (defining "actual malice" in terms of a publication "made with knowledge that it was false or with reckless disregard of whether it was false or not").

Lindberg's claim of defamation clearly falls within the scope of section 76-a(2). New York law defines "action involving public petition and participation" as a claim based upon:

(1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

(2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.

N.Y. Civ. Rights Law § 76-a(1)(a). Count 1 fits comfortably within both of these definitions. First, it arises out of two articles that were made in a "public forum"—that is, in the pages of *The Wall Street Journal*. *See, e.g.*, *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1038-39 (Cal. Ct. App. 2008) (concluding that newspapers are "public fora" because they "can be purchased and read by members of the public"); *Graves v. Chronicle Printing Co.*, CV185010056S, 2018 WL 6264070, at *5 (Conn. Super. Ct. Nov. 7, 2018) (same); *Phoenix Trading, Inc. v. Kayser*, No. C10-0920JLR, 2011 WL 3158416, at *7 (W.D. Wash. July 25,

2011) (same).[7]  Additionally, the *Journal*'s publications constitute "conduct in furtherance of the exercise of the constitutional right of free speech."  *Kayser*, 2011 WL 3158416, at *5.

Lindberg's activities are undoubtedly "issue[s] of public interest" within the meaning of section 76-a(1)(a)(1) and (2); after all, Lindberg's multi-billion-dollar portfolio is made up of companies that "service vital industries." (Compl. ¶ 3, 10; *see id.* ¶ 16).  Because his business dealings impacted a broad swath of society, including individuals insured by the companies that Lindberg acquired, and ultimately led to these companies being placed in rehabilitation, they are of "public interest".  *See, e.g.*, *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 650 (Cal. Ct. App. 1996), *disapproved of on other grounds in Equilon Enters. LLC v. Consumer Cause, Inc.*, 52 P.3d 685 (Cal. 2002) ("matters of public interest" may include "activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals").  Moreover, the intersection of Lindberg's business affairs and his political contributions are matters of public interest.  *See, e.g.*, *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 479 (Cal. Ct. App. 2000) (statements involving "inherently political question" related to self-governance of 3,000-person community was of "public interest").  No less are the activities described in the Second Article matters of public interest, since that article both updates the status of the significant investigations and legal proceedings involving Lindberg and his companies, and describes

_____

[7] Because the recently enacted legislation significantly expanded the definition of "action[s] involving public petition and participation" under N.Y. Civ. Rights Law § 76-a, there is little New York case law discussing its new scope.  New York's revised definition of "action[s] involving public petition and participation" draws on language found in other states' laws, *see, e.g.*, Cal. Civ. Pro. Code § 425.16(e)(3), (4); Conn. Gen. Stat. § 52-196a(2); Wash. Rev. Code § 4.24.525(2)(d), and the cases applying similar definitions from those states offer guidance here.

Lindberg's leveraging of his business assets for his personal benefit (LoBue Decl. Ex. **3**, ¶¶ 7-9).

As the Second Circuit has observed,

> New York courts generally defer to publishers' judgments as to what subjects are matters of public concern: "[w]hile not conclusive, a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is newsworthy, may be powerful evidence of the hold those subjects have on the public's attention."

*Chaiken v. VV Publ'g Corp.*, 119 F.3d 1018, 1032 (2d Cir. 1997) (quoting *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 349 (1984)).

Finally, Count 1 falls within the scope of section 76-a(2) because "the truth or falsity" of the communications at issue is "material" to a defamation claim. Proof of the falsity of the statements at issue is a constitutionally-required *sine qua non* of Lindberg's defamation claim. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767 (1986) ("*Hepps*").[8]

## C.      Lindberg Has Failed Adequately to Plead Actual Malice

Where actual malice is the fault standard, in order to survive a motion to dismiss plaintiff "must plead plausible grounds to infer actual malice by alleging enough facts to raise a reasonable expectation that discovery will reveal evidence of actual malice." *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Second Circuit has stated that, under this rule, the "hurdles to plausibly pleading actual malice" are "significant given the First Amendment interest at stake." *Id*. at 545.

---

[8] The actual malice fault standard is the only aspect of the amended New York Civil Rights Law that Defendant is invoking on this motion. The law, however, authorizes the award of attorneys' fees, costs, and compensatory damages arising from the filing of an action in violation of its terms. Civ. Rights Law § 70-a(1)(a)-(b). Defendant reserves the right to pursue those remedies through an appropriate proceeding following the resolution of the present motion.

Lindberg has not surmounted these hurdles.  He mouths the words "actual malice," (Compl. ¶ 58), but as to none of the 11 alleged defamations does he provide a basis for plausibly concluding that the *Journal*'s reporters knew of their falsity or recklessly disregarded the truth.  This will not do.  For instance, in *Huizenga v. NYP Holdings, Inc.*, No. 17-cv2113-LTS-GWG, 2019 WL 1620743 (S.D.N.Y. Apr. 16, 2019), the court granted a motion to dismiss for failure to plead actual malice when the plaintiff made only "general assertions" regarding the defendants' state of mind, such as "[d]efendants knew the statements to be false" and "[d]efendants' acts were willful and malicious."  *Id.* at *3.  The Court held that these "general assertions" were not sufficient to survive a motion to dismiss when the plaintiff did not allege any specific facts as to why the defendants entertained doubt as to the truth of the statements.  *Id.*

The closest the Complaint comes is in positing that the disputed statements were sourced from "persons who were emotionally, politically, or financially vested in seeing Lindberg and his success become the subject of damaging publicity," (Compl. ¶ 39), but that is insufficient.  The Complaint does not say who those sources are supposed to be, why they were intent on tarnishing Lindberg, or, most importantly, that the *Journal* knew of any such enmity.  Reporters must often rely on interested parties to obtain the news, and doing so cannot thrust them into liability.  Instead, a plaintiff must demonstrate that the publication engaged in a reckless attitude toward the truth, such as "publish[ing] despite 'obvious reasons to doubt the veracity of the informant or the accuracy of his reports' or despite the 'inherently improbable' nature of the statements themselves."  *Biro*, 807 F.3d at 545 (quoting *St. Amant v. Thompson*,

390 U.S. 727, 732 (1968)); *see also Palin,* 940 F.3d at 814 (2d Cir. 2019).[9]  Nothing like that is alleged here.

Finally, Lindberg cannot establish actual malice based on the *Journal*'s publication of the First Article in the March 1, 2019 print edition after his counsel delivered a letter to the *Journal.*  (Compl. Ex. 1).  The letter does not provide information that would create a "subjective awareness of probable falsity" of anything in the article.  *St. Amant,* 390 U.S. at 731.[10]  Actual malice "cannot be predicated on mere denials, however vehement." *Edwards v. Nat'l Audubon Soc., Inc*., 556 F.2d 113, 121 (2d Cir. 1977).

## III.    Neither Article is Actionable

None of the 11 specified passages set forth in Complaint ¶ 56 is actionable under the law of defamation.  If the Court were to reach the merits—which it need not do given the foregoing arguments—it should therefore dismiss Count I for failure to state a claim.  In doing so, the Court would be fulfilling the important gatekeeper function assigned to it in all cases by

---

[9] *Palin* is instructive by comparison.  In *Palin*, the Second Circuit held that the plaintiff had plausibly pleaded actual malice when the plaintiff alleged that (1) the editor who approved the disputed editorial had previously reviewed publications that contradicted the disputed claim; (2) the editor was politically biased against the plaintiff due to his familial relationship to a political opponent of the plaintiff; (3) the disputed article included a hyperlink to an article that contradicted the disputed claim; and (4) the publication almost immediately issued a correction that removed the disputed claim.  940 F.3d at 814-15.  None of those or comparable factors is alleged here.

[10] The letter mainly complains about the First Article's use of the terms "divert," "insolvent," and "disguised."  As discussed in Point III, these characterizations are opinions based on disclosed facts not alleged to be false (in the lawyer's letter or in the Complaint), or that are otherwise privileged.  The other issue raised—that the insurance funds were not used for "personal" purchases—does not address the central theme of the First Article that Lindberg had procured a benefit by diverting insurance assets to purchase assets for *other companies in his personal empire.*  None of the other presently alleged libels, (Compl. ¶ 56), was mentioned in the lawyer's letter, nor does the Complaint allege that any pre-publication protest was delivered as to the Second Article.

Rule 12(b)(6), but a role that acquires special prominence when the complaint seeks to punish the press for reporting the news. *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 264 (S.D.N.Y. 2013) (acknowledging the "'particular value' in resolving defamation claims at the pleading stage, 'so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms'"). Certain rudimentary principles of the law of defamation suffice to dispose of all of the claimed libels:

*First*, a statement that does not seriously injure the plaintiff's reputation by holding him or her up to hatred, contempt, ridicule or aversion—whether true or false—is not defamatory. *See generally* R. Sack, Sack on Defamation § 2.4.1 (5th ed. 2019) ("Sack") (citing cases); Restatement (Second) of Torts § 559 (1977).

*Second,* it is the plaintiff's burden to plead that a statement challenged as defamatory is not substantially true. *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017). This rule flows from the constitutional principle that truth is not merely a defense, but must be negated by the defamation plaintiff at least as to any publication on a matter of public concern. *Hepps*, 475 U.S. 767; *see Tannerite*, 864 F.3d at 244 n. 6. "Substantial truth" asks whether the published statement would have a different effect that the alleged truth would have had on the plaintiff's reputation; it "overlooks minor inaccuracies" and does not import "an overly technical or exacting conception of truth in publication." *Tannerite,* 864 F.3d at 243; *accord Highland Capital Mgt., L.P. v Dow Jones & Co., Inc.*, 178 A.D.3d 572, 574 (1st Dep't 2019) ("*Highland Capital*").

*Third,* only statements of fact—those that can be proved to be true or false—are actionable. Statement of opinion are not. Here, two kinds of opinion come into play. Subjective assessments, including loose hyperbole, conjecture and predictions of future events (such as

calling a financial scheme a "potentially risky strategy") are inherently incapable of being proved true or false and cannot be defamatory. *See, e.g.*, *Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 377, 381 (S.D.N.Y. 1998) (subjective judgments); *Shawe v. Kramer Levin Naftalis & Frankel LLP,* 167 A.D.3d 481, 482 (1st Dep't 2018) (predictions).  In addition, the law gives wide berth to assessments—dubbed "pure opinion"—that, while potentially damaging if they imply the speaker's knowledge of undisclosed facts, are protected when the facts on which the judgment is based are set forth and are either true or not published with the requisite degree of fault.  *E.g.*, *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014); *Hotchner v. Castillo-Puche*, 551 F.2d 910, 913-14 (2d Cir. 1977).  An "interpretation" of facts stated in the publication is not actionable.  *Wheeler v. Twenty-First Century Fox*, 322 F. Supp. 3d 445, 457 (S.D.N.Y. 2018).

    *Fourth*, a report of a governmental proceeding is absolutely privileged, even if the allegations reported are utterly false, so long as the report is "fair and true"—i.e., so long as it accurately conveys the substance of the proceeding, and gives the accused's side of the story if that is part of the proceeding (the "fair report privilege").  *See, e.g.,* N.Y. Civ. Rights Law § 74. "In determining whether an article constitutes a fair and true report, 'the language used therein should not be dissected and analyzed with a lexicographer's precision,' because a news article is, 'by its very nature, a condensed report of events which must, of necessity, reflect to some degree the subjective viewpoint of the author[.]'"  *Highland Capital*, 178 A.D.3d at 573 (quoting *Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.*, 49 N.Y.2d 63, 68 (1979)).  Administrative and law enforcement investigations, no less than court and legislative proceedings, come within the privilege.  *E.g.*, *Aboutaam v. Dow Jones & Co., Inc.*, 180 A.D.3d 573, 574 (1st Dep't 2020) (investigation by ICE and foreign law enforcement agencies); *Rodriguez v. Daily News, L.P.*, 142 A.D.3d 1062, 1063 (2d Dep't 2016) (police investigation);

*Freeze-Right Refrig. & Air Conditioning Servs., Inc. v. City of New York,* 101 A.D.2d 175, 181

(1st Dep't 1984) (investigation by municipal consumer affairs bureau of plaintiff's sales

practices).

        *Fifth,* a plaintiff can only complain about a statement that is "of and concerning"

him or her.  This principle "stands as a significant limitation on the universe of those who may

seek a legal remedy for communications they think to be false and defamatory and to have

injured them."  *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399-400 (2d Cir. 2006).  For

example, impugning the financial condition of a corporation does not libel its chief executive.

*Jankovic v. Int'l Crisis Group*, 429 F. Supp. 2d 165, 171 (D.D.C. 2006).

        Application of these principles demonstrates that each of the alleged libels set

forth in paragraph 56 of the Complaint is deficient as a matter of law, as explained below and

summarized in the chart annexed as Appendix B.

    1.    *That Lindberg "diverted huge sums" from the life insurers:*

        The report of "diversion" was based on stated facts not alleged to be false or to

have been published with fault, which are set forth in Appendix A verbatim as they appear in the

First Article.  It is therefore protected as pure opinion.  Alternatively, if the word "diversion" is

deemed to be factual, the statement that Lindberg "diverted" assets from the insurance

companies to his non-insurance business was substantially true.  The principal definition of

"divert" in Merriam Webster's online dictionary is "to turn from one course or use to another,"

and an example provided is "diverting funds to other projects."[11]  This is a fair description of

how Lindberg arranged for a large share of the assets of the cash-rich insurance companies he

---

[11] *Divert*, Merriam-Webster, https://www.merriam-webster.com/dictionary/divert
 (last visited Dec. 14, 2020).

had acquired to be loaned to SPVs and used to acquire or benefit other companies he controlled. The assertion in the complaint that those transfers were "prudent" investments, (Compl. ¶ 40(1)), does not make the description any less accurate.

2. *That affiliated companies were "insolvent" or "appeared insolvent":*

The First Article only uses the phrase "appeared insolvent," and that phrase only appears in a quote from an investigatory letter from the North Carolina Department of Insurance:

> "Concerns have been identified regarding the affiliated debt securities and the special purpose vehicles ("SPVs") that are held by the Companies," a senior state examiner wrote to the finance chief of Mr. Lindberg's insurance group in March 2017.
>
> Some affiliated entities borrowing money appeared insolvent, the official wrote.
>
> . . . .
>
> The Lindberg spokesman said the insurers provided additional information "to substantiate the financial solvency of these entities."

(LoBue Decl. Ex. 1, ¶¶ 74–76). Even if this statement of apparent financial condition were defamatory of the "affiliated entities," they are not of and concerning Lindberg, the only named plaintiff. In any event, this quote is protected by the fair report privilege. Not only is there no claim that the investigation did not occur or that the letter was misquoted, but Lindberg's response is published as well—the report is both true, and fair.

3. That Lindberg "lent $2B from those insurers to entities he controlled, using much of it to expand his private holdings":

This passage is not actionable for a simple reason: the Complaint does not allege that it is false. Indeed, the First Article quotes a Lindberg spokesperson as confirming the amount of funds transferred to entities in which Lindberg has a "significant economic interest" at $2 billion (LoBue Decl. Ex. 1, ¶ 13), and plaintiff does not allege that this quotation is invented or erroneous. Moreover, the First Article details many of the "private holdings" purchased by

(25)

those non-insurance companies, and Lindberg likewise does not deny that those purchases

occurred.

4.      That the "sheer scale" of the use of insurance assets "exposes policyholders in US
          and Europe to an unusual and potentially risky strategy":

This is a subjective opinion, not capable of being proved true or false because it is

merely a prediction of what might happen in the future.  Moreover, the statement is a pure

opinion—it is an interpretation based on the undisputed, stated facts that Lindberg caused the

transfer of billions of dollars out of the insurance companies, and that those transfers had already

caused regulators to investigate whether the companies were thereby rendered insolvent, later

taking them into receivership to protect policyholders.

5.      *That the "sheer scale" of the transfers "has little precedent":*

This passage is, first, not defamatory, because perfectly ethical and proper

business strategies might be newly-conceived and thus with little or no precedent.  Moreover, the

use of the word "little" signals that this statement is subjective opinion (what is "little" in this

context?).  Nor is it alleged to be factually false.  The Complaint calls out only one precedent,

Berkshire Hathaway, but that is consistent with there being but "little" precedent, to the extent

that term has a factual component.

6.      *That the insurers "disguised the flow of money":*

Even if this statement is deemed to be of and concerning Lindberg and not the

companies, the use of the judgmental term "disguised" is an expression of pure opinion based on

disclosed facts not alleged to be false or published with fault.  The First Article describes how

the funds were moved through SPVs in which Lindberg was the "financial owner" while a

partner in a law firm held the voting rights, and then used to purchase assets for Lindberg's non-

insurance interests.  (LoBue Decl., Ex. 1, ¶¶ 47–50).  The article does not imply that the North

Carolina regulators were deceived, because it reports that (according to a Lindberg spokesperson) Commissioner Goodwin's office approved the structure. But investors and other members of the public also read the copious regulatory filings of insurance companies. The *Journal* is entitled to opine that Lindberg's complex financial stratagem was a "disguise" because it exalted form over substance and turned what had been affiliate investments into supposedly unaffiliated ones by a legal restructuring that did not change the economic reality. So long as the facts on which this term was based are set forth, as they were, the reader can judge for him or herself whether its use was merited.

7.  *That Lindberg "found a strategy that would allow him to contend on regulatory filings that his affiliated investments were, in fact, unaffiliated":*

This statement is not alleged to be false. (*See* Compl. ¶ 40(7)).

8.  *Regarding alleged dividends paid to Lindberg, that "insurance money was flowing into his pockets":*

The First Article does not say that dividends were paid to Lindberg directly from insurance companies as opposed to indirectly, from companies that were recipients of loans from insurers. There is no contention that this statement is untrue. Moreover, the core of the challenged passage is a quote from an Insurance Department investigation ("The examiner also said loans to affiliates 'were used to provide subsequent dividends to Mr. Greg Lindberg . . . The letter questioned whether some actions complied with state laws.'") and therefore privileged as a fair report, whether or not the allegation reported is correct. The use of the phrase "money was flowing into his pockets," though unflattering, is nonetheless a fair representation of the issue being investigated, and therefore no less within the privilege. *See Holy Spirit Ass'n*, 49 N.Y.2d at 68 (privileged fair report may "reflect to some degree the subjective viewpoint of [the] author"). Finally, even if not privileged, the phrase would be a pure opinion based on the disclosed facts of how the money flowed.

9.     *That "the financial hole at his insurers could exceed $1B":*

The Complaint alleges that this assertion is defamatory, but fails to acknowledge that it was reported in the Second Article only as a description of what regulators were investigating:

> *Now, state and federal authorities in separate probes are seeking to follow the money trail. Regulators fear many of the loans to Mr. Lindberg's businesses may be uncollectible and that the financial hole at his insurers could exceed $1 billion, according to a person familiar with the matter.*

(LoBue Decl. Ex. 3, ¶ 9).  This passage is covered by the fair report privilege.  The statement is also couched in the language of opinion, speculating that loans "may be" uncollectible and the losses "could exceed" $1 billion.  To the extent the passage is not privileged and held to be factual in nature, the essential truth of that "fear" is also admitted by Lindberg in his civil complaint against Causey, in which he admitted that his insurance businesses had been blocked from access to the credit markets, (*see* LoBue Decl. Ex. 6, ¶¶ 107, 110), and placed in rehabilitation to protect policyholders, (*id*. ¶ 116), some of whom were unable to redeem their policies, (*id*. ¶ 119).  Finally, simply reporting that someone is under investigation is not defamatory, because "[r]easonable readers understand that some people who are [investigated] are guilty and that others are not."  *Martin v. Hearst Corp*, 777 F.3d 546, 553 (2d Cir. 2015).

10.     *That Lindberg scoured Instagram for prospective partners:*

This statement is not defamatory, even if untrue.  Finding dates through social media is a common practice.  It is not disreputable.  "There is common agreement that a communication that is merely unflattering, annoying, irksome, or embarrassing, or that hurts the plaintiff's feelings, without more, is not actionable."  Sack at 2–13 (citing cases).  In any event, although Lindberg alleges that he does not own an Instagram account, (Compl. ¶ 53(2)), nowhere does he assert that he did not use Instagram in the manner reported.

(28)

11.    *That MM was subject to "surveillance . . . without her knowledge":*

The Complaint does not allege the substantial falsity of this item.  First, plaintiff alleges only that the anonymized MM was provided with protective services at her request and with her knowledge, (Compl. ¶ 53(3)); that is not inconsistent with (and could well have facilitated) also surreptitiously reporting her movements back to Lindberg.  Second, even if the Complaint successfully raises an issue about MM, it does not allege any falsity in the reports in the Second Article about several *other* women who were tailed and photographed without their knowledge or consent by Lindberg's detectives.  (LoBue, Decl. Ex. 3, ¶¶ 19, 38, 45, 48).  For this reason, the gist of the Second Article—that Lindberg made a practice of using agents to investigate and conduct surveillance on his romantic interests—is substantially true. [12]

## IV.    The Tort Counts Involving the *Journal*'s Alleged Sourcing Fail to State a Claim

In addition to his claim for defamation, Lindberg attempts to plead two counts that, although labelled differently, allege the same thing:  that by reporting information obtained from unidentified "former staffers and operatives" in the Second Article, the *Journal* is guilty of aiding and abetting breach of fiduciary duty (Count II) and tortious interference with contract

---

[12] In addition to the 11 allegedly defamatory passages set forth in the complaint, Lindberg alleges in passing that a photograph that appeared in the First Article defamed him by implication. (Compl. ¶ 43).  Because there are no fewer than nine photographs in the online article, and the Complaint does not specify which one gives rise to his complaint or why it is defamatory, this allegation cannot stand.  The photographs are matter-of-fact depictions of various persons and places mentioned in the article, and are in no way defamatory.  "The photographs in the article are appropriately related to the subject of the article and are accompanied by accurate captions. Their inclusion was a reasonable exercise of editorial discretion." *Aboutaam,* 180 A.D.3d at 574. *See generally Stepanov v Dow Jones & Co., Inc*., 120 A.D.3d 28, 37–38 (1st Dep't 2014) (claim of libel by implication requires plaintiff to "make a rigorous showing that the language of the communication as a whole can be reasonably read [] to impart a defamatory inference" and that the communication can be reasonably read "to affirmatively suggest that the author intended or endorsed that inference.").

(Count III).  These claims constitute a frontal assault on the media's ability to gather and report the news, and would turn the everyday practice of journalism into a venture through a tort minefield.  They should be rejected out of hand because they would impose an unwarranted burden on the exercise of First Amendment rights.  Even putting aside the special constitutional solicitude for news reporting, however, Counts II and III are dead on arrival because neither states a claim on which relief can be granted.

      *First,* although the plaintiff pronounces that "[s]ome former staffers and operatives" had "confidentiality and non-disclosure agreements" with Lindberg, (Compl. ¶¶ 50, 52), his allegations are bare-boned legal conclusions that fail to specify the essential element of "the existence of a valid contract between the plaintiff and a third party."  *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F. Supp. 933, 945 (S.D.N.Y. 1983); Restatement (Third) of Torts § 17 (2020) at (1)(a) (existence of a valid contract is an element of any claim for tortious interference with contract).  The Complaint fails either to identify the persons that Lindberg alleges were sources or to append or quote the relevant provisions of any contracts.  Failure to identify the contracts with which a defendant allegedly interfered is fatal to the claim for tortious interference with contract.  *See, e.g.*, *Martin Ice Cream Co.*, 554 F.Supp. at 945; *see also William Ives Consulting, Inc. v. Guardian It Sys., LLC*, 19-CV-00336-GCM, 2020 WL 6495542, at *4 (W.D.N.C. Nov. 4, 2020) (dismissing claim for tortious interference with contracts because complaint contained only "conclusory assertions" and did not identify the specific contracts at issue); *Highland Capital*, 178 A.D.3d at 574 (affirming dismissal of tortious interference claim where complaint "failed to cite any specific confidentiality agreements that defendants knowingly induced their sources to violate").

*Second*, the claim for aiding and abetting fiduciary duty fails because the Complaint does not allege facts sufficient to establish that any fiduciary relationship existed between Lindberg and the unnamed staffers and operators. "A conventional business relationship, without more, is insufficient to create a fiduciary relationship"; rather, "a plaintiff must make a showing of special circumstances that could have transformed the parties' business relationship to a fiduciary one, such as control by one party of the other for the good of the other." *Saul v. Cahan*, 153 A.D. 3d 947, 949 (2d Dep't 2017) (internal quotation marks and citation omitted) (affirming dismissal of claim for breach of fiduciary duty for failing to plead fiduciary relationship); *see also Meridian Horizon Fund, LP v. KPMG (Cayman)*, 487 Fed. App'x 636, 642–43 (2d Cir. 2012) (affirming dismissal of claim for aiding and abetting a breach of fiduciary duty where complaint "fails sufficiently to allege any special circumstances that would transform the relationship into a fiduciary one"). The Complaint alleges no special circumstances that would support a conclusion that the unnamed "former staffers and operatives" were Lindberg's fiduciaries. Rather, it alleges merely that a fiduciary duty arose out of the "sensitive nature of some of the services they were providing for Lindberg, or on his behalf, as well as the confidential information they possessed." (Compl. at ¶ 52). Bare exposure to confidential information, without more, does not transform a service provider—even one whose services are of an indeterminate "sensitive" nature—into a fiduciary. If it did, every signatory to a non-disclosure agreement would bear fiduciary obligations in addition to contractual ones. Fiduciaries are not created so indiscriminately.

*Third*, the Complaint fails sufficiently to allege that the *Journal* knew of either the contractual or fiduciary obligations that purportedly were breached. *See* Restatement (Third) of Torts § 17 (2020) at cmt. *l* (actual knowledge is an element of a claim for tortious interference

(31)

with contract); *Martin Ice Cream Co.*, 554 F. Supp. at 945 (same); Restatement (Third) of Torts § 28 (2020) at cmt. *c* (actual knowledge is an element of a claim for aiding and abetting breach of fiduciary duty); *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005) (same). The Complaint's conclusory allegations that the *Journal*'s reporters knew about those contracts and fiduciary duties, (*see* Compl. ¶¶ 52, 63, 67), are precisely the kind of recitation-of-the-elements pleading that is insufficient to survive a motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 687 (2009) ("Rule 8 does not empower respondent to plead the bare elements of his cause of action . . . and expect his complaint to survive a motion to dismiss."); *Gilford v. NYS Office of Mental Health*, 17-CV-8033 (JPO), 2019 WL 1113306, at *6 (S.D.N.Y. Mar. 11, 2019) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)) ("No matter what the pleading standard is, [the plaintiff's] complaint must contain enough factual allegations that are *not* made upon information and belief to 'raise a right to relief above the speculative level.'"). The Complaint speculates that the reporters "would not have been strangers to interacting with potential sources who were constrained" by confidentiality agreements, (Compl. at ¶ 51), but this allegation is not even sufficiently robust to establish that the reporters *should have* known that their particular (unidentified) sources owed contractual and fiduciary duties to Lindberg—much less that they had the *actual* knowledge of those obligations that is essential to the tort claims here. *See, e,g*., *Global Minerals and Metals Corp. v. Holme*, 35 A.D.3d 93, 101-02 (1st Dep't 2006) ("Actual knowledge, as opposed to merely constructive knowledge, is required and a plaintiff may not rely on conclusory or sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty.").

*Fourth*, Lindberg fails to plead that the *Journal* specifically intended for unidentified staffers and operators to breach their contracts, and did so "without justification."

*See, e.g.*, *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401-02 (2d Cir. 2006) ("intentional procurement of the third-party's breach of the contract without justification" is an essential element of a tortious interference with contract claim); *Alvord & Swift v. Muller Const. Co.*, 46 N.Y.2d 276, 281 (1978) ("Intentional interference with contractual relations . . . must be intentional, not merely negligent or incidental to some other, lawful, purposes."). Even if the Complaint's conclusory allegations that the *Journal*'s reporters "actively encourag[ed]" and "intentionally" sought to cause the breaches, (Compl. at ¶¶ 52, 63, 67), were accepted, the Complaint *at most* could be read to assert that the *Journal* reporters disregarded their sources' obligations to Lindberg in their quest to obtain newsworthy information. But those same allegations demonstrate that, in the circumstances, the conduct was "justified" and therefore not tortious. The news cannot be reported without sources. The reporters' pursuit of information is at the heart of First Amendment-protected news publishing, and, as such, is precisely the sort of "other, lawful purpose" that removes conduct from the scope of tort law. *See, e.g.*, *Highland Capital*, 178 A.D.3d at 574 (affirming dismissal of tortious interference with contractual relations claim because "Defendants' conduct as alleged in the complaint was incidental to the lawful and constitutionally protected process of news gathering and reporting."); *Harris v. Town of Fort Ann*, 35 A.D.3d 928, 929 (3d Dep't 2006) (rejecting claim for tortious interference with contract where defendants had the "manifestly [] lawful purpose" of "[u]rging a governmental entity to take a particular action on a pending permit application"). A news publisher "whose motive and conduct is intended to foster public awareness or debate cannot be found to have engaged in the wrongful or improper conduct required to sustain a claim for interference with contractual relations." *Huggins v. Povitch*, No. 131164/94, 1996 WL 515498, at *9 (N.Y. Sup. Ct., N.Y. Cty. Apr. 19, 1996) ("[T]he broadcaster's [F]irst [A]mendment right to broadcast an

(33)

issue of public importance, its lack of any motive to harm the plaintiff, and the obvious societal interest in encouraging freedom of the press, negate essential elements of the tort."); *accord Jenni Rivera Enter., LLC v. Latin World Entm't Holdings, Inc.*, 249 Cal. Rptr. 3d 122, 150-51 (Cal. Ct. App. 2019) (citing courts that have rejected on First Amendment grounds claims for intentionally interfering with a non-disclosure agreement); *Seminole Tribe of Fla. v. Times Pub. Co.*, 780 So.2d 310, 312, 318 (Fla. Dist. Ct. App. 2001) (no cause of action for tortious interference against media defendants who engaged in "routine news gathering techniques" including "asking," "solicit[ing]," and "request[ing]" individuals subject to non-disclosure contracts for information).

      *Fifth*, the Complaint does not plausibly assert that the *Journal* reporters' actions *caused* the breaches in question. *See* Restatement (Third) of Torts § 17 (2020) at cmt. *m* (to prevail on a claim for tortious interference with contract, plaintiff must show "that the contract would have been performed, or performed differently, but for the defendant's wrongful intervention"); *White Knight of Flatbush, LLC v. Deacons of Dutch Congregation of Flatbush*, 159 A.D.3d 939, 940–41 (2d Dep't 2018) (to state a claim for tortious interference with contract "the plaintiff must specifically allege that the contract would not have been breached but for the defendant's conduct"); *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Secs., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006) (to state a claim for aiding and abetting a breach of fiduciary duty, "the plaintiff must allege that the aiding and abetting defendant proximately caused the harm on which the primary liability is predicated"). The Complaint asserts that the *Journal*'s reporters "encouraged and persuaded" certain "former staffers and operatives" to breach their duties, (*see* Compl. at ¶ 52), but stops short of contending that such encouragement had any effect on the staffers' alleged decisions to breach. To the contrary, the Complaint

(34)

alleges that the "former staffers and operatives" at issue here had "an emotional, political, or financial interest in harming Lindberg" quite apart from the *Journal*'s efforts. (Compl. at ¶ 51).[13] This is precisely the kind of "predispos[ition]" to breach that destroys the causal chain. *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 293–94 (S.D.N.Y. 1998) ("Once a plaintiff alleges facts . . . establishing that the breaching party was predisposed toward breaching its agreement, the claim for tortious interference must be dismissed for failure to plead 'but for' causation.").

## CONCLUSION

The Complaint should be dismissed with prejudice.

Dated: December 15, 2020

Respectfully submitted,

*s/ Robert P. LoBue*

Robert P. LoBue

---

[13] The failure to allege that the actions of the *Journal* reporters caused the sources to breach their alleged duties does not appear to have been an accident. In his motion for summary judgment in his action for breach of contract and breach of fiduciary duty against two individuals alleged to have been sources for the Second Article, Lindberg quoted deposition testimony given by one alleged source that he affirmatively sought out a *Journal* reporter to disclose information about the surveillance of Lindberg's romantic interests after reading the First Article:

> Serber further admitted that he had independently searched out and contacted this journalist—a Wall Street Journal reporter—after "reading something else that he'd written" about Lindberg. (*Id.* at 20 – 22). Serber told this journalist "that I was calling him because he had a – seemed to have a journalistic interest in [] Lindberg, and I thought that he was the right person to talk to. I told him that I think I have some information that he might be interested in[.]" (*Id.* at 31 – 34 & 56 – 57).

LoBue Decl., Ex. 13, at 5.

Of Counsel:

Jason P. Conti, General Counsel
Craig Linder, Associate General Counsel
Joseph Weissman, Counsel
Dow Jones & Company, Inc.

Tara J. Norris
Ian D. Eppler
Patterson Belknap Webb & Tyler LLP

<u>Appendix A</u>

Statements in First Article not alleged to be false, or published with actual malice, that support statement that Lindberg "diverted" assets (numbered paragraphs correspond to LoBue Decl. Ex. 1):

> (i)    regarding directing insurance co. funds to SPVs so they would not be considered "affiliated investments":
>
>> [¶ 13]: The spokesman pegged the volume of investments by Mr. Lindberg's insurers in entities in which he has a "significant economic interest" at $2 billion. He said the investment strategy was approved in advance by North Carolina regulators and was part of a plan by Mr. Lindberg to both improve investment returns for his insurers and expand his overall enterprise.
>>
>> [¶ 18]: Mr. Lindberg's investment of insurance funds into affiliates at one point amounted to more than 50% of the assets of one of his main insurers, according to regulatory filings and other documents.
>>
>> [¶ 31]: He was candid about wanting a bigger role for affiliated investments in seeking deal approval from Alabama regulators. At a hearing, he said he thought Southland could do better by swapping some low-yielding corporate bonds into floating-rate debt of his Eli Global operating companies.
>>
>> [¶ 34]: Mr. Lindberg shifted Southland to North Carolina and began replacing tens of millions of dollars of its bonds with loans to Lindberg companies.
>>
>> [¶ 35]: By the end of 2015, $177 million of Southland's expanded portfolio was invested in affiliated entities, filings show—more than half its assets at that point.
>>
>> [¶¶ 36-37, 45-47]: [North Car.] made a rare exception for Mr. Lindberg, allowing Southland to invest as much as 40% of its assets in Lindberg affiliates rather than the normal 10%, according to regulatory correspondence reviewed by the Journal.
>>
>> The Lindberg spokesman confirmed that.
>>
>> At first, Southland in its regulatory filings openly listed the flow of money to its owner's ventures as "affiliated" loans, naming Eli Global companies as the borrowers.
>>
>> The filings raised concerns in Florida, known for tough insurance regulation. Officials in 2016 took steps to suspend Southland from doing business in the state, finding it was "financially impaired" due to the high level of affiliated investments. Southland voluntarily withdrew from the state.

By putting half of its assets in affiliates, Southland had breached even the lenient agreement with North Carolina. A department examiner took note. She directed Mr. Lindberg in an early 2016 letter to "refrain from investing further in affiliates and to provide a plan outlining how [the insurer] will return to compliance with the 40% agreed upon limit," according to a copy of the letter in the internal Lindberg documents.

[¶¶ 49-52]: As part of the plan, an intermediate entity, a "special purpose vehicle," would borrow from one of the insurers and in turn lend the money to a Lindberg company.

Mr. Lindberg put a small amount of capital into each SPV and was the financial owner, while the voting rights were held by an entity controlled by William Wofford, a partner at an outside law firm, Hutchison PLLC, the internal corporate documents show. Hutchison was paid $400,000 up front for this service.

Because it lacked voting rights, "Eli Global has absolutely no control" over the SPVs, and therefore they weren't affiliates, the company said in a 2016 presentation to North Carolina regulators reviewed by the Journal. One slide in the presentation was headed: "Replacing Affiliate Loans with SPV."

The law firm provided regulators with legal opinions that the SPVs weren't affiliates. Some of the firm's lawyers including Mr. Wofford donated to Mr. Goodwin's campaign at the time of the February 2016 fundraiser at Mr. Lindberg's home, held as regulators were considering the SPV plan.

[¶¶ 58-59]: By the end of 2017, the U.S. insurers in total had about $710 million invested in entities in which Mr. Lindberg had a significant economic interest, his spokesman said.

Such related investments accounted for about one-third of the combined assets of his three North Carolina-registered insurers at that point, the spokesman said, not counting their investments in each other or related insurers.

(ii)   regarding use of SPVs to purchase assets that benefitted other parts of Lindberg empire, or Lindberg personally:

[¶¶ 55-56]: Mr. Lindberg's Colorado Bankers Life Insurance Co. lent $8.8 million in November 2016 to a new SPV, Macon LLC, which promised to pay 9.5% annual interest over a decade. Mr. Lindberg used that money to acquire a Massachusetts public-relations firm for his conglomerate, the documents show.

By routing the loan through the SPV, Colorado Bankers could claim the loan wasn't to an affiliated borrower, even though Mr. Lindberg was using the money to expand his empire and one of his companies was the ultimate borrower. (The loan was secured by the assets of the public-relations firm.)

[¶ 61]: As his empire grew, so did Mr. Lindberg's stated net worth. It reached $1.7 billion at the end of 2017, his spokesman said. That was up fivefold from the $340 million he claimed four years earlier,

[¶¶ 67-68]: Although the maze of entities makes it difficult to trace insurance money directly to Mr. Lindberg's home purchases, at least one can be linked. Last July, after splitting from his wife, Mr. Lindberg through a shell company paid $5.5 million for a 12,000 square-foot mansion in Raleigh.

The house was bought with the help of a $3.3 million loan from Kite Asset Management Inc., listing an address at Eli Global headquarters. A Lindberg insurer invested $40 million in Kite a few weeks before the home purchase. Delaware filings show Mr. Lindberg was Kite's president.

[¶ 70]: Mr. Lindberg used much of the insurance money to acquire scores of businesses for Eli Global, including a New Mexico wine wholesaler, an Australian software firm, a Canadian debt collector and chains of eye-doctor practices.

[¶¶ 80-81]: Mr. Lindberg continued to expand his empire, buying insurers in Michigan, the Netherlands and Luxembourg, and establishing a reinsurer in Bermuda. He also helped finance a reinsurer in Vermont. The Bermuda and Vermont reinsurers proceeded to loan a total of more than $600 million to Mr. Lindberg's companies.

Mr. Lindberg extracted money from the insurers via a Malta entity he set up to provide investment services to his companies. It received $34 million in fees in 2017, Malta filings show[.]

[¶ 82]: Beginning in late 2017, Mr. Lindberg's Colorado Bankers began hauling in large sums of new money to be invested: $1.3 billion in sales of annuities, a type of saving product, to retirees and other conservative investors. Much of that was lent to Lindberg-related entities, filings show.

| Challenged Statement (as numbered in Complaint ¶ 56) | Reasons Not Actionable |
|---|---|
| **Statement 1 (First Article ¶ 3):** "Lindberg 'diverted' 'huge sums' 'from the group of life insurance firms he began assembling in 2014[.]'" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Statement of pure opinion based on stated facts.**<br><br>• **Not alleged to be materially false.** |
| **Statement 2 (First Article ¶ 75):** "Money was invested in affiliated entities that were 'insolvent' or 'appeared insolvent[.]'" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Protected by the fair report privilege.**<br><br>• **Not of and concerning the plaintiff.** |
| **Statement 3 (First Article ¶ 4):** "Lindberg 'lent at least $2 billion from those insurers to scores of entities he controlled, using much of it to expand his private holdings[.]'" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Not alleged to be materially false.** |
| **Statement 4 (First Article ¶ 5):** "The sheer scale of [] Lindberg's use of insurance assets . . . exposes hundreds of thousands of policyholders across the U.S. and in Europe to an unusual and potentially risky strategy[.]" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Statement of subjective opinion or pure opinion based on stated facts.** |
| **Statement 5 (First Article ¶ 5):** "The sheer scale of [] Lindberg's use of insurance assets . . . has little precedent[.]" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Not defamatory as a matter of law.** |

| | |
|---|---|
| | • **Statement of pure opinion based on stated facts.**<br><br>• **Not alleged to be materially false.** |
| **Statement 6 (First Article ¶ 6):** "The insurers disguised the flow of money[.]" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Not of and concerning the plaintiff.**<br><br>• **Statement of pure opinion based on stated facts.**<br><br>• **Not alleged to be materially false.** |
| **Statement 7 (First Article ¶ 48):** "Lindberg found a strategy that would allow him to contend on regulatory filings that his affiliated investments were, in fact, unaffiliated[.]" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Not alleged to be materially false.** |
| **Statement 8 (First Article ¶ 75):** "Lindberg was taking dividends or 'insurance money was flowing into his pockets[.]'" | • **Barred by the statute of limitations.**<br><br>• **Not published with actual malice.**<br><br>• **Protected by the fair report privilege.**<br><br>• **Statement of pure opinion based on stated facts.**<br><br>• **Not alleged to be materially false.** |
| **Statement 9 (Second Article ¶ 9):** "There was a 'financial hole at his insurers [which] could exceed $1 billion[.]'" | • **Not published with actual malice.**<br><br>• **Protected by the fair report privilege.**<br><br>• **Report of investigation not defamatory as a matter of law.**<br><br>• **Not of and concerning the plaintiff.** |
| **Statement 10 (Second Article ¶ 35):** "'Lindberg also scoured Instagram for | • **Not published with actual malice.**<br><br>• **Not defamatory as a matter of law.** |

| | |
|---|---|
| prospective partners, often aspiring models[.]'" | • **Not alleged to be materially false.** |
| **Statement 11 (Second Article ¶ 70):** "MM, one of the 'interests,' was subject to 'surveillance . . . without her knowledge.'" | • **Not published with actual malice.**<br><br>• **Substantial truth of reports of surveillance not contested.** |