PATTERSON BELKNAP WEBB & TYLER LLP
Robert P. LoBue (RL-2284)
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000

Of Counsel:

Jason P. Conti, General Counsel
Craig Linder, Associate General Counsel
Joseph Weissman, Counsel
Dow Jones & Company, Inc.

Tara J. Norris
Patterson Belknap Webb & Tyler LLP

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GREG E. LINDBERG, | Case No. 1:20-cv-08231 (LAK) |
| Plaintiff, | |
| -against- | |
| DOW JONES & COMPANY, INC., | |
| Defendant. | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION
TO DISMISS THE COMPLAINT**

Defendant respectfully submits this reply in further support of its motion to dismiss.

## I. THE FIRST ARTICLE IS TIME-BARRED

Lindberg argues that the hyperlink in the Second Article republished the First Article based on two mutually inconsistent theories: *first*, that the First Article was about Lindberg's financial manipulations whereas the Second Article was about his love life, ostensibly a different subject that "departed from" the First and was meant to attract a different audience; *second*, that the Second Article was actually more of the same—it "reinforced the impression" of the First Article by repeating the defamations of the earlier piece (Opp. at 9-10).[1] These arguments are in obvious tension with one another, and neither of them is correct as a matter of law.

*First*, the unremarkable fact that the Second Article reports on some matters that go beyond the main subjects of the earlier one cannot render the embedded hyperlink a republication of the First Article on the theory that a "new audience" was exposed to the defamation.[2] That proposition, if accepted, would prove far too much: it would make any hyperlink, even one without additional commentary, an actionable republication whenever the later publication discussed matters not found in the linked source article. All of the case law agrees that Lindberg's theory is not the law. *See, e.g.*, *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 505–507 (6th Cir. 2015) ("Simply alerting a new audience to the existence of a preexisting statement does not republish it"). To the contrary, the decisions recognize that hyperlinking to a prior report is not a republication but a reference that serves to locate the prior work for the reader's convenience (*see* Memo in Support, cases cited at 11 and n.3). Lindberg's reliance on a

---

[1] Plaintiff's Response to Defendant's Motion to Dismiss (Dkt. 21) is referred to as "Opp." The opening Memorandum of Law in Support of Defendant's Motion to Dismiss the Complaint (Dkt. 13) is referred to as "Memo in Support."

[2] Lindberg's argument is also factually incorrect: the core concern of both articles is his use of corporate funds for personal benefit. *See* Point II, *infra*.

1

decision issued when the word "internet" was not yet in the dictionary addressing paperback editions of hardcover books, *Rinaldi v. Viking Penguin, Inc.*, 52 N.Y.2d 422 (1981) (Opp. at 9), does not shed light on the issue.

*Second*, the allegedly defamatory statements in the First Article are *not* repeated in the Second Article.  Paragraph 56 of the Complaint itemizes the alleged defamatory statements.  None of those found in the First Article (items 1–8) reappears in the Second.  The contrast between this case and the sole authority cited by Lindberg for this point, *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263 (S.D.N.Y. 2016), could not be sharper.  In *Enigma,* "at least two of [defendant's] timely posts themselves restate, almost verbatim, allegedly defamatory statements from the [untimely] 2014 Post, and only then do they direct users to read the 2014 Post for additional, similar information."  *Id.* at 278.  Suggesting in dictum that the "almost verbatim" reiteration of the prior statements likely constituted "republication" as a matter of libel law, the court distinguished cases where the subsequent publication did not restate the allegedly defamatory content in presenting the hyperlink.  *Id.*, citing *In re Phila. Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012) ("mere reference to an article . . . as long as it does not restate the defamatory material, does not republish the material . . . Taken together, though a link and reference may bring readers' attention to the existence of an article, they do not republish the article") and *Salyer v. S. Poverty Law Ctr., Inc.*, 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009) ("[A] reference, without more, is not properly a republication[, because . . . w]hile it may call the *existence* of the article to the attention of a new audience, it does not present the *defamatory contents* of the article to that audience." (emphases in original)).

Thus, if a later publication repeats in words a prior defamation, the publisher cannot claim impunity by simply adding a hyperlink and asserting that its repetition of the earlier defamation for that reason alone is not a republication. But that is not this case. Dow Jones is prepared to defend on the merits every challenged statement in the Second Article. It should not, however, have to defend stale claims based on statements in the earlier article that were not repeated in the Second Article.

## II. LINDBERG HAS NOT PLEADED ACTUAL MALICE AND CANNOT DO SO

Lindberg contends that he is not a public figure and that neither article involves an "issue of public interest" under New York Civil Rights Law § 76-a(1)(a)(1). The Court should reject these arguments and apply the actual malice standard—a standard that Lindberg effectively concedes he did not meet in his Complaint (Opp. at 17).

### A. Lindberg is a Public Figure

Lindberg argues he did not invite public attention to himself or seek a media spotlight, citing *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136 (2d Cir. 1984) (Opp. at 12), but the *Lerman* test is not the only standard used to evaluate whether a plaintiff is a limited purpose public figure (*see* Memo in Support at 13). Nothing in *Lerman* or later case law suggests that it was intended to displace the separate category of the "involuntary public figure." *See, e.g.*, *Wells v. Liddy*, 186 F.3d 505, 540 (4th Cir. 1999). Where a plaintiff engages in activities that invite public attention, he may be "deemed a public figure" even if he would have preferred to avoid media scrutiny. *McDowell v. Paiewonsky*, 769 F.2d 942, 949 (3d Cir. 1985).

Lindberg makes much of the fact that his political donations are protected by the First Amendment, but the same is true of statements to the media that indisputably give rise to public figure status in other circumstances. *See, e.g.*, *Lerman*, 745 F.2d at 136. Like direct advocacy through public discourse, political donations represent one method by which people can "thrust

3

themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved" and thereby gain public figure status. *See Wolston v. Reader's Digest Ass'n, Inc.*, 443 U.S. 157, 164 (1979); *Arrigoni v. Velella*, 110 A.D.2d 601, 603–04 (1st Dep't 1985) (finding that plaintiff was a public figure as a matter of law where he "made substantial political contributions"). Unlike the plaintiff in *Wolston*, Lindberg was not "dragged unwillingly into the controversy" described in the First and Second Articles, 443 U.S. at 166; rather, his volitional conduct posed issues of legitimate public concern about which the *Journal* reported.

Here, Lindberg took the risk that his large-scale political and business manipulations would prompt the kind of public attention reflected in the *Journal* articles and much other reporting.[3] He donated millions of dollars—enough to make him *the single largest political donor in North Carolina*—to political candidates (*see* LoBue Decl., Ex. 1 (Dkt. 14-1) at ¶¶ 2, 84). He donated enormous sums to the insurance commissioner whose office regulated his core businesses (*id.* at ¶¶ 40, 52, 85), and attracted significant public scrutiny for that reason alone (LoBue Decl., Exs. 9-12), making him, at a minimum, a public figure regarding his efforts to influence that office and his regulated business affairs. While there may be individuals whose participation in political activism and advocacy is so modest that it does not render them public figures (*see* Opp. at 13), Lindberg is not one of those people.

---

[3] Lindberg objects to the submission of published reports to demonstrate his public figure status (Opp. at 7–8), but the use of judicial notice at the motion to dismiss stage for this purpose is well established. *See, e.g.*, *Biro v. Condé Nast*, 963 F. Supp. 2d 255, 271 n.9 (S.D.N.Y. 2013), *aff'd*, 622 F. App'x 67 (2d Cir. 2015) ("[T]he Court can take judicial notice of the existence of articles written by and about Biro . . . . Courts in this Circuit have employed judicial notice in making determinations about whether plaintiffs are public figures at the motion to dismiss stage."). This issue is particularly suited to judicial notice, as the publications are not reasonably subject to question as to authenticity, and demonstrate the notoriety of and public interest in plaintiff's activities. As one Court of Appeals has observed, "[i]n a defamation case, the question of public figure status is pervasive, and it should be answered as soon as possible." *Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 724 (5th Cir. 1980).

Lindberg's attempts to disentangle his political activism and criminal behavior from his business activities are unconvincing. Although Lindberg argues that the "financial health of [his] companies" is not related to his political contributions (Opp. at 14), Lindberg's political donations were part of a criminal scheme to deflect scrutiny of precisely the financial health of those companies. The First Article, for example, describes the "secret recordings made by North Carolina's current insurance commissioner" in connection with the FBI investigation into Lindberg's activities (*id.* ¶ 10). A reader would not understand *why* the FBI was investigating Lindberg's political donations to North Carolina's insurance commissioner without being informed that Lindberg owned several North Carolina insurance companies and had invested their assets into other companies he owned after obtaining favorable treatment from the prior commissioner, to whom he had also made substantial contributions.

The activities described in the Second Article are not purely private merely because they touch on Lindberg's romantic relationships. The article presents Lindberg's use of a security company he owned to follow women he was dating as another example of his use of company assets for personal benefit. This reporting was hardly "dirt" in which the public had no legitimate interest (Opp. at 6); to the contrary, as the Second Article highlights, "state and federal authorities in separate probes [were] [also] seeking to follow the money trail" (LoBue Decl., Ex. 3 at ¶¶ 7–9).

And, finally, there is the minor detail not addressed in Lindberg's opposition that he was convicted of two federal felonies for trying to corrupt the government of the State of North Carolina. Lindberg says nothing to distinguish this case from those holding that such notorious criminal activity renders the perpetrator a public figure (*see* Memo in Support at 15–16).

### B. N.Y. Civil Rights Law Requires Lindberg to Plead Actual Malice

Whether or not a public figure, Lindberg also is required to plead that Dow Jones published the First and Second Articles with actual malice because those articles constitute the exercise of free speech rights "in connection with an issue of public interest." N.Y. Civ. Rights Law §§ 76-a(1)(a), 76-a(2).[4] Lindberg raises two meritless objections to the application of section 76-a(2) to his defamation claim. *First*, he mistakenly asserts that the statute applies only to public figures (Opp. at 15). Section 76-a(1)(a)'s actual malice requirement applies to *all* claims that "involve[e] public petition and participation," whether or not brought by public figures. *Second*, Lindberg objects to the "expansive interpretation" of "issue[s] of public interest" (Opp. at 16). But Lindberg's quarrel on this point is with the New York legislature, not with Dow Jones. The statute instructs that "'[p]ublic interest' shall be construed broadly, and shall mean any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d).

Lindberg's activities are clearly of public concern. His use of assets originating with insurance companies to fund other companies within his vast business empire is of interest to, among others, persons insured by a Lindberg-owned insurance company who might need those funds to pay out a valid claim. That Lindberg's insurance companies ultimately were placed into receivership to avoid "potential harm to policyholders" (LoBue Decl., Ex. 6 at ¶ 116), underscores the legitimacy of this public interest, but the fact is hardly necessary to justify the *Journal*'s reporting about the risk. And Lindberg's sizable donations to politicians, including the insurance commissioner charged with regulating his investment of insurance funds (*see* LoBue Decl., Ex. 1 at ¶¶ 36–43, 73–77, 84–89), raise questions about the regulator's ability to oversee

---

[4] Lindberg does not dispute that amended section 76-a(2) governs this case, based on Judge Rakoff's thorough analysis in *Palin v. New York Times Co.*, 2020 WL 7711593 at *13 (S.D.N.Y. 2020). (See Opp. at 15 n.3.)

6

Lindberg's insurance businesses effectively and, more generally, about the influence of political contributions on governmental decision-making. And, for the same reason that Lindberg is a public figure for the purpose of the Second Article, that article also relates to issues of public importance, both updating the investigations and providing additional examples of how he deployed corporate assets for personal gain.

### C. Leave to Replead Should be Denied

Lindberg does not attempt to defend the adequacy of his pleading of any facts that support actual malice. Rather, he seeks this Court's permission to file an amended complaint containing additional, unidentified allegations. But leave to amend should be denied where amendment would be futile. *E.g.*, *Parker v. Citizen's Bank, N.A.*, 2019 WL 5569680 at *6 (S.D.N.Y. Oct. 29, 2019). Nothing that Lindberg might conjure up in a new pleading could cure the untimeliness of the Complaint as to the First Article, and the non-actionability of the few challenged passages in the Second Article. Leave to amend should be denied.

### III. THE CHALLENGED STATEMENTS ARE NOT ACTIONABLE AS DEFAMATION

Lindberg's response on the merits begins by asserting two propositions that are either incorrect or inapposite (Opp. at 18–19). *First,* that Lindberg is the main subject of both articles does not automatically mean that every statement in the articles is "of and concerning" him. The cases cited by Defendant and not addressed by Lindberg make clear that even a close relationship between the plaintiff and the allegedly defamed entity does not make the publication "of and concerning" the plaintiff. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 399–400 (2d Cir. 2006) (investor and company in which investment is made); *Jankovic v. Int'l Crisis Group*, 429 F. Supp. 2d 165, 171 (D.D.C. 2006), *aff'd in part, rev'd in part on other grounds*, 464 F.3d 1080

(D.C. Cir. 2007) (company and its CEO). Thus, while some of the challenged statements are of and concerning Lindberg, others—specifically ## 2, 6, and 9—are not.

*Second,* Lindberg claims that none of the challenged statements is covered by the fair report privilege because there is "little that Defendant can point to that credibly suggests" that any of them was derived from official proceedings (Opp. at 18).  The problem with this argument is that the passages as to which Defendant claims the privilege—## 2, 8 and 9—*say* they are quoting from or summarizing official proceedings,[5] but the Complaint does not allege that those attributions are fabricated, incomplete, or misleading.  Under *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017), it was Lindberg's burden to plead that those statements—including the attribution to various official investigations—were untrue. He failed to do so.

Beyond this, Lindberg does little more than regurgitate the allegations of his complaint regarding alleged falsity, but he disregards the Defendant's analysis of each of the challenged statements and the several reasons why each passage is not actionable (Memo in Support at 24–29 and App. B thereto).  Dow Jones respectfully refers the Court to that analysis in its opening brief, save only to take note of one particularly audacious theme of the opposition: that despite all the machinations reported on by the *Journal,* the insurance companies remained well capitalized and the policyholders safe (Opp. at 20, 21).  Lindberg does not pause to explain his

---

[5] Complaint ¶ 56 (2) (challenging paragraph in First Article, numbered 75 in LoBue Decl. Ex. 1, that attributes allegations to report of senior state examiner); Complaint ¶ 56 (8) (challenging paragraph in First Article, numbered 74 in LoBue Decl. Ex. 1, that attributes allegations to report of state examiner); Complaint ¶ 56 (9) (challenging paragraph in Second Article, numbered 9 in LoBue Decl. Ex. 3, that describes subject of investigations by "federal and state authorities").  Reports on governmental investigations come within the fair report privilege if they fairly and accurately report what is being investigated, and there is no requirement that the media await the outcome of the investigation or publication of findings before alerting readers to its existence. *See, e.g., Freeze Right Refrigeration & Air Conditioning Services, Inc. v. New York,* 101 A.D.2d 175, 182, 475 N.Y.S. 2d 383, 388 (1st Dep't 1984).

judicial admission that by 2019 his insurance companies had been "devastated" by loss of access to capital markets and placed in receivership to protect the policyholders (Memo in Support at 7 and LoBue Decl. Ex. 6). Indeed, there is now pending in the Bankruptcy Court for the Southern District of New York a proceeding concerning one of Lindberg's insurance companies domiciled in Bermuda, in which court-appointed liquidators are, according to Bankruptcy Judge Chapman, "seeking to marshal assets to repay creditors who have been defrauded by Mr. Lindberg," in a case that the court likened to that of Bernie Madoff.[6]

## IV.   THE NEWSGATHERING TORT CLAIMS SHOULD BE DISMISSED

Lindberg ignores the wealth of case law establishing that acts "incidental to the lawful and constitutionally protected process of news gathering and reporting," are justified and not actionable. *See, e.g.*, *Highland Capital Mgmt., L.P. v. Dow Jones & Co., Inc.*, 178 A.D.3d 572, 574 (1st Dep't 2019) (affirming dismissal of tort claims arising out of publisher's obtaining and publishing information allegedly disclosed in violation of a confidentiality agreement). Failure to apply the common law element of justification would propel this case onto a collision course with the First Amendment. Just as federal and state statutes that create a damages action for the publication of information that the speaker knows or should have known to have been obtained in violation of wiretapping laws cannot constitutionally be used against a publisher of a matter of public interest, *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the torts alleged here cannot be asserted against the *Journal*.[7] Because Lindberg's tort claims arising from the use of information

---

[6] See LoBue Suppl. Decl., Ex. 14 (transcript of Jan. 5, 2021 hearing at 13 (fraud by Lindberg), 25 (Madoff), in *In re PB Life and Annuity Co., Debtor,* Case No. 20-12791-scc (Bankr. S.D.N.Y.)).

[7] Lindberg's reliance on *Huggins v. Povich*, 1996 WL 515498, at *9 (Sup. Ct., N.Y. Cty. Apr. 19, 1996) (Opp. at 24), for the proposition that the Second Article does not address an "issue of public importance" is puzzling. The statements in *Huggins* were made by a night club owner's ex-wife regarding their marriage and divorce, during her appearance on Maury Povich's television talk show. *Id.* at *4–5. Those statements are of significantly less public importance than the ones in

9

allegedly obtained from a source bound by confidentiality obligations are not cognizable, leave to amend these claims should be denied as futile.

While the First Amendment is reason enough to dismiss both the contract interference and fiduciary duty claims, each is also infirm for failure to plead necessary elements. Lindberg's claim for aiding and abetting breach of fiduciary duty fails because he does not allege the "special circumstances" giving rise to a fiduciary relationship to be present. *See Saul v. Cahan*, 153 A.D. 3d 947, 949 (2d Dep't 2017). Lindberg cites no law for the proposition that persons "responsible for [his] personal security" are his fiduciaries and owe him a duty of confidentiality separate and apart from any obligation contained in agreements they allegedly signed.

Finally, Lindberg does not adequately allege either that valid contractual obligations between himself and the unnamed security operatives existed, or that the *Journal* reporters knew of these contractual (or the non-existent fiduciary) obligations. The Complaint merely pleads that the reporters *should have known* about the security operatives' obligations because as experienced journalists they "would not have been strangers" to the existence of confidentiality agreements in general (Compl. ¶ 51)—a proposition that, were it sufficient, would render the "actual knowledge" element toothless.

## Conclusion

The Complaint should be dismissed with prejudice.

                                                       Respectfully submitted,

                                                    *s/Robert P. LoBue*
                                                    Robert P. LoBue

---

the Second Article, which relate to Lindberg's use of company agents for personal surveillance services.