UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

GREG E. LINDBERG

                    Plaintiff,

             -against-

                                           20-cv-8231 (LAK)

DOW JONES & COMPANY, INC.,

                    Defendant.

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

### MEMORANDUM OPINION

Appearances:

        Aaron Z. Tobin
        Michael Merrick
        CONDON TOBIN SLADEK THORNTON, PLLC

        Charles A. Gruen
        LAW OFFICES OF CHARLES A. GRUEN

        *Attorneys for Plaintiff*

        Robert P. LoBue
        PATTERSON, BELKNAP, WEBB & TYLER LLP
        *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        This case arises from two allegedly defamatory articles published in *The Wall Street Journal* (the "*Journal*") about Greg Lindberg's business and romantic pursuits.[1]  Lindberg is the founder and sole owner of the Global Growth investment firm and its portfolio of affiliated companies, which includes a number of insurance companies.[2]  In early 2019, the *Journal* reported

---

[1]       Complaint [Dkt. 4] at ¶ 1.

[2]       *Id.* at ¶ 10.

2

that Lindberg had diverted $2 billion from these insurance companies for his personal use.[3] A number of months later, the *Journal* published a second article about Lindberg that focused on his alleged use of surveillance operatives to spy on his former fiancée and other women who "caught his eye."[4]

Lindberg claims that these articles were defamatory and that reporters for the *Journal* improperly relied on sources who were subject to confidentiality agreements or owed him a duty of confidentiality. He alleges that Dow Jones & Company, Inc. ("Dow Jones") – the owner of *The Wall Street Journal* – is liable to him for defamation, tortious interference with contracts, and aiding and abetting breaches of fiduciary duty.

### Facts

I.     *The First Article*

The *Journal* first reported on Lindberg in a February 28, 2019 article posted to the newspaper's website under the title *Financier Who Amassed Insurance Firms Diverted $2 Billion into His Private Empire* (the "First Article").[5] It was printed on March 1, 2019 with minor modifications on the front page of the print *Journal* with the title *Insurance Tycoon Diverts $2 Billion*.[6]

---

[3]     *Id.* at ¶ 40.

[4]     *Id.* at ¶¶ 46, 53.

[5]     *Id.* at ¶ 40.

[6]     *Id.* at ¶ 43.

The First Article claimed that Lindberg had diverted $2 billion of insurance company funds for his personal benefit by causing the insurers to lend money to entities he owned.[7]  According to the article, insurance companies typically invest premiums "conservatively" to ensure sufficient liquidity to pay insurance claims.[8]  For the same reason, the article claimed, state regulators monitor and regulate insurance companies' investments in affiliated entities.[9]  For example, the article noted that "[s]ome states" limit affiliate investments to 10 percent of an insurer's assets.[10]  In contrast, the article claimed that one of Lindberg's insurance companies had invested more than 50 percent of its assets in affiliated entities.[11]

The article reported also that Lindberg had moved his insurance companies to North Carolina, where regulators allowed his insurance companies to invest up to 40 percent of their assets in affiliated entities.[12]  It explained that Lindberg had made generous political contributions to the North Carolina insurance commissioner – Wayne Goodwin – who was up for re-election around the time that Lindberg moved his insurance companies to the state.[13]  In addition, the article claimed that

---

[7]

*Id.* at ¶ 40.

[8]

First Article [Dkt. 14-1] at ¶ 15.

Paragraph numbers refer to the numbers included in the copies of the articles provided by Dow Jones in support of its motion to dismiss.

[9]

*Id.* at ¶¶ 16-17.

[10]

*Id.*

[11]

*Id.* at ¶ 18.

[12]

*Id.* at ¶¶ 34, 36, 44.

[13]

*Id.* at ¶¶ 39-40.

"in consultation with" North Carolina regulators, Lindberg had restructured the insurance companies' investments into special purpose vehicles ("SPVs") that Lindberg owned – but did not control – to avoid the limitations on investing in affiliated entities.[14] According to the article, the SPVs did not simply hold that money. Instead, they lent it to Lindberg's other companies, which allowed Lindberg to profit from these assets as well.[15]

While Lindberg was engaged in these lending practices, the article claimed, his net worth had increased to $1.7 billion.[16] It described various luxury items that Lindberg purportedly had purchased at the time, such as a Gulfstream aircraft, a 214-foot yacht, and multiple large properties.[17] With respect to one such purchase – a 12,000 square-foot mansion in Raleigh, North Carolina – the *Journal* claimed that it had traced the funds used to purchase the home to one of Lindberg's insurance companies.[18]

The article revealed also that Lindberg – whom it described as the largest political donor in North Carolina – was the subject of a federal criminal investigation regarding his donations to North Carolina regulators.[19] It stated also that the North Carolina regulators were concerned about the solvency of the SPVs and affiliated entities that had borrowed money from these insurance

---

[14]     *Id.* at ¶¶ 48-51, 54.

[15]     *Id.* at ¶¶ 49, 55-56.

[16]     *Id.* at ¶ 61.

[17]     *Id.* at ¶¶ 2, 62.

[18]     *Id.* at ¶¶ 67-68.

[19]     *Id.* at ¶¶ 2, 9.

companies.[20]  It noted that these entities had paid dividends to Lindberg, "suggesting that insurance money was flowing into his pockets."[21]

## II.    The Second Article

On October 3, 2019, the *Journal*'s online edition published another article about Lindberg (the "Second Article").[22]  Entitled *'Active Interest': Insurance Tycoon Spied on Women Who Caught His Eye*, it allegedly "reinforced the impression" that Lindberg and his businesses were operating in an "unethical" or "legally dubious" manner and "sought to create the impression that Lindberg harassed, stalked and victimized women in his personal life."[23]

The article began by noting that federal officials had obtained a warrant to arrest Lindberg following an investigation into whether he had bribed a state regulator.[24]  Next, the article said that Lindberg had paid dozens of surveillance operatives to trail women he was, or was interested in, dating.[25]  The report included colorful details and photos from surveillance dossiers and quoted heavily from surveillance operatives.  For example, it reported that one surveillance operative had enrolled in a culinary school in Manhattan where Lindberg's then fiancée – referred

---

[20]    *Id.* at ¶¶ 74-75.

[21]    *Id.* at ¶ 75.

[22]    Compl. at ¶ 46.

[23]    *Id.* at ¶¶ 46, 53.

[24]    Second Article [Dkt. 14-3] at ¶ 1.

[25]    *Id.* at ¶¶ 2-3.

6

to as MM – was taking classes so that the operative could keep a close eye on her activities without her knowledge.[26] The article quoted a surveillance dossier's report that MM was "not social at [the school] and appears to have no interest in her classmates . . . MM is very focused and business minded."[27]

　　　　While the article noted that Lindberg had met some women at nightclubs and through matchmaker services, it claimed also that Lindberg had identified "prospective partners" for surveillance officials to track by "scour[ing] Instagram" for women, who were "often aspiring models."[28] "Then," it claimed, "the surveillance team went to work, finding the woman's address and following her to learn about habits and possible boyfriends."[29]

　　　　The article claimed that "Mr. Lindberg's unorthodox pursuit of romantic interests is a previously unreported sign of the entrepreneur's lavish lifestyle since he started acquiring life insurers in 2014" and explained that "[t]he spending took off after Mr. Lindberg began lending at least $2 billion of the insurers' funds to his private conglomerate, the focus of **a Journal investigation in February**."[30] The words "a Journal investigation in February" contained a hyperlink[31] that, if selected, took the reader to the First Article on the *Journal*'s website.[32]

---

[26]
　　　　*Id.* at ¶¶ 65, 70.

[27]
　　　　*Id.* at ¶ 71.

[28]
　　　　*Id.* at ¶ 35.

[29]
　　　　*Id.*

[30]
　　　　*Id.* at ¶ 7-8.

[31]
　　　　While most readers interact with hyperlinks on a daily basis, some technical background nonetheless may be helpful. At a high level, "[e]ach document [on the internet] has an

Next, the article reported that state and federal authorities in separate investigations were "seeking to follow the money trail" from Lindberg's insurers and noted that "[r]egulators fear many of the loans to Mr. Lindberg's businesses may be uncollectible and that the financial hole at his insurers could exceed $1 billion."[33] It then reported that "[t]wo state insurance departments have taken control of much of his insurance empire, looking to preserve assets."[34] The *Journal* explained that "[a]uthorities sometimes sue owners of troubled insurers to recover missing funds, and lavish spending could be used as trial evidence."[35]

The article speculated about the source of funds for Lindberg's surveillance activities. In that regard it stated: "[w]here the money for the pursuit and surveillance of women came from isn't clear."[36] Nonetheless, it noted that "[b]ank records and internal Lindberg corporate documents

---

address, known as a Uniform Resource Locator ('URL'), identifying, among other things, the server on which it resides." *Shea on Behalf of Am. Rep. v. Reno*, 930 F. Supp. 916, 929 (S.D.N.Y. 1996), *aff'd sub nom. Reno v. Shea*, 521 U.S. 1113 (1997). These URLs are also known as "links" and may be imbedded in "text or images that, when selected by the user, permit him to view . . . [the] Web document" located at that URL. *Id.* When links are imbedded in this manner, they are generally referred to as hyperlinks. "[W]hen a user viewing a document located on one server selects a [hyperlink] to a document located elsewhere, the browser will automatically contact the second server and display the document." *Id.*

[32]

Compl. at ¶ 48; *See also* Mark Maremont and Leslie Scism, *'Active Interest': Insurance Tycoon Spied on Women Who Caught His Eye*, THE WALL STREET JOURNAL (Oct. 3, 2019), https://www.wsj.com/articles/active-interest-insurance-tycoon-spied-on-women-who-caught-his-eye-11570117310 (last visited August 10, 2021).

[33]

Second Article at ¶ 9.

[34]

*Id.* at ¶ 10.

[35]

*Id.*

[36]

*Id.* at ¶ 61.

reviewed by the *Journal* show that Mr. Lindberg shuffled money among scores of private companies he controlled, through wire transfers, intercompany loans and fee arrangements."[37] It explained also that "property deeds show he used insurance-company funds to buy a Raleigh, N.C., mansion."[38] However, the *Journal* reported, a "spokesman for Mr. Lindberg said the loans from his insurers were proper, that none have defaulted and that no insurance money was used for Mr. Lindberg's lifestyle or his surveillance operation."[39]

III.    *Investigation and Conviction*

Lindberg alleges that the North Carolina Department of Insurance (the "Department") began investigating his business activities in 2017.[40]   According to Lindberg, the Department "pushed" the Global Growth insurance companies into rehabilitation in June 2019, a move that he claims led to millions of dollars of losses and impacted policyholders.[41]   Separately, in early 2020, Lindberg was convicted of federal bribery in the Western District of North Carolina.[42]

---

[37]

   *Id.*

[38]

   *Id.* at ¶ 62.

[39]

   *Id.* at ¶ 14.

[40]

   Compl. at ¶ 35.

[41]

   *Id.* at ¶ 45.

[42]

   *See* Judgment [No. 5:19-cr-22 (W.D.N.C.), Dkt. 261].

9

*IV.     Lindberg Sues Dow Jones*

On October 2, 2020, Lindberg brought this action against Dow Jones for defamation, tortious interference with contracts, and aiding and abetting a breach of fiduciary duty.   The defamation claim asserts that eleven statements published by the *Journal* were defamatory.   At a high level, the allegedly defamatory statements in the First Article are: (1) Lindberg "diverted" "huge sums" from his insurers, (2) the insurers invested in entities that were "insolvent," (3) the assets were used to "expand [Lindberg's] private holdings," (4) the lending practice was a "risky strategy," (5) the "sheer scale" of Lindberg's use of insurers' assets "has little precedent," (6) the "insurers disguised the flow of money," (7) Lindberg "found" the SPV strategy, and (8) "insurance money was flowing into [Lindberg's] pockets."[43]   The three allegedly defamatory statements in the Second Article are: (1) there was a "financial hole at his insurers [which] could exceed $1 billion," (2) Lindberg "scoured Instagram for prospective partners, often aspiring models," and (3) MM, one of Lindberg's "interests," was subject to "surveillance . . . without her knowledge."[44]

Dow Jones now moves to dismiss each of Lindberg's claims against it.   For the reasons discussed below, that motion is granted.

---

[43]     Compl. at ¶ 40.

[44]     *Id.* at ¶ 53.

*Discussion*

I.      *Legal Standard*

To survive a motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face."[45] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[46] The Court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[47] However, a complaint that offers only "labels and conclusions . . . will not do."[48]

At this stage, the "court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."[49] The Court may consider also documents on which the plaintiff "relies and which [are] integral to the complaint," even if not attached to the complaint or incorporated by reference.[50]

---

[45]
    *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[46]
    *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[47]
    *ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[48]
    *Twombly*, 550 U.S. at 555.

[49]
    *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[50]
    *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

    Here, both *Journal* articles either are incorporated by reference or are integral to the complaint and are properly considered on this motion to dismiss.

## II.     Statute of Limitations

New York has a one-year statute of limitations for defamation claims.[51] Both parties agree that claims arising from the Second Article – which was published on October 3, 2019 – are timely. In addition, it undisputed that the publication of the First Article, on February 28, 2019 and March 1, 2019, occurred more than a year before Lindberg brought this action. Nonetheless, Lindberg contends that claims arising from statements in the First Article are timely because they were republished by the Second Article.[52]

"Under the 'single publication rule,' the publication of a defamatory statement in a single [publication] . . . although widely circulated and distributed, constitutes one publication, which gives rise to one cause of action, and the statute of limitations runs from the date of that publication."[53] However, the "republication" of a defamatory statement in a "separate aggregate publication from the original" will "retrigger[] the period of limitations."[54] "[T]he test of whether

---

[51]

N.Y. C.P.L.R. § 215(3).

Under New York's borrowing statute, claims brought in New York must comply with the shorter of the limitations period in New York or the jurisdiction where the claim arose. N.Y. C.P.L.R. § 202. The parties agree that New York's one-year statute of limitations controls under this statute.

[52]

Compl. at ¶ 59.

As the "facts necessary to establish the defense are evident on the face of the complaint," the Court properly may consider whether the statute of limitations bars Lindberg's claims on a motion to dismiss. *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (*citing McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

[53]

*Martin v. Daily News L.P.*, 121 A.D.3d 90, 103, 990 N.Y.S.2d 473, 483 (1st Dep't. 2014) (*citing Gregoire v. Putnam's Sons*, 298 N.Y. 119, 123 1948)).

[54]

*See Firth v. State*, 98 N.Y.2d 365, 371, 747 N.Y.S.2d 69, 72 (2002).

a statement has been republished is if the speaker has affirmatively reiterated it in an attempt to reach a new audience that the statement's prior dissemination did not encompass."[55]  "Thus, for example, repetition of a defamatory statement in a later edition of a book, magazine or newspaper may give rise to a new cause of action."[56]

These doctrines apply to online as well as print publications.[57]  As online content may be shared and reposted with a single click, the single publication rule is critical to prevent the "endless retriggering of the statute of limitations."[58]  On the other hand, application of the single publication rule to material posted online does not mean that "once a defendant makes a statement in a prominent place on the Internet, he can proactively repeat that claim in new places on the Internet *ad infinitum* and remain immune from suit."[59]  Instead, if defamatory material on the Internet is republished to a new online audience, the limitations period may begin anew.

Lindberg does not argue that any of the eight allegedly defamatory statements in the First Article were repeated in the Second Article.  In fact, the only reference to the First Article that Lindberg points to in the Second Article is the note that Lindberg's lending of insurance funds to his private companies had been the focus of a *Journal* investigation in February.[60]  That reference

---

[55]
     *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 505 (6th Cir. 2015) (citing *Firth*, 98 N.Y.2d at 371).

[56]
     *Firth*, 98 N.Y.2d at 371.

[57]
     *Id.* at 370-1.

[58]
     *Id.* at 370.

[59]
     *Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 571 (S.D.N.Y. 2019).

[60]
     Second Article at ¶ 8.

did not provide any other information from the First Article, except that the words "a *Journal* investigation in February" contained a hyperlink that, when selected, took readers to the *Journal* web-page containing the First Article. Beyond that reference, the Second Article's discussion of Lindberg's insurance companies is limited to suggesting that insurance company funds were spent on Lindberg's surveillance operation and describing the state and federal investigations into the insurers' financial situation.

      None of that amounts to a republication. As a starting point, traditional principles of republication dictate that a mere reference to a prior article is not a republication.[61] Accordingly, "calling attention" to an earlier defamatory publication "without re-uttering any of the defamatory matter" – either "verbatim or in substance" – does not amount to a republication.[62] As the Second Article did not reiterate any of the allegedly defamatory statements in the First Article, the reference to the First Article was not a republication.[63]

---

[61]     *Klein v. Biben*, 296 N.Y. 638, 639-40 (1946). *See also In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 175 (3d Cir. 2012), as corrected (Oct. 25, 2012) ("under traditional principles of republication, a mere reference to an article" that "does not restate the defamatory material, does not republish the material.").

[62]     *MacFadden v. Anthony*, 117 N.Y.S.2d 520, 521 (Sup. Ct. N.Y. Cnty. 1952).

[63]     Lindberg does not argue that any statements in the Second Article repeated – verbatim or in substance – the statements in the First Article that Lindberg claims were defamatory. Nonetheless, the Court notes that the Second Article reports that Lindberg's mansion in Raleigh was purchased with insurance company funds (Second Article at ¶ 62), an assertion that Lindberg alleges was defamatory when made in the First Article (Compl. at ¶ 40). In any event, the Court need not consider whether the Second Article republished that statement because Lindberg entirely fails to allege that it was false, and thus fails to state a claim based on that statement.

   The inclusion of a hyperlink to the First Article does not alter that conclusion because a hyperlink is merely "the twenty-first century equivalent of the footnote."[64]  While hyperlinks may present "added accessibility and convenience," that characteristic – which applies to all online references – does not provide a "principled reason for holding a hyperlink distinct from a traditional reference, such as a footnote, for purposes of republication."[65]  Accordingly, courts consistently agree that the publication of a hyperlink that "reference[s] . . . an article" but "does not restate the defamatory material is not a republication of the material."[66]

   In addition, as with a traditional reference, it is irrelevant whether the "purpose of the hyperlink [is] to entice new readers who had not previously read [the defamatory article] to click on

---

[64] *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013) *aff'd*, 876 F.3d 413 (2d Cir. 2017).  *See also Salyer v. Southern Poverty Law Center, Inc.*, 701 F.Supp.2d 912, 917 (W.D.Ky. 2009) (a hyperlink is merely a "new means for accessing the referenced article.").

[65] *Lokhova v. Halper*, 995 F.3d 134, 143 (4th Cir. 2021) ("The public policy supporting the single publication rule and the traditional principles of republication dictate that a mere hyperlink, without more, cannot constitute republication").

[66] *Biro v. Conde Nast*, 171 A.D.3d 463, 464, 95 N.Y.S.3d 799, 799-800 (1st Dep't. 2019). *See also Haefner v. New York Media, L.L.C.*, 27 Misc.3d 1208(A), 910 N.Y.S.2d 405, 2009 WL 6346547, *5 (Sup. Ct. N.Y. Cnty. 2009) ("New York law provides that the inclusion of internet hyperlinks to [an] original article in . . . later articles does not give rise to republication[].", *aff'd* 82 A.D.3d 481 (1st Dep't. 2011). *See also Brimelow v. New York Times Co.*, No. 20-cv-222 (KPF), 2020 WL 7405261, at *7 (S.D.N.Y. Dec. 16, 2020) ("Courts have concluded that merely hyperlinking to an existing publication does not duplicate the content of that publication and give rise to liability."); *In re Philadelphia Newspapers*, 690 F.3d at 174 ("Several courts specifically have considered whether linking to previously published material is republication. To date, they all hold that it is not"); ROBERT D. SACK, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS § 7 3.1 (5th ed. 2017) (collecting cases holding that a hyperlink does not republish linked material).

the link and be directed to the article."[67]  As the Third Circuit explained, a reference accompanied

by a hyperlink "may call the *existence* of [an] article to the attention of a new audience" but does

not amount to a republication because it "does not present the *defamatory contents* of the article to

the audience."[68]  Accordingly, the Second Article's reference to "a *Journal* investigation in

February" and the hyperlink embedded therein did not republish the First Article.

For similar reasons, the Second Article's remaining discussion of Lindberg's

insurance companies -- which provided new information not included in the First Article -- did not

republish the First Article.[69]  While republication may occur when a publisher makes "changes to

material already published on a website, or add[s] substantive material to allegedly defamatory

content on a website,"[70] Lindberg has not provided any basis to extend this principle to changes or

updates that appear in a *new* separate publication.  As one court aptly noted, the proper analogy for

a new article that "substantively alter[s] or add[s] to" a prior article is "not to a new edition but to

---

[67]     *Salyer*, 701 F.Supp.2d at 916-7 (explaining that a hyperlink does not amount to a republication because it is missing "the critical feature of republication," which is "that the original text of the article was changed or the contents of the article presented directly to a new audience").

[68]     *In re Philadelphia Newspapers*, 690 F.3d at 175 (emphasis in original) (*quoting Salyer*, 701 F.Supp.2d at 916).

[69]     Dow Jones does not dispute that the Second Article's reference to a "financial hole" at Lindberg's insurers, which was presented for the first time in the Second Article, is timely even without resort to the doctrine of republication. *See Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 277 (S.D.N.Y. 2016) (statements that "go beyond merely hyperlinking" and "contain additional statements which [plaintiff] alleges are themselves defamatory," amount to a new publication and trigger a new limitations period).

[70]     *Lokhova*, 995 F.3d at 143 (citation omitted).

a *sequel*," which does not republish the earlier material.[71] That distinction applies here as well. The First Article was not updated or changed by the publication of updated information in the Second Article.[72] Accordingly, no republication occurred.

Finally, Lindberg's argument that the updated information in the Second Article – in particular, the report of a "financial hole" at his insurance companies – republished the First Article by "reinforcing the impression that the insurers' purported lending activity could or would adversely affect policyholders" is entirely meritless.[73] Presenting *new* information to reinforce the impression presented in the First Article – by its very nature – does not repeat the allegedly defamatory material in the First Article. As discussed above, without restating that material, no republication occurred.

Hence, Lindberg's defamation claims arising from statements in the First Article are barred by the statute of limitations.

---

[71]  *Perlman v. Vox Media, Inc.*, No. N19C-07-235, 2020 WL 3474143, at *6, *8 (Del. Super. Ct. June 24, 2020) *reargument denied*, 2020 WL 4730406 (Del. Super. Ct. Aug. 14, 2020), *aff'd*, 249 A.3d 375 (Del. 2021).

[72]  Lindberg has not argued that the entire *Journal* website should be considered one publication that was updated when the Second Article was added to that site. In any case, the Court would reject such an argument. The *Journal* website is a repository for distinct articles, which do not become one publication merely because they are hosted on the same site. An opposite conclusion would "force[]" publishers "either to avoid posting [new articles] on a Web site or use a separate site for each new piece of information," and thus "reduc[e] the Internet's unique advantages." *Firth*, 98 N.Y.2d at 372. Such a result would be contrary to the policy concerns underlying the application of the single publication rule in online fora. *Id.*

[73]  Opp. at 10.

*III.    Actual Malice*

Section 76-a of New York's Civil Rights Law requires plaintiffs to establish that defamatory statements were made with actual malice in any action "involving public petition and participation."[74]   A November 10, 2020 amendment to this law defines "public petition and participation" to include a claim based upon:

> (1) any communication in a place open to the public or a public forum in connection with an issue of public interest; or

> (2) any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition.[75]

The law further directs that the term "public interest" is to "be construed broadly, and shall mean any subject other than a purely private matter."[76]

Lindberg does not dispute that the *Journal* articles were published "in a place open to the public or a public forum."   Instead, the parties dispute whether the allegedly defamatory statements are "in connection with an issue of public interest."

---

[74]
N.Y. Civil Rights Law § 76-a(2).

The parties' briefs assume that New York law applies here.  Such "implied consent . . . is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000).

[75]
N.Y. Civil Rights Law § 76-a(1)(a).

[76]
*Id.* § 76-a(1)(d).

Before the November 10, 2020 amendment, this statute effectively was limited to "controversies over a public application or permit."[77]  Accordingly, there is virtually no case law defining the terms "public interest" and "purely private matter" under this statute.  On the other hand, New York common law long has required proof of gross negligence where a defamation claim arose from communications "arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition."[78]  In that context, the New York Court of Appeals has distinguished between matters of "public concern" and "matters of purely private concern."[79]  New York courts have developed robust case law defining each of these terms.[80]  As

---

[77]

    *Palin v. New York Times Co.*, 510 F. Supp. 3d 21, 25 (S.D.N.Y. 2020).

    In *Palin*, Judge Rakoff concluded that this amendment should be applied retroactively. *Id.* at 29.  Lindberg does not argue that this amendment should not apply here. *See* Opp. at 15 n. 3.

[78]

    *Chapadeau v. Utica Observer-Dispatch, Inc.*, 38 N.Y.2d 196, 199, 379 N.Y.S.2d 61, 64 (1975).

[79]

    *Huggins v. Moore*, 94 N.Y.2d 296, 302-3, 704 N.Y.S.2d 904, 908 (1999) (internal citation and quotation marks omitted).

[80]

    While these cases predate the amendment to Section 76-a, "[i]t is a well-established principle of statutory construction that words of technical or special meaning are used by the legislature, not loosely, but with regard for their established legal significance." *Chauca v. Abraham*, 30 N.Y.3d 325, 330, 67 N.Y.S.3d 85, 89 (2017) (quotation marks omitted) (*citing inter alia* Comment, N.Y. Stat. Law § 233 (Mckinney) ("when a word having an established meaning at common law is used in a statute, the common law meaning is generally followed")).

    In fact, according to its legislative history, the amendment was intended to broaden the law's application to communications "in a public forum *with respect to issues of public concern*."  N.Y. Senate Bill S52A, Sponsor Mem. of Sen. Hoylman (July 22, 2020) (emphasis added).

New York common law clearly defines "public" and "purely private" matters in the context of defamation, the Court applies those definitions here.[81]

In assessing whether an article involves a matter of "public concern," the New York Court of Appeals has instructed that "a commercial enterprise's allocation of its resources to specific matters and its editorial determination of what is 'newsworthy,' may be powerful evidence of the hold those subjects have on the public's attention."[82]  It cautioned also that it is "[t]he press, acting responsibly, and not the courts [that] must make the *ad hoc* decisions as to what are matters of genuine public concern, and while subject to review, editorial judgments as to news content will not be second-guessed so long as they are sustainable."[83]

Matters of "public concern" generally include "matter[s] of political, social, or other concern to the community," even those that do not "affect the general population."[84]  This description has been held to encompasses reports of improper business practices, particularly where such conduct may result in loss to stakeholders.[85]  Accordingly, the *Journal*'s report that regulators

---

[81]

      *See e.g. Coleman v. Grand*, No. 18-cv-5663 (ENV), __ F.Supp.3d __, 2021 WL 768167, at *8 (E.D.N.Y. Feb. 26, 2021) (applying New York common law to interpret the terms "public interest" and "purely private matter" under this section); *Reus v. ETC Hous. Corp.*, 72 Misc.3d 479, 486, __ N.Y.S.3d __ (Sup. Ct. N.Y. Cnty. May 6, 2021) (same).

[82]

      *Gaeta v. New York News, Inc.*, 62 N.Y.2d 340, 349, 477 N.Y.S.2d 82, 85 (1984) (internal quotation marks omitted).

[83]

      *Id.* (internal quotation marks omitted).

[84]

      *Abbott v. Harris Publications, Inc.*, No. 97-cv-7648 (JSM), 2000 WL 913953, at *7 (S.D.N.Y. July 7, 2000).

[85]

      *See e.g. Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 102 n. 9 (2d Cir. 2000) (concluding that there was no doubt that "allegedly improper valuation of substantial investments made by a publicly held company" were a matter of public concern) (collecting

were concerned about a $1 billion hole at Lindberg's insurance companies, which implicates the insurers' ability to pay claimants, is a matter of public interest under Section 76-a.[86]  In fact, Lindberg alleges that his insurance companies were pushed into rehabilitation in June 2019, which, he alleges, impacted policyholders.[87]  Plainly, the Second Article's discussion of those insurers' financial situations was a matter of public concern.  Lindberg therefore must allege actual malice to state a legally sufficient claim with regard to this statement.

Next, Dow Jones argues that the Second Article's depiction of Lindberg's surveillance efforts relates to a matter of public concern as well.  While matters that "fall[] into the realm of mere gossip and prurient interest" are generally considered "purely private" matters,[88] "human-interest items" may be matters of public concern if "reasonably related to matters warranting public exposition."[89]  "[A]s with any test that measures the reasonable relationship of one thing to another, offending statements can only be viewed in the context of the writing as a whole, and not as disembodied words, phrases or sentences."[90]  "In light of the extremely broad

---

cases); *Post v. Regan*, 677 F. Supp. 203, 208 (S.D.N.Y. 1988), *aff'd*, 854 F.2d 1315 (2d Cir. 1988) ("loss to a public corporation of $165 million due to unauthorized trading activities and the subsequent remedial actions taken by the corporation widely reported by the media, are of public concern.").

[86]

For the same reason, the statements in the First Article are reasonably related to a matter of public concern and would require allegations of actual malice even if the Court had not concluded that claims based on those statements were barred by the statute of limitations.

[87]

Compl. at ¶ 45.

[88]

*Huggins*, 94 N.Y.2d at 302-3 (internal quotation marks omitted).

[89]

*Lewis v. Newsday, Inc.*, 246 A.D.2d 434, 435, 668 N.Y.S.2d 377, 378 (1st Dep't. 1998) (*quoting Chapadeau*, 38 N.Y.2d at 199).

[90]

*Gaeta*, 62 N.Y.2d at 349.

interpretation of that standard by New York courts," cases where "the subject matter was not a matter of legitimate public concern are extremely rare."[91]

This point is well illustrated in the *Gaeta* case. There, the defendant published an article about New York State's transfer of patients from a mental-health facility to a nursing home.[92] In the course of the article, the author noted that a particular patient's mental health breakdown had been precipitated by his son's suicide, which the article claimed had occurred because the son's mother had dated other men.[93] The mother claimed that statement was defamatory. The New York Court of Appeals held that the article's overall topic – the State's transfer of patients to nursing homes – involved a matter of legitimate public concern and that "the familiar journalistic technique of featuring the experiences of a single individual, as exemplifying in human terms the plight of many," did not "change the character of the article."[94] Furthermore, it emphasized that the allegedly defamatory material was "at least arguably a matter of legitimate public interest, and reasonably related to the major subject of the article" because "background details limited to [the patient's] illness and treatment" – including events leading up to his illness, such as the plaintiff dating "other men" – were "hardly remote from the subject of the article."[95]

---

[91]   *Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001).

[92]   62 N.Y.2d at 346.

[93]   *Id.*

[94]   *Id.* at 349-50.

[95]   *Id.* at 350.

Another instructive decision is *Weiner v. Doubleday & Co.*[96] *Weiner* involved an allegedly defamatory statement included in a book about Frances Schreuder's purported role in her father's murder.[97] The plaintiff, Frances' psychiatrist, acknowledged that the book generally involved a matter of public concern but argued that the "particular topic of his relationship with [his patient]" – and in particular, the book's assertion that Frances "always slept with her shrinks" – was "a detour from legitimate public concern into the realm of mere gossip and prurient interest."[98] The New York Court of Appeals disagreed and explained that because the book was "in part, clearly intended as an inquiry into the failure of family and professional figures to halt the progression of [Frances'] illness before it resulted in murder," Frances' "relationship with plaintiff is not so remote from that subject as to constitute a clear abuse of editorial discretion."[99] As the court emphasized, the plaintiff's argument presented "precisely the sort of line-drawing that . . . is best left to the judgment of journalists and editors, which [the court] will not second-guess absent clear abuse."[100]

Finally, *Naantaanbuu v. Abernathy* is helpful as well.[101] That case involved an allegedly defamatory description of a purported extramarital affair between Dr. Martin Luther King Jr. and the plaintiff, which was reported to have taken place on the night before Dr. King's

---

[96]       74 N.Y.2d 586, 550 N.Y.S.2d 251 (1989).

[97]       *Id.* at 590-1.

[98]       *Id.* at 592, 595.

[99]       *Id.* at 595.

[100]      *Id.*

[101]      816 F. Supp. 218 (S.D.N.Y. 1993).

assassination.[102]  While an extramarital affair would typically not be a matter of "public concern,"

the court held that "[b]ecause of King's death the next day, the events of [the night before] in general

are clearly matters of public interest."[103]  It concluded also that because "there are those who feel

that King's private life bears on his public life," the "reports of King's behavior at Naantaanbuu's

home [were] a matter of public interest as well."[104]  Of note, the court acknowledged that the

discussion of Dr. King's alleged affair with the plaintiff "may sound unnecessarily sordid to some,"

but concluded that under New York law, this did not alter the conclusion that it was a matter of

public concern.[105]

   Here, Lindberg's efforts to spy on his former fiancée and women he found on

Instagram may not be a matter of public concern when considered in isolation.[106]  As Dow Jones

argues, however, the portrayal of Lindberg's surveillance efforts was reasonably related to a matter

of public concern because it provided an additional example of Lindberg's "leveraging of his

business assets for his personal benefit."[107]  As presented in the Second Article, Lindberg's

surveillance operation was a "previously unreported sign of the entrepreneur's lavish lifestyle since

---

102

  *Id.* at 221.

103

  *Id.* at 226.

104

  *Id.*

105

  *Id.*

106

  While otherwise private matters may be of public concern if they "are illustrative of a larger
subject of legitimate concern to the public at large" including "important social issue[s],"
Dow Jones has not argued that its report on Lindberg's surveillance efforts reflects on any
larger social issues. *Huggins*, 94 N.Y.2d at 304-5.

107

  Br. [Dkt. 15] at 19.

he started acquiring life insurers in 2014" and an example of Lindberg's "spending [that] took off after [he] began lending at least $2 billion of the insurers' funds to his private conglomerate."[108] The article explained also that Lindberg's spending is relevant to his insurers' financial condition because "[a]uthorities sometimes sue owners of troubled insurers to recover missing funds, and lavish spending could be used as trial evidence," in such an effort.[109]

In addition, the Second Article explained that while it was not clear "[w]here the money for the pursuit and surveillance of women came from . . . [b]ank records and internal Lindberg corporate documents reviewed by the *Journal* show that Mr. Lindberg shuffled money among scores of private companies he controlled, through wire transfers, intercompany loans and fee arrangements."[110] The article explained also that the *Journal* previously had traced the funds used to purchase Lindberg's mansion in Raleigh to funds paid by his insurers in support of the notion that Lindberg had used insurer funds for personal expenses.[111] It reported also that "[a] spokesman for Mr. Lindberg said the loans from his insurers were proper, that none have defaulted and that no insurance money was used for Mr. Lindberg's lifestyle or his surveillance operation."[112]

Read in this context, the *Journal*'s portrayal of Lindberg's surveillance operation is reasonably related to its report on Lindberg's use of insurance company funds. And as noted above,

---

[108]

Second Article at ¶ 7-8.

[109]

*Id.* at ¶ 10.

[110]

*Id.* at ¶ 61.

[111]

*Id.* at ¶ 62.

[112]

*Id.* at ¶ 14.

matters implicating the insurance companies' assets are clearly of public concern under New York law. The fact that the *Journal* highlighted Lindberg's surveillance of romantic interests – a matter that may seem "unnecessarily sordid" to some – does not change this conclusion.[113]  New York law is clear that the Court may not second guess the *Journal*'s "judgments as to news content . . . as long as they are sustainable."[114]  Likewise, the Court may not second guess the *Journal*'s editorial judgement in employing the "journalistic technique"[115] of highlighting "human-interest items"[116] when reporting on a matter of public concern. The Second Article's discussion of whether Lindberg had used insurance company funds to pay surveillance operatives to spy on women is not "so remote" from the larger issues involving Lindberg's use of insurance funds "as to constitute a clear

---

[113]

  *Naantaanbuu*, 816 F. Supp. at 226.

[114]

  *Gaeta*, 62 N.Y.2d at 349.

[115]

  *Id.* at 350.

[116]

  *Lewis*, 246 A.D.2d at 435.

abuse of editorial discretion."[117]  Accordingly, Lindberg must allege that the challenged statements

regarding his surveillance efforts were made with actual malice.

Lindberg does not that argue that his allegations are sufficient to claim plausibly that

the challenged statements were made with actual malice.[118]  Instead, he seeks leave to amend to

"provide sufficient allegations of actual malice."[119]  However, Lindberg has not submitted a

proposed amended complaint or offered any indication of how he intends to allege sufficiently that

Dow Jones acted with actual malice.

In general, "'[p]roposed amendments are futile,' and . . . must be denied, 'if they

would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of

Civil Procedure.'"[120]  Where a request to amend makes "no specific argument as to how an amended

---

[117]

> *Weiner*, 74 N.Y.2d at 595.

> Lindberg's purported use of Instagram to identify "prospective partners" does not, standing alone, implicate his use of insurance company funds. However, the Second Article claimed that once Lindberg identified a women of interest on Instagram, "the surveillance team went to work, finding the woman's address and following her to learn about habits and possible boyfriends." Second Article at ¶ 35.  It continued to describe how Lindberg's security operatives would track women, including "report[ing] back if their subjects were spotted with men other than Mr. Lindberg." *Id*. at ¶ 37.  Read in this context, the article did not merely report that Lindberg used Instagram as a dating app.  Rather, it reported on his purported use of Instagram as part of his efforts to identify and track women.  In fact, Lindberg's brief agrees that the gist of the Second Article, was to "portray [him] as someone who had combined his wealth with technology to . . . take voyeurism to the extreme." Opp. at 6.

[118]

> *Id*. at 17.

[119]

> *Id*. at 18.

[120]

> *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 252 (2d Cir. 2017) (*quoting Thea v. Kleinhandler*, 807 F.3d 492, 496-97 (2d Cir. 2015)).

complaint would 'cure prior deficiencies' or pass muster under Rule 12(b)(6)," it is properly denied as futile.[121]   That is the case here.   In consequence, Lindberg has failed to demonstrate that his amendments would not be futile.   Accordingly, his request to amend is denied.[122]

### IV.   Tortious Interference and Breach of Fiduciary Duty

Lindberg alleges that reporters for the *Journal* improperly obtained and reported information from his former staffers and operatives.   He claims that this conduct tortiously interfered with confidentiality and non-disclosure agreements by which these individuals were bound.   In addition, he claims that the *Journal*'s conduct aided and abetted the staffers' and operatives' breach of their fiduciary duties.

To state a claim for tortious interference with contract, Lindberg must allege "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party

---

[121]

> *Id. See also In re Goldman Sachs Mortg. Servicing S'holder Derivative Litig.*, 42 F.Supp.3d 473, 487 (S.D.N.Y. 2012) ("the Second Circuit has repeatedly upheld a district court's decision to deny a plaintiff's informal request to amend its complaint when it failed to advise the district court of how an amendment would cure defects in the complaint.").

[122]

> In any case, it would be futile to add allegations of actual malice with regard to the Second Article's report that Lindberg "scoured Instagram" or that MM was subject to "surveillance . . . without her knowledge," because Lindberg fails to allege that either statement is false, for the reasons explained in Dow Jones' motion to dismiss. *See* Br. at 28-29.   Critically, Lindberg does not even attempt to dispute Dow Jones' argument in this regard.   The remaining challenged statement in the Second Article – i.e., the report of a "financial hole" at Lindberg's insures – ultimately may be barred by the fair report privilege.   However, that privilege is an affirmative defense and the Court is not convinced that Dow Jones has alleged sufficiency that it applies here. *See Greenberg v. Spitzer*, 155 A.D.3d 27, 42-43, 62 N.Y.S.3d 372, 384 (2nd Dep't. 2017).   Finally, leave to amend the allegations based on the First Article would be denied because a "time-barred claim would not survive a motion to dismiss and is, therefore, futile." *Kelly v. City of New York*, No. 15-cv-53 (CM), 2017 WL 3107207, at *2 (S.D.N.Y. July 17, 2017) (*citing Wallace v. N.Y.C. Dept. of Corrections*, 112 Fed.Appx. 794, 795 (2d Cir. 2004)).

intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff."[123]  "The law requires some factual specificity in pleading tortious interference."[124]  Accordingly, to plead the first element of this claim sufficiently, Lindberg must allege "in nonconclusory language, the essential terms of the parties' contract, including the specific provisions upon which liability is predicated."[125]  In particular, "[i]f multiple contracts are at issue, the complaint must specify the particular contracts that have been interfered with by defendants" and "provide at least some specific facts about the underlying contracts, such as the parties to the contracts or terms of the contracts, to put defendants on notice as to which contracts they are accused of interfering with."[126]

Lindberg fails to satisfy these requirements.  As an initial matter, he claims that "[s]ome former staffers and operatives have since been revealed as sources for the article and the confidential information that appeared in [the Second Article]"[127] but does not allege with any

---

[123]
       *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996).

[124]
       *150 E. 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co.*, No. 97-cv-4262 (SHS), 1998 WL 65992, at *1 (S.D.N.Y. Feb. 17, 1998).

[125]
       *Pitcock v. Kasowitz, Benson, Torres & Friedman, LLP*, 80 A.D.3d 453, 454, 915 N.Y.S.2d 239, 241 (1st Dep't. 2011).  *See also Bennett v. State Farm Fire & Cas. Co.*, 137 A.D.3d 731, 26 N.Y.S.3d 554, 555 (2nd Dep't. 2016) (complaint properly dismissed where plaintiff "fails to plead the terms of the alleged underlying contract . . . and any specific breach thereof."); *Leadsinger, Inc. v. Cole*, No. 05-cv-5606 (HBP), 2006 WL 2320544, at *12 (S.D.N.Y. Aug. 10, 2006) (dismissing tortious interference claim where plaintiff failed to "allege the relevant terms of the contracts.") (collecting cases).

[126]
       *Amtrust N. Am., Inc. v. Safebuilt Ins. Servs., Inc.*, No. 14-cv-09494 (CM), 2015 WL 7769688, at *7 (S.D.N.Y. Dec. 1, 2015).

[127]
       Compl. at ¶ 50.

specificity who these individuals were. Instead, he alleges only that "[f]or instance, one of them was a former contractor based in the Los Angeles area" and that "[a]nother was a former employee of the Lindberg-owned company which was responsible for his personal security."[128]  These vague allegations are insufficient to put Dow Jones on notice of which contracts it is alleged to have interfered with.

In addition, Lindberg fails to specify which contractual provisions allegedly were violated.  He claims only that "[t]he former staffers and operatives" had "confidentiality and non-disclosure agreements that prohibited them from divulging confidential and proprietary information and trade secrets to the Wall Street Journal."[129] But these conclusory allegations do not point to any specific contract or provision that the former staffers and operatives violated by sharing information with Dow Jones.  His claim for tortious interference therefor cannot be maintained.[130]

Lindberg's allegations are insufficient also to claim plausibly that the *Journal* reporters aided and abetted breaches of fiduciary duty.  To state a claim, Lindberg must  allege "breaches of fiduciary duty, that the defendant knowingly induced or participated in the breach, and

---

[128]

> *Id.*

[129]

> *Id.* at ¶ 52.

[130]

> In similar circumstances, "alleg[ations] that defendants tortiously interfered with [plaintiff's] confidentiality agreements with current and former employees, when defendants solicited confidential information for the allegedly defamatory article, in breach of those confidentiality agreements," were insufficient to state a claim.  *Highland Capital Management, L.P. v. Dow Jones & Co., Inc.*, No. 151322/2018, 2018 WL 4668424, at *2 (Sup. Ct. N.Y. Cnty. Sep. 28, 2018).  On appeal, the First Department explained that the plaintiff "failed to cite any specific confidentiality agreements that defendants knowingly induced their sources to violate." *Highland Cap. Mgmt., L.P. v. Dow Jones & Co., Inc.*, 178 A.D.3d 572, 574, 116 N.Y.S.3d 18, 20 (1st Dep't. 2019).

damages resulting therefrom."[131]  To establish the first element – an underlying breach of fiduciary duty – Lindberg first must plausibly allege facts sufficient to show that the former staffers and operatives owed him fiduciary duties.  Under New York law, a fiduciary relationship exists "only when a person reposes a high level of confidence and reliance in another, who thereby exercises control and dominance over him."[132]  "Whether a relationship is fiduciary in nature must be determined on the basis of the services agreed to by the parties."[133]

Here, Lindberg's allegations do not claim plausibly that the sources for the Second Article owed him fiduciary duties.  He describes these individuals only as "a former contractor based in the Los Angeles area" and "a former employee of the Lindberg-owned company which was responsible for his personal security."[134]  These allegations do not explain what services these individuals provided on Lindberg's behalf, let alone indicate that their responsibilities created a fiduciary relationship.  Plainly, the mere fact that someone is a former contractor or worked – in an

---

[131]

Bullmore v Ernst & Young Cayman Is., 45 A.D.3d 461, 464, 846 N.Y.S.2d 145, 148 (1st Dep't 2007).

[132]

People ex rel. Cuomo v. Coventry First LLC, 13 N.Y.3d 108, 115, 886 N.Y.S.2d 671, 675 (2009).  See also Rienzi & Sons, Inc. v. Puglisi, 638 F. App'x 87, 90-91 (2d Cir. 2016) ("under New York law, the 'two essential elements of a fiduciary relation are . . . de facto control and dominance.") (quoting Marmelstein v. Kehillat New Hempstead, 11 N.Y.3d 15, 21, 862 N.Y.S.2d 311, 314 (2008)).

[133]

Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC., 376 F. Supp. 2d 385, 413-14 (S.D.N.Y. 2005), as amended (July 6, 2005).

[134]

Compl. at 50.

unidentified capacity – for a company that Lindberg owned and that provided him with personal security services, does not establish that these individuals owed Lindberg fiduciary duties.[135]

Lindberg's remaining allegations do not come any closer to establishing a fiduciary relationship. He claims that the *Journal*'s sources owed him a fiduciary duty "due to the sensitive nature of some of the services they were providing for Lindberg, or on his behalf, as well as the confidential information they possessed."[136] But, as an initial matter, "the mere communication of confidential information [is not] sufficient in and of itself to create a fiduciary relationship."[137] In addition, Lindberg has not pointed to any cases concluding that a fiduciary relationship may be established based on the "sensitive nature" of a relationship.

To the contrary, the New York Court of Appeals explained that the relationship between a cleric and a congregant, in which the cleric counseled the congregant on personal matters, including her "marital concerns," did not create a fiduciary relationship because the plaintiff failed

---

[135]

Courts have differed in their determination of whether an employee necessarily owes its employer a fiduciary duty. *Compare Sullivan & Cromwell LLP v. Charney*, 15 Misc.3d 1128(A), 841 N.Y.S.2d 222, 2007 WL 1240437, *5 (Sup. Ct. N.Y. Cnty. 2007) ("The law is equally clear that no fiduciary duties exist between an employer and an at-will employee" and concluding that employee who "sa[id] embarrassing things and leak[ed] confidential firm documents to the press" did not have fiduciary duty to the firm) (collecting cases), *with Shamrock Power Sales, LLC v. Scherer*, No. 12-cv-8959 (KMK), 2015 WL 5730339, at *20 (S.D.N.Y. Sept. 30, 2015) (employee owed employer fiduciary duty as a matter of law) (collecting cases). Here, however, Lindberg has not even alleged that the staffers or operatives were his employees.

[136]

Compl. at ¶ 52.

[137]

*Goel v. U.S. Dep't of Just.*, No. 03-cv-0579 (HB), 2003 WL 22471945, at *2 (S.D.N.Y. Oct. 30, 2003) (internal quotation marks omitted) (concluding that government did not owe confidential informant a fiduciary duty despite assurance that informant's privacy would be protected) (*quoting Wiener v. Lazard Freres & Co.*, 241 A.D.2d 114, 122, 672 N.Y.S.2d 8, 14 (1st Dep't 1998)).

to "set forth facts and circumstances in the complaint demonstrating that the [she] became uniquely vulnerable and incapable of self-protection regarding the matter at issue."[138] Lindberg entirely fails to allege such facts here.[139] Accordingly, he fails to claim plausibly that the *Journal*'s sources owned him a fiduciary duty.

　　　　In addition, even assuming that Lindberg had alleged sufficiently that these sources owed him contractual or fiduciary duties, he fails to claim plausibly that the *Journal* reporters knew about these obligations. That is fatal to both claims, which require that Dow Jones had "actual knowledge" of the sources' confidentiality obligations.[140] With regard to tortious interference,

---

[138]

> *Marmelstein*, 11 N.Y.3d at 22. *See also Guice-Mills v. Forbes*, 21 Misc.3d 599, 604, 863 N.Y.S.2d 874, 878 (Sup. Ct. N.Y. Cnty. 2008) (no fiduciary relationship when defendant "learned of plaintiff's criminal record while acting as her Pastor, and then intentionally distributed that information to the Church congregation" where there were no facts indicating "that plaintiff, as a congregant, became uniquely vulnerable and incapable of self-protection as a result of her relationship with defendant.").

[139]

> While the complaint notes that the Second Article referred to some sources as "former security staffers" (Compl. at ¶ 49), Lindberg does not allege that these "security staffers" were providing personal security services on his behalf. In any case, he has not pointed to any cases holding that the provision of personal security services creates a fiduciary duty and the Court is aware of none.

[140]

> *See Glob. Mins. & Metals Corp. v. Holme*, 35 A.D.3d 93, 101-2, 824 N.Y.S.2d 210, 217 (1st Dep't. 2006) (To state a claim for aiding and abetting a breach of fiduciary duty "[a]ctual knowledge, as opposed to merely constructive knowledge, is required and a plaintiff may not merely rely on conclusory and sparse allegations that the aider or abettor knew or should have known about the primary breach of fiduciary duty."). *See also In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005) ("actual knowledge" required to state a claim for by aiding and abetting a breach of fiduciary duty). The same is true with regard to tortious interference. *See Wellington Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC*, No. 14-cv-7529 (RJS), 2016 WL 5414979, at *4 (S.D.N.Y. Mar. 18, 2016) ("In order to meet the second element of a tortious interference with contract claim, it is not sufficient 'for a plaintiff to show that a defendant has constructive knowledge of a contract; rather, there must be evidence of *actual* knowledge.'" (emphasis in original) (*quoting Roche Diagnostics GmbH v. Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013)).

allegations of "actual knowledge" "may not consist of conclusory assertions of knowledge" or "pleadings based solely on information and belief."[141] Critically, "[c]laims that a defendant should have known about a contract or its terms 'as a matter of course' or based on 'common practice' within an industry are . . . insufficient."[142]

The "actual knowledge" requirement for aiding and abetting a breach of fiduciary duty is similar. "The tort of aiding and abetting [a] breach[] of a common law duty does not encompass a 'should have known' standard."[143] "Actual knowledge, not mere notice or unreasonable unawareness, is therefore essential."[144] And like with tortious interference, actual knowledge cannot be alleged "on information and belief" or "according to standard industry practice."[145]

---

[141]
 *Taboola, Inc. v. Ezoic Inc.*, No. 17-cv-9909 (PAE), 2020 WL 1900496, at *10 (S.D.N.Y. Apr. 17, 2020) (cleaned up).

[142]
 *Id. See also Wellington*, 2016 WL 5414979, at *4 ("industry practice is not sufficient to show actual knowledge" of a contract) (*citing Medtech Products Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797, 814 (S.D.N.Y. 2008) (rejecting the argument that a defendant "'knew or should have known' about the contracts because it is a 'sophisticated entity' familiar with the concept of confidentiality agreements" as "mere speculation unsupported by the specific allegations of actual knowledge necessary to survive a motion to dismiss a claim of tortious interference with contractual relations.")).

[143]
 *Ferring B.V. v. Allergan, Inc.*, 4 F. Supp. 3d 612, 623-4 (S.D.N.Y. 2014) (knowledge of fiduciary duties cannot be inferred from knowledge of a business relationship or employment).

[144]
 *Hongying Zhao v. JPMorgan Chase & Co.*, No. 17-cv-8570 (NRB), 2019 WL 1173010, at *3 (S.D.N.Y. Mar. 13, 2019) (subsequent history omitted) (*citing Samuel M. Feinberg Testamentary Tr. v. Carter*, 652 F. Supp. 1066, 1082 (S.D.N.Y. 1987)).

[145]
 *MLSMK Inv. Co. v. JP Morgan Chase & Co.*, 431 F. App'x 17, 19-20 (2d Cir. 2011). *See also Glob. Mins.*, 35 A.D.3d at 102 (knowledge of a business relationship did not establish that the defendant "knew his dealings . . . violated any agreements or his fiduciary duties.").

Lindberg's allegations entirely fail to plead actual knowledge for either claim. He alleges only that reporters acting on Dow Jones' behalf "would not have been strangers to interacting with potential sources who were constrained by what records or information they could provide because of an existing confidentiality or non-disclosure agreement" because they were "investigative journalists with a major international daily newspaper."[146] Based on these facts, he alleges that "[u]pon information and belief . . . Defendant . . . [was] aware of the existence of these agreements and fiduciary relationships."[147] At most, these allegations suggest that Dow Jones' reporters might have known or could have known about the purported confidentiality obligations. That is wholly insufficient to establish actual knowledge. Accordingly, Lindeberg's claims for tortious interference with contracts and aiding and abetting breaches of fiduciary duty are dismissed.

### Conclusion

For the forgoing reasons, defendant's motion to dismiss [Dkt. 12] is granted. Plaintiff may move for leave to file an amended complaint, which shall be attached to any such motion, on or before September 13, 2021.

SO ORDERED.

Dated: August 11, 2021

_____
Lewis A. Kaplan
United States District Judge

---

[146]     Compl. at ¶ 51.

[147]     *Id.* at ¶ 52.