UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GREG E. LINDBERG

                Plaintiff,

          -against-

DOW JONES & COMPANY, INC.,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

20-cv-8231 (LAK)

## MEMORANDUM OPINION

Appearances:

        Aaron Z. Tobin
        Michael Merrick
        CONDON TOBIN SLADEK THORNTON, PLLC
        *Attorneys for Plaintiff*

        Charles A. Gruen
        LAW OFFICES OF CHARLES A. GRUEN
        *Attorney for Plaintiff*

        Robert P. LoBue
        PATTERSON, BELKNAP, WEBB & TYLER LLP
        *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        This case involves two articles published in *The Wall Street Journal* (the "*Journal*")

regarding Greg Lindberg's business and romantic pursuits.  The matter is before the Court on

Lindberg's motion for leave to file an amended complaint against Dow Jones & Co. Inc. ("Dow

Jones"), the publisher and owner of the *Journal*.

### *Factual Background*

Lindberg is the founder and sole owner of the Global Growth investment firm and its portfolio of affiliated companies, which includes a number of large insurance companies. In late 2018, two *Journal* reporters reached out to Lindberg for comment on a story they were preparing regarding those insurance companies.[1] Lindberg claims that his advisers answered many questions and provided information to the *Journal* reporters over the course of several months.[2] Following that exchange, the *Journal,* in early 2019, published its first article about Lindberg (the "First Article").[3] It reported that Lindberg had diverted $2 billion from the Global Growth insurance companies for his personal use by causing those companies to lend money to affiliated entities that he owned.[4]

After that article was published, Lindberg's attorney sent the *Journal* reporters a letter requesting that they correct certain allegedly false statements in the First Article.[5] In particular, the letter disputed the *Journal*'s report that "money" had been "invested in 'insolvent' affiliates."[6] In support of that assertion, the letter claimed that "[a] big [four] accounting firm valued all of Mr. Lindberg's material affiliated assets and reported pre-tax net worth of $1.7 billion as of

---

[1]

Proposed Amended Complaint [Dkt. 28-1] (hereinafter "PAC") at ¶ 38.

[2]

*Id.* at ¶ 40.

[3]

*Id.* at ¶ 41.

[4]

*Id.*

[5]

*Id.* at ¶ 42.

[6]

Letter from A. Tobin [Dkt. 28-1, Ex. 1] at 2.

[December 31, 2017]" and that "[a]nother well-known third-party valuation firm reached a similar result in January of 2018."[7]  Another portion of the letter claimed that "Mr. Lindberg personally invested tens of millions of dollars in capital to enhance the credit quality of [his insurers'] loans."[8]  The *Journal* declined to make any substantive changes to the First Article.[9]

On October 3, 2019, the *Journal* published a second article about Lindberg, titled: "'Active Interest': Insurance Tycoon Spied on Women Who Caught His Eye" (the "Second Article").[10]  According to that article, Lindberg had paid surveillance operatives to trail various women, including his former fiancé and women whom he had identified on Instagram.[11]  It claimed that these operatives "tail[ed] the women up to 24 hours a day, taking surreptitious photos and sometimes putting GPS trackers on their vehicle."[12]  It reported also that one surveillance operative had enrolled in the culinary school that Lindberg's former fiancé – referred to as MM – attended, albeit without MM's knowledge.[13]

The Second Article explained that the *Journal* had obtained this information primarily from former surveillance operatives, who had provided reporters with the dossiers and internal chat

---

[7]      *Id.*

[8]      *Id.*

[9]      PAC at ¶ 43.

[10]     *Id.* at ¶ 47.

[11]     Second Article [Dkt. 34-2] at ¶¶ 35, 65.

[12]     *Id.* at ¶ 3.

[13]     *Id.* at ¶ 70.

threads discussing the surveillance operations.[14]   The *Journal* reported that it had contacted women who had been subjects of those dossiers.[15]   According to the Second Article, "[s]ome said they were aware of the surveillance, while others were surprised by its extent."[16]   It noted also that one woman had told the *Journal* that she was "'aware to a certain extent' of the surveillance."[17]

In addition to publishing those statements, the Second Article included comments from Lindberg's attorney and spokesperson.   For example, it published his attorney's assertion that "security cameras were installed in a few instances in apartments – not only with the women's prior knowledge and consent but also at their request."[18]   And it quoted Lindberg's spokesperson's claim that "[a]ll security services provided [to MM] . . . were with her full cooperation and consent."[19]

Finally, it referenced the First Article and noted that state and federal authorities were investigating the financial status Lindberg's insurance companies.[20]   In that regard, it stated that "[r]egulators fear many of the loans to Mr. Lindberg's businesses may be uncollectible and that the financial hole at his insurers could exceed $1 billion."[21]

---

[14]
    *Id*. at ¶¶ 16, 32-34.

[15]
    *Id*. at ¶¶ 16-17.

[16]
    *Id*.

[17]
    *Id*. at ¶ 20.

[18]
    *Id*. at ¶ 46.

[19]
    *Id*. at ¶ 72.

[20]
    *Id*. at ¶¶ 8-9.

[21]
    *Id*. at ¶ 9.

5

According to Lindberg, the information in the Second Article was obtained, in part, from Jeffrey Serber and Trent Trennepohl, who had worked as security contractors at Apex International, LLC ("Apex"), a security firm owned by Lindberg.[22] Apex allegedly provided Lindberg and his family with close protection services, which he defines as including physical protection, driving, advance detail, location scouting and reconnaissance, and protective intelligence.[23] Lindberg claims that Serber and Trennepohl "were both assigned to field work that would inform the close protection team's operation decisions."[24] In that role, he alleges that Serber and Trennepohl were privy to personal and confidential information, which they were bound to hold in confidence based on confidentiality agreements they entered into with Lindberg and Apex.[25]

On October 2, 2020, Lindberg sued Dow Jones for defamation, tortious interference with contract, and aiding and abetting breaches of fiduciary duty based on the publication of the First and Second Articles. On August 11, 2021, the Court dismissed each of these claims.[26] In particular, it concluded that claims for defamation based on the First Article were untimely.[27] In addition, it concluded that the Second Article reported on a matter of public interest and hence was subject to

---

22

PAC at ¶¶ 51-53.

23

*Id.* at ¶ 52.

24

*Id.* at ¶ 53.

25

*Id.* at ¶ 53-54.

26

*Lindberg v. Dow Jones & Co., Inc.*, No. 20-cv-8231 (LAK), 2021 WL 3605621 (S.D.N.Y. Aug. 11, 2021).

27

*Id.* at *7.

Section 76-a of New York's Civil Rights Law, which requires allegations of actual malice in such cases.[28] As Lindberg's first complaint concededly failed to allege actual malice, the Court dismissed his claim for defamation based on the Second Article without prejudice to a motion for leave to amend.[29] Finally, the Court concluded that Lindberg failed to allege facts sufficient to state a claim for tortious interference with contract or aiding and abetting breaches of fiduciary duty.[30]

Lindberg now moves for leave to file an amended complaint, which he has submitted along with his motion (the "Proposed Amended Complaint"). He claims that the proposed amendments remedy the deficiencies raised in the Court's prior decision. For the reasons discussed below, that motion is granted in part and denied in part.

## *Discussion*

### *I.  Legal Standard*

"'Proposed amendments are futile,' and thus must be denied, 'if they would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.'"[31] In assessing whether the Proposed Amended Complaint states a legally sufficient claim under Rule 12(b)(6), the Court considers whether it alleges "enough facts to state a claim for

---

28

> *Id.* at *10.

29

> *Id.*

30

> *Id.* at *14.

31

> *Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 252 (2d Cir. 2017) (quoting *Thea v. Kleinhandler*, 807 F.3d 492, 496-97 (2d Cir. 2015)).

relief that is plausible on its face."[32]  The Court accepts as true all factual allegations and draws all reasonable inferences in the plaintiff's favor.[33]

At this stage, the "court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference."[34] The Court may consider also documents on which the plaintiff "relies and which [are] integral to the complaint," even if not attached to the complaint or incorporated by reference.[35]

## II.   Defamation

Lindberg alleges that the following three statements in the Second Article were defamatory: that (1) the "financial hole at his insurers [] could exceed $1 billion," (2) Lindberg "scoured Instagram for prospective partners," and (3) MM, one of Lindberg's "interests," was subject to 'surveillance . . . without her knowledge."[36]  In addition, he contends that the Second Article was

---

[32]

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[33]

*ATSI Commc'ns. Inc. v. Shaar Fund Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[34]

*Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

[35]

*Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

Here, both *Journal* articles either are incorporated by reference or are integral to the complaint and are properly considered on this motion.  In addition, the documents attached to the amended complaint – including a February 28, 2019 letter from Aaron Tobin and the confidentiality agreements for Serber and Trennepohl – are properly considered.

[36]

PAC at ¶¶ 78, 79.

defamatory because it sought to create the impression that he "harassed, stalked and victimized women."[37]

"Under New York law, the elements of [a] defamation claim are (1) a defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party, (4) that is false, (5) made with the applicable level of fault, (6) causing injury, and (7) not protected by privilege."[38] In addition, because the Court concluded that the Second Article involves a matter of public interest under Section 76-a of New York's Civil Rights Law,[39] Lindberg must allege that any defamatory statements were made "with knowledge of its falsity or with reckless disregard of whether it was false"– i.e. with actual malice.[40]

"Despite its name, the actual malice standard does not measure malice in the sense of ill will or animosity, but instead the speaker's subjective doubts about the truth of the

---

37

*Id.* at ¶ 79.

38

*Live Face on Web, LLC v. Five Boro Mold Specialist Inc.*, No. 15-cv-4779 (LTS), 2016 WL 1717218, at *2 (S.D.N.Y. Apr. 28, 2016) (quoting *Egiazaryan v. Zalmayev*, No. 11-cv-2670, 2011 WL 6097136, at *3 (S.D.N.Y. Dec. 7, 2011) (citing *Dillon v. City of New York*, 261 A.D.2d 34, 38, 704 N.Y.S.2d 1, 5 (1s: Dep't 1999))).

39

*See Lindberg*, 2021 WL 3605621, at *10.

40

N.Y. Civ. Rights Law § 76-a(2).

"[A]n actual malice standard is imposed" for actions under section 76-a of the New York Civil Rights Law. *Guerrero v. Carva*, 10 AD3d 105, 116, 779 N.Y.S.2d 12, 21 (1st Dep't. 2004). Both parties assume that case law analyzing "actual malice" under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) is applicable to the "actual malice" requirement under section 76-a of New York's Civil Rights Law. In addition, New York courts have applied the *New York Times* standard in interpreting "actual malice" under section 76-a. *See e.g.*, *Singh v. Sukhram*, 56 A.D.3d 187, 194, 866 N.Y.S.2d 267, 274 (2nd Dep't. 2008); *Sackler v. Am. Broad. Companies, Inc.*, 71 Misc. 3d 693, 700, 144 N.Y.S.3d 529, 534 (Sup. Ct. N.Y. Cnty. 2021). Accordingly, this Court does the same.

publication."[41]  "If it cannot be shown that the defendant knew that the statements were false, a plaintiff must demonstrate that the defendant made the statements with reckless disregard of whether they were true or false."[42]  "The reckless conduct needed to show actual malice 'is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing,' but by whether . . . 'the defendant in fact entertained serious doubts as to the truth of his publication.'"[43]  Put in other words, "the basic question for determination by the court is: Did the defendant lie?"[44]

*A.*     *Statement Regarding Lindberg's Insurance Companies*

Lindberg contends that the Second Article was defamatory because it claimed that "Lindberg and his businesses had been operating in an unethical, unsavory or legally dubious manner, by falsely reporting that there was a 'financial hole at his insurers [which] could exceed $1 billion.'"[45]  Read in full, the challenged statement was that "[r]egulators fear many of the loans to

41

> *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (citing *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 510 (1991) ("Actual malice under the *New York Times* standard should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will.").

42

> *Id.*

43

> *Id.* (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)).  *See also Sackler*, 144 N.Y.S.3d at 534.

44

> Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER AND RELATED PROBLEMS § 5:5.1 (5th ed. 2017) (hereinafter "SACK ON DEFAMATION").

45

> PAC at ¶ 78.

> Lindberg argues for the first time in his reply brief that the Second Article was defamatory

10

Mr. Lindberg's businesses may be uncollectible and that the financial hole at his insurers could exceed $1 billion, according to a person familiar with the matter."[46]  Thus, the Second Article did not say that there was a $1 billion financial hole in Lindberg's businesses.  Rather, it said that "a person familiar with the matter" had said that "regulators fear[ed]" that loans to Lindberg's businesses might "be uncollectible" and, if they did prove uncollectible, the resulting "financial hole" "could exceed $1 billion."  Accordingly, Lindberg's proposed pleading relies on a substantial mischaracterization of this aspect of the Second Article, a mischaracterization from which he proceeds to argue that his insurers were financially sound.  But even accepting, solely for the purpose of argument, Lindberg's mischaracterization, this claim would fail because the Proposed Amended Complaint fails to allege that any suggestion of a "financial hole" was made with "knowledge of its falsity or with reckless disregard of whether it was false" as required by Section 76-a of New York's Civil Rights Law.

---

because it implied that he had diverted assets from his insurers and concealed that practice from regulators.  Reply Br. at 2 n.2.  However, the Proposed Amended Complaint alleges only that the *First Article* conveyed those defamatory statements and/or implications.  *See* PAC at ¶ 41.  And the Court ruled previously that any defamatory statements in the First Article were untimely and not republished by the Second Article unless reiterated therein. *Lindberg*, 2021 WL 3605621, at *5.  As the Court explained then, Lindberg had not claimed that "any statements in the Second Article repeated – verbatim or in substance – the statements in the First Article that Lindberg claims were defamatory."  *Id*. at *5 n. 63.  The Proposed Amended Complaint is unchanged in that regard.  Instead, it alleges that the Second Article "sought to reinforce the impression that Lindberg and his businesses had been operating in an unethical, unsavory or legally dubious manner, *by falsely reporting that there was a 'financial hole at his insurers [which] could exceed $1 billion*,'" and claiming that "*this statement* was essentially a repackaging of the defamatory statements published in connection with the First Article."  PAC at ¶ 67-68.  Those allegations are based only on the implications of the "$1 billion hole" statement.

46

Second Article at ¶ 9.

The parties primarily dispute whether that statement is actionable, false, and/or defamatory. However, it is unnecessary to reach those issues because Lindberg fails to allege that the *Journal*'s supposed report of a $1 billion hole at his insurance companies was made "with knowledge of its falsity or with reckless disregard of whether it was false" as required under Section 76-a of New York's Civil Rights Law.[47]

In an attempt to support his claim that his mischaracterization of the article was false, Lindberg's Proposed Amended Complaint points to an array of facts that purportedly demonstrate that his insurers were financially sound, including allegations that:

- "There had never been a 'going concern' or 'insolvency' opinion on any borrower where Lindberg maintained a significant economic interest."[48]

- "[T]he domestic insurers held over $2 billion of cash, cash equivalents, and liquid bonds."[49]

- "[A] report from a well-recognized national valuation firm found that, as of December 31, 2019, Global Growth's assets were between $860 million and $1.46 billion on a fair market value basis."[50]

---

[47]

N.Y. Civ. Rights Law § 76-a(2).

[48]

PAC at ¶ 41(2).

[49]

*Id.* at ¶ 41(4).

[50]

*Id.* at ¶ 67.

- "Lindberg had committed to personally backstopping or guaranteeing all transactions with affiliated companies with his entire net worth, which had been independently valued by a third party at $1.7 billion."[51]

However, even assuming that these allegations would have been sufficient to allege that the supposed report of a $1 billion hole at his insurers was false, Lindberg's claim would fail because he does not allege that the *Journal* reporters knew the bulk of that information when they published the Second Article. Instead, Lindberg's allegations of actual malice are based solely on a February 28, 2019 letter that Lindberg's attorney sent to Dow Jones' general counsel.[52] In relevant part, that letter claimed that "[n]o money was ever invested in 'insolvent' affiliates."[53] In support of that assertion, it explained that "[a] big [four] accounting firm valued all of Mr. Lindberg's material affiliated assets and reported pre-tax net worth of $1.7 billion as of [December 31, 2017]" and that "[a]nother well-known third party valuation firm reached a similar result in January of 2018."[54] Finally, the letter stated also that "Mr. Lindberg personally invested tens of millions of dollars in capital to enhance the credit quality of [his insurers'] loans."[55]

Critically, however, that letter did not explain why Lindberg's personal wealth was relevant to his insurance companies' financial status. Lindberg now alleges that he "committed to

---

[51]

*Id.* at ¶¶ 41(4), 67.

[52]

*Id.* at ¶¶ 42, 68.

[53]

Letter from A. Tobin at 2.

[54]

*Id.*

[55]

*Id.*

personally backstopping or guaranteeing all [of the insurers'] transactions with affiliated companies,"[56] but he does not allege that the *Journal* reporters knew that. And while he informed the *Journal* that he had invested "tens of millions of dollars" to "enhance the credit quality" of the insurers' loans,[57] any such investment would have been consistent with the existence of a $1 billion financial hole. Accordingly, even assuming, contrary to fact, that the Second Article had said that there in fact was a $1 billion financial hole -- and, as we have seen, it said only that some regulators feared that there might be such a hole if loans proved uncollectible -- this aspect of the proposed pleading would fail because it does not allege facts supporting a conclusion that the *Journal* reporters "entertained serious doubts" that there in fact was any such hole.

> *B.      Statements Regarding Lindberg's Surveillance of Women*

Lindberg claims next that he was defamed by the Second Article's report that he "scoured Instagram for prospective partners" and that his fiancé, MM, was subject to surveillance without her knowledge,[58] thus implying that he stalked, harassed and victimized women. Once again, however, Lindberg's proposed amendment fails to allege that any statements in the article were published with actual malice.

In arguing the contrary, Lindberg contends primarily that the *Journal* reporters were reckless in publishing "speculative" and "outrageous" information obtained from sources with an

---

[56]

PAC at ¶ 41(4).

[57]

Letter from A. Tobin at 2.

[58]

PAC at ¶ 79.

14

interest in harming him, such as Serber, Trennepohl, and Lindberg's ex-wife.[59]   However, "[k]nowledge of [a source's] ill-will does not by itself prove knowledge of probable falsity."[60]   And the information reported by the Second Article was simply "not of such an extraordinary nature as would suggest a high probability of falsity."[61]

Moreover, "[w]hile reliance on . . . unreliable sources without further investigation may support an inference of actual malice," that is the case only where publications "containing the allegedly defamatory statements were based 'wholly' on information from unverified . . . sources."[62]   Here, Lindberg does not contend that was the case.  In fact, he alleges only that the *Journal* relied "primarily" on biased sources.[63]   Moreover, he asserts that those sources provided the *Journal* with

---

[59]

   *Id.* at ¶ 71.

[60]

   *Hotchner v. Castillo-Puche*, 551 F.2d 910, 914 (2d Cir. 1977).  *See also Gross v. New York Times Co.*, 281 A.D.2d 299, 299, 724 N.Y.S.2d 16, 17 (1st Dep't 2001) (explaining that the fact that "some of [defendant's] sources may have borne plaintiff ill will[] is not probative of actual malice").

[61]

   *Hotchner*, 551 F.2d at 913.

[62]

   *Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015) (quoting *St. Amant*, 390 U.S. at 732).

[63]

   PAC at ¶ 71.

   In addition, Lindberg alleges facts indicating only that the *Journal* reporters may have known that Trennepohl was biased against him.  *See id.* at ¶ 65 ("Trennepohl posted disparaging comments about Lindberg on Facebook").  However, he has not alleged that the reporters were aware of any information indicating that Serber or Lindberg's ex-wife were biased against him, aside from the fact that Serber was terminated from Lindberg's company and Lindberg was presumably divorced from his ex-wife.  *See id.* at ¶ 52.  That is insufficient to allege plausibly that the *Journal* reporters were "subjectively aware that the[se] source [were] unreliable."  *BYD Co. Ltd. v. VICE Media LLC*, No. 20-cv-3281 (AJN), 2021 WL 1225918, at *9 (S.D.N.Y. Mar. 31, 2021) (citation omitted).

dossiers and internal chat threads describing the surveillance operations.[64]  And significant portions

of the Second Article quoted and relied on those sources, which Lindberg does not allege were false

or falsely attributed.[65]  Accordingly, he has not claimed plausibly that the *Journal* reporters recklessly

disregarded the truth of the information published in the Second Article.

In addition, while Lindberg does allege that the *Journal* reporters were aware of

certain information that would have portrayed him in a better light,[66] most of that information

actually was included in the Second Article.  In particular, the *Journal* reported that some of the

women "said they were aware of the surveillance, while others were surprised by its extent,"[67] and

that one women said that she was "'aware to a certain extent' of the surveillance."[68]  Moreover, the

article included statements indicating that certain surveillance efforts – such as the installation of

security cameras in some women's homes – was done with the women's knowledge and consent.[69]

Finally, it included Lindberg's spokesperson's assertion that "[a]ll security services provided [to

---

[64]

PAC at ¶¶ 60, 63.

[65]

*See e.g.*, Second Article at ¶¶ 16, 18-19, 48-49, 57, 69, 71.

[66]

PAC at ¶ 72 (alleging that "many of the women . . . advis[ed] Defendant that they were aware of the surveillance and that Lindberg had treated them kindly").

[67]

Second Article at ¶ 17.

[68]

*Id.* at ¶ 20.

[69]

*Id.* at ¶ 46 (quoting Lindberg's attorney's assertion that "security cameras were installed in a few instances in apartments – not only with the women's prior knowledge and consent but also at their request."); *Id.* at ¶ 45 (one women said that she "was aware that the security staff had installed a high-tech home-security camera inside the apartment").

MM] . . . were with her full cooperation and consent."[70]  The *Journal*'s inclusion of this information

cuts against the allegedly defamatory implication of the Second Article, "allowing readers to decide

for themselves what to conclude from the [article], [thus] making any allegation of actual malice less

plausible."[71]  Read in its entirety, "the article cannot be said to evince an intent to deliberately avoid

learning or portraying the truth."[72]

Finally, Lindberg's assertion that the *Journal* reporters were "obsessed" with him or

had a "systemic campaign of defaming" him,[73]  is not sufficient to claim plausibly that they

knowingly or recklessly published a false report about him.  "Actual malice in the common-law

sense of spite or ill will is at most evidence of malice," and the Supreme Court has cautioned that

"courts must be careful not to place too much reliance on such factors."[74]  Accordingly, conclusory

allegations that the *Journal* reporters were "out to get" Lindberg, or "harassed" sources to tell them

the "right" information, cannot, standing alone, suffice to allege actual malice.

*          *          *

---

[70]

*Id.* at ¶ 72.

[71]

*Turner v. Wells,* 879 F.3d 1254, 1274 (11th Cir. 2018).

[72]

*Cabello-Rondon v. Dow Jones & Co., Inc.*, No. 16-cv-3346 (KBF), 2017 WL 3531551, at *10 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018) (citing *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016)  ("[R]eporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice.")).

[73]

PAC at ¶ 73, 65.

[74]

SACK ON DEFAMATION § 5:5.1 (quoting *Celle v. Filipino Reporter Enters.*, 209 F.3d 163, 183 (2d Cir. 2000) and *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989)).

17

For each of the forgoing reasons, the Proposed Amended Complaint fails to allege plausibly that any of the allegedly defamatory statements were made with actual malice as required by Section 76-a of New York's Civil Rights Law. As it would be futile to allow Lindberg to amend his defamation claim, leave to amend his defamation claim will be denied.

## III. *Aiding and Abetting a Breach of Fiduciary Duty*

Lindberg alleges that Serber and Trennepohl breached their fiduciary duties by providing confidential information to the *Journal* reporters. In turn, he claims that the *Journal* reporters should be liable for aiding and abetting Serber's and Trennepohl's breaches of their fiduciary duty.

The Court previously dismissed this claim because, among other reasons, Lindberg did not allege sufficiently that Serber and Trennepohl owed him any fiduciary duties. As the Court explained, a fiduciary relationship exists "only when a person reposes a high level of confidence and reliance in another, *who thereby exercises control and dominance over him.*"[75] That standard is not met where plaintiff alleges only that the purported fiduciary received sensitive or confidential information.[76] Accordingly, the Court disagreed with Lindberg's claim that Serber's and

---

75

*Lindberg*, 2021 WL 3605621, at \*12 (emphasis added) (quoting *People ex rel. Cuomo v. Coventry First LLC*, 13 N.Y.3d 108, 115, 886 N.Y.S.2d 671, 675 (2009)).

76

*Id.* (quoting *Goel v. U.S. Dep't of Just.*, No. 03-cv-0579 (HB), 2003 WL 22471945, at \*2 (S.D.N.Y. Oct. 30, 2003)).

Trennepohl's roles as security contractors or access to sensitive personal information created a fiduciary relationship.[77]

The allegations in the Proposed Amended Complaint do not alter that conclusion. Lindberg now alleges that Serber and Trennepohl "were both assigned to field work that would inform the close protection teams operation decisions."[78]  However, he has not alleged that their "field work" placed them in a position of control or dominance over Lindberg.  Indeed, he has not provided any support for the notion that security personnel owe fiduciary duties at all, let alone contractors whose role merely "*informed*" the operations of close protection teams.

Morever, the Court already has concluded that the mere receipt of confidential or sensitive information does not create fiduciary duties.  Lindberg has not explained how his proposed amendments address that deficiency and has not provided that Court with any principled reason to depart from its prior conclusion.[79]  While Lindberg claims that he "essentially put his life in [Serber's and Trennepohl's] hands" by entrusting them with sensitive information, that allegation is entirely

---

[77]

   *Id*.

[78]

   PAC at ¶ 53.

[79]

   Lindberg's reliance on *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 767 F. Supp. 1220 (S.D.N.Y. 1991), *rev'd*, 967 F.2d 742 (2d Cir. 1992), *as amended* (Sept. 23, 1992) is entirely misplaced.  The cited portion of *Litton* noted only that confidential information received in the course of a confidential or fiduciary relationship may not be exploited for personal benefit.  *Litton*, 767 F. Supp. at 1232.  However, the court in *Litton* continued to explain that "Under New York law . . . the mere reposal of confidential information will not in and of itself transform an arm's length relationship into a fiduciary relationship . . . The fact that [plaintiff] disclosed confidential information to [another party] does not change the nature of their relationship, whatever it may have been."  *Id*. at 1233.

conclusory.[80] The fact that Serber and Trennepohl received personal information that was ultimately embarrassing or otherwise damaging to Lindberg's reputation does not create the level of dependance or control necessary to allege a fiduciary relationship.[81]

In any case, even if Lindberg had alleged that Serber and Trennepohl were his fiduciaries, he has not alleged plausibly that the *Journal* reporters had actual knowledge of their fiduciary duties. As the Court concluded previously, that is fatal to his claim.[82]

For the foregoing reasons, Lindberg's proposed amendments would not remedy the pleading deficiencies with regard to his claim for aiding and abetting breaches of fiduciary duty. Accordingly, leave to amend that claim must be denied.


*IV.    Tortious Interference with Contract*

Lindberg alleges also that the *Journal* reporters tortiously interfered with confidentiality and non-disclosure agreements that Serber and Trennepohl were bound by. As the Court noted previously, to state a claim for tortious interference with contract, Lindberg must allege "(a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach

---

[80]

PAC at ¶ 85.

[81]

Of note, Lindberg has not alleged that Serber and Trennepohl owed him fiduciary duties based on the confidentiality agreements that they entered into. In addition, he has not pointed to any cases concluding that the existence of a confidentiality agreement, standing alone, is sufficient to establish a fiduciary relationship under New York law.

[82]

*See Lindberg*, 2021 WL 3605621, at *14.

resulted in damage to the plaintiff."[83]  The Court previously dismissed Lindberg's claim because he failed to identify the contractual provisions that the *Journal* allegedly interfered with and failed to allege that the *Journal* reporters were aware that Serber and Trennepohl were bound by confidentiality agreements.[84]

Lindberg's Proposed Amended Complaint has remedied those deficiencies.  First, he has attached Serber's and Trennepohl's confidentiality agreements to his amended complaint and points to the provisions in those agreements that he contends were violated.[85]  Furthermore, he alleges that Serber sent a copy of his confidentiality agreement to the *Journal* reporters and raised concerns with providing information based on that agreement.[86]  That is sufficient to allege that the *Journal* reporters had actual knowledge of Serber's obligations.  Likewise, Lindberg's allegations are sufficient to claim plausibly that the *Journal* reports knew that Trennepohl – who was employed in the same capacity as Serber – was bound by the same confidentiality obligations.[87]  Furthermore, the Proposed Amended Complaint includes allegations describing the *Journal* reporters' efforts to

---

[83]    *Id.* at *11 (quoting *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996)).

[84]    *Id.* at *11, *14.

[85]    PAC at ¶ 54 (citing Dkt. 28-1, Ex. 3-4).

[86]    *Id.* at ¶ 57.

[87]    *Id.* at ¶ 59.

encourage and enable Serber and Trennepohl to provide them with confidential information in violation of their confidentiality agreements.[88]  Those allegations are sufficient to state a claim.

Dow Jones emphasizes that "New York courts have recognized that, in limited cases, liability for tortious interference may be cut off if the conduct was justified."[89]  However, that does not necessarily preclude recovery here.  Whether or not a defendant's conduct is justified under New York law depends on a "balancing of factors to determine whether the interference was justified under the circumstances of the particular case.  These factors include: the nature of the defendant's conduct, the defendant's motive, the interests of the plaintiff with which the defendant interferes, the interests the defendant seeks to advance, the social interests at stake, the proximity of the defendant's conduct to the interference, and the relations between the parties."[90]  In applying these

---

[88]

Whether Serber or Trennepohl were predisposed to breach their confidentiality agreements and would have done so regardless of defendant's conduct turns on factual issues that cannot be decided at this stage.  *C.f. Trahan v. Lazar*, 457 F. Supp. 3d 323, 359 (S.D.N.Y. 2020).  Lindberg alleges that the *Journal* reporters procured Serber's and Trennepohl's breaches by providing encouragement, assurances, and arranging for the confidential transmission of information.  PAC at ¶¶ 57-59, 61-63.  These allegations, at the very least, raise factual questions regarding the cause of Serber's or Trennepohl's breaches that preclude dismissing this claim.

[89]

*Rich v. Fox News Network, LLC*, 939 F.3d 112, 129 (2d Cir. 2019) (explaining that "news gathering may well be . . . protected," from claims for tortious interference with contract, but declining to "consider whether New York law would recognize news gathering as a justification for tortious interference with contract. For, even if it did, the [plaintiffs] unquestionably allege malice sufficient to overcome any such possible justification.").

[90]

*Jews for Jesus, Inc. v. Jewish Cmty. Rels. Council of New York, Inc.*, 968 F.2d 286, 292-93 (2d Cir. 1992) (citing *Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 406 N.E.2d 445, 448, 428 N.Y.S.2d 628, 631-32 (1980) and Restatement (Second) of Torts § 767 (1979)). *See also Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, No. 16-cv-2767 (GBD), 2019 WL 1649983, at *15 (S.D.N.Y. Mar. 28, 2019).

factors, courts are called upon to determine whether the "'exercise of [an] equal or superior right" justifies interference with a plaintiff's contractual rights.[91]

Given the fact specific nature of this inquiry, the Court disagrees with Dow Jones' assertion that any conduct in the course of news gathering or reporting necessarily justifies interferences with contractual obligations.[92]  As the First Department has recognized, the "First Amendment is not a shibboleth before which all other rights must succumb."[93]  Accordingly, the Court cannot conclude as a matter of law that Dow Jones' interests – however lawful or desirable they may be – outweigh Lindberg's interest in preserving his contractual relationships.

For similar reasons, the Court disagrees with Dow Jones' argument that the First Amendment bars all claims – such as Lindberg's – based on new gathering or reporting activities. The law in this Circuit is that "torts committed in news gathering are not protected" by the First Amendment."[94]  "There is no threat to a free press in requiring its agents to act within the law."[95]

---

[91]

*Id.* (quoting *Foster v. Churchill*, 87 N.Y.2d 744, 750, 665 N.E.2d 153, 157 (N.Y. 1996)).

[92]

The Court recognizes that New York courts have in some cases dismissed claims for tortious interference with contract where defendant's conduct "was incidental to the lawful and constitutionally protected process of news gathering and reporting." *Highland Capital Mgmt., L.P. v. Dow Jones & Co.*, 178 A.D.3d 572, 574, 116 N.Y.S.3d 18, 20 (1st Dep't 2019).  However, under *Jews for Jesus*, whether a similar result is warranted in this case turns on factual issue that cannot be decided on a motion to dismiss.  968 F.2d at 292-93,

[93]

*Le Mistral, Inc. v. Columbia Broad. Sys.*, 61 A.D.2d 491, 494, 402 N.Y.S.2d 815, 817 (1st Dep't. 1978).

[94]

*Galella v. Onassis*, 487 F.2d 986, 995 (2d Cir. 1973).  *See also Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971) ("[t]he First Amendment has never been construed to accord newsmen immunity from torts or crimes committed during the course of news-gathering.").

[95]

*Galella*, 487 F.2d at 996.

Moreover, as noted above, New York law already allows Court's to weigh the importance of news gathering activities in assessing whether a defendant's interference with a contract is justified. Dow Jones therefore has not established that a complete bar to all claims arising from news gathering or reporting is essential to the freedom of the press.

Finally, the Court is satisfied that Lindberg's request to amend his tortious interference claim is not made in bad faith or other improper purpose, substantially for the reasons stated in Lindberg's memorandum of law and reply brief. Accordingly, leave to amend is granted solely with regard to Lindberg's claim for tortious interference with contract.

### *Conclusion*

For the forgoing reasons, plaintiff's motion for leave to amend [Dkt. 27] is granted with regard to plaintiff's claim for tortious interference with contract. It is denied in all other respects. The amended complaint shall be deemed served as of today.

SO ORDERED.

Dated: November 22, 2021

_____
Lewis A. Kaplan
United States District Judge